**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* | ) | |
| **PETER HUESEMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **5:14-cv-00212-XR** |
| | ) | |
| **v.** | ) | **Judge Xavier Rodriguez** |
| | ) | |
| **PROFESSIONAL COMPOUNDING** | ) | |
| **CENTERS OF AMERICA, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS
THE GOVERNMENT'S COMPLAINT IN PARTIAL INTERVENTION**

---

Defendant, Professional Compounding Centers of America, Inc. ("PCCA"), respectfully submits this Reply in Support of its Motion to Dismiss (the "Motion") the Government's Complaint In Partial Intervention (Dkt. 66) ("government's Complaint" or "Complaint") under Federal Rules of Civil Procedure 12(b)(6), 8, and 9(b).

## INTRODUCTION

Between its Complaint in Partial Intervention (Dkt. 66) and its Response (Dkt. 91), the government has spent over 110 pages trying to explain its case, and yet PCCA remains wholly unaware of the government's position on how AWP **should be** calculated.  The government simply asks the Court to accept, at face value and without any legal support, that AWP should not have been what PCCA reported to third party publishers.  This is not enough.  If the Court cannot answer the simple question – "What is AWP and how it is appropriately calculated?" – then dismissal of the government's Complaint is warranted and appropriate.  If PCCA is not on notice now as to how it should appropriately calculate AWP according to the government, how can the Court find that it had requisite notice a decade ago when the government alleges it set AWPs in violation of a standard the government still cannot define?

Moreover, the government argues that since 2003 PCCA should have been on notice that the complained of conduct was problematic, but that that same knowledge cannot not be equally attributed to TRICARE, who was aware of allegedly inflated AWPs in the pharmaceutical industry and its contractor's alleged role in promoting those AWPs. Not to mention, **it adopted a reimbursement methodology based on AWP and chose that very same contractor to adjudicate claims** despite that knowledge.  After *Escobar*, the government can no longer claim fraud if it had knowledge of the alleged conduct and continued to routinely pay claims allegedly tainted by that conduct. *Universal Health Servs., Inc. v. United States ex rel. Escobar,* 579 U.S. 176 (2016). In the end, it is the government and not PCCA that is asking for a "get out of jail free"

card, hoping to skirt, obfuscate and ultimately avoid responsibility for its own knowing violation of its regulations and its knowing payment of allegedly inflated claims based on a payment methodology it selected despite full knowledge of industry practice related to AWPs.

## ARGUMENT

### I.  The Government Misapprehends and Seeks to Extend the Scope of the Anti-Kickback Statute To Absurd Limits

The government misapprehends and improperly seeks to expand the scope of the Anti-Kickback Statute ("AKS") beyond reasonable bounds. The government asserts PCCA's argument that the government has not pleaded a reimbursable item is a red-herring. In response, the government itself inserts several red herrings in order to divert the Court's attention from the reality that the government has not, and cannot allege or argue a fundamental requirement: that PCCA sold a single item for which payment  may be made by TRICARE.[1]  While the language of the AKS extends to any "person," its language carefully circumscribes the types of items and services it is intended to cover and PCCA does not produce or sell any such items.

In one of its numerous red herring arguments, the government argues that "[u]nder PCCA's reading, nothing would prevent a drug manufacturer from paying kickbacks to induce doctors to prescribe medically unnecessary drugs, while causing and intending federal health care programs to pay hundreds of millions of dollars for those prescriptions." Dkt. 91 at 16.  This is simply not true. However, this particular red-herring is consistent with the government's attempts throughout its Complaint and Response to moor its wayward ship to ports that provide no shelter. Simply put, PCCA's sale of active pharmaceutical ingredients is materially different than the government's example of a pharmaceutical manufacturer paying kickbacks to induce the prescription of

---

[1] The lack of precedent noted by the government may fairly be attributable to the fact that the government itself recognizes this fundamental requirement and historically has avoided bringing cases under the AKS where no reimbursable item or service is at issue.

medically unnecessary pharmaceuticals. As described in detail in PCCA's Motion to Dismiss, PCCA does not sell any product that is reimbursable as a matter of law nor even reimbursed in fact by TRICARE. The products sold by pharmaceutical manufacturers, like Pfizer, are themselves reimbursable, and are frequently reimbursed, as Pfizer produces and sells them. PCCA is not arguing that medically unnecessary orders of otherwise covered items would not give rise to an AKS violation.[2] PCCA's position is what the GAO found and the Department of Defense concurred, that, regardless of necessity, PCCA's products **have never been paid for** by TRICARE or any federal program. The government suggests that "the phrase 'payment may be made' means the AKS applies when payment under a federal health care program is contemplated, possible, or 'could' be made." Dkt. 91 at 28. Active pharmaceutical ingredients, as sold by PCCA, are, at best, items used in products that were reimbursed by TRICARE in violation of its own regulations.

The AKS does not extend to PCCA's products even under the government's theory, because payment for the products that PCCA **actually sells** is not "contemplated" by TRICARE, is not "possible" under its regulations, and "could" never be (and has never been) made. The government's proposed expansion of the concept of "program related business" would essentially extend the AKS to any consumer product or service sold to pharmacies and pharmaceutical manufacturers (or any type of provider or supplier doing federal health care business). In the government's view, the AKS would extend to the printer used to print prescriptions in the pharmacy, the machines used in the actual manufacture of finished pharmaceutical products, and – as noted in PCCA's motion – the candy bar sold in the retail space of a pharmacy. Similarly, it would extend the ambit of the AKS to the wifi service used at a pharmacy or manufacturing

---

[2] The government's ability to prosecute kickback schemes involving the prescription of medically unnecessary medications goes directly to the type of over-utilization concerns that drove the initial passage of the AKS. The example is clearly a red herring because the government makes no allegations regarding medically unnecessary compounded medications in its Complaint.

facility, the maintenance work on the refrigerator in the employee lounge and the janitorial service used to clean offices at a pharmaceutical manufacturing facility.  It is doubtful that Comcast, or Kit Kat are on notice that the government now believes they are subject to the severe criminal and civil ramifications of the AKS simply for doing business with those that do "program related business."  Similarly, having, for its entire existence, repackaged and sold products that no federal program has ever paid for, PCCA was not on notice that the AKS would have applied to its products.[3]  The government's unavailing arguments to the contrary in its Response do nothing to cure this deficiency in the allegations of its Complaint.

## II.  The Government's Arguments Regarding Implied Certification and Materiality are Bizarre, Unavailing and do not Cure its Deficient FCA Allegations

The government argues that it can plausibly state an FCA action against PCCA if it alleges that PCCA's customers had knowledge of the falsity of implied certifications allegedly made to TRICARE.  Dkt. 91 at 44.  Indeed, the government alleges that it need not even plead that PCCA was aware of the requirements it was allegedly causing its customers to violate.  *Id.* at n. 11.  The government has not alleged any conspiracy, nor tied PCCA's knowledge in any way to the knowledge of its customers.  Instead, the government makes an argument as to the knowing misrepresentations allegedly made by PCCA's customers, and simply claims it does not have to plead that PCCA knew anything about these certifications.[4]  This is a convenient argument for the

---

[3] PCCA is not seeking a "get out of jail free card."  Taken as true and without further context, Exhibit 19 to the complaint suggests PCCA felt its competitor's conduct of raising AWP might be bad for the system, but it was legal.  That said, the Exhibits as a whole clearly show that PCCA was reacting to an unregulated market created by the government itself.  PCCA is, then, rather looking for a more fundamental "card" with respect to due process – a "the government cannot prosecute you for reasonably responding to its own unlawful conduct" card.

[4] The government, on page 30 of its response, demonstrates the odd inconsistency in the allegations of its complaint.  It cites to paragraph 44 of the complaint as support for the representations made by PCCA's customers when submitting a claim, but then cites to paragraphs 64 and 191 as support that the claims submitted did not disclose the disparity between the AWP and the selling prices of the ingredients.  The government's latter representation to the Court seems spurious given that the former clearly states that a claim for compounded medication required the customer to list "the pricing information for the ingredient."  The government nowhere alleges that the required information was not submitted on the claims, nor that the amount listed by PCCA's customers was not truthful.

government (since they do not allege that PCCA knew about any certifications, the requirements the certifications allegedly violated, or even that the certifications were being made), but ultimately the argument is not supported by the plain language of the FCA, or the cases on knowledge cited by PCCA in its Motion. Dkt. 84 at 18-20, 32-45.

The government's spurious arguments on materiality flow directly from the erroneous position that it does not have to plead PCCA's knowledge. The government suggests that for the element it deems "condition of payment," PCCA caused its customers to violate certain conditions of payment. However, the government does nothing to cure the Complaint's defect of failing to allege PCCA had actual knowledge, or acted in deliberate ignorance or with reckless disregard of the conditions of payment **PCCA's customers** are alleged to have violated. The government again asks the Court to gloss over PCCA's lack of knowledge as to the "bargain" in which it was supposedly engaged with the government. The government does not just get to dispense with an element of the FCA simply because that element is detrimental to the case the government desires to pursue.

Finally, with respect to "government action" the government argues that the court must find TRICARE knew the specific fraud allegedly being perpetrated by PCCA. Even though TRICARE did know, *Escobar* does not require such a showing. 579 U.S. at 194-5.[5] General

---

Nothing in the contradiction of these allegations would support an inference by the court that PCCA's customers did not submit its actual acquisition costs that the government alleges they was required to submit.

[5] To support its materiality argument, the government points to Complaint allegation Paragraph 174, wherein it alleges that Fagron settled with the DOJ for $22.05 million to resolve allegations similar to this case in 2019. It is not clear to PCCA why a litigation decision made by an unrelated third party in litigation based upon distinct facts would be in any way relevant to the Court's consideration of the sufficiency of the government's allegations in the present case. In particular, the referenced settlement did not include any acknowledgement of liability by Fagron, so the settlement is not a finding of liability on the government's present theory against PCCA. The Court should simply disregard the Fagron settlement as it has no weight in the present matter. Moreover, the government argues that its decision to decline another case is irrelevant, so it is not clear why its decision to settle a different one would be any more relevant. Dkt. 91 at 44. Similarly, the government's reference to the Fagron settlement as evidence that PCCA's setting of its AWPs to match its competitors was unreasonable is misplaced. That Fagron reached a no-fault settlement without an acknowledgement of liability in 2019, has no bearing on what PCCA knew and understood from March of 2012 until May of 2015.

knowledge of the alleged fraud is sufficient, if the government "regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated." *Id.* That is precisely what happened here. As the government lays out in its response, there is no possible inference that TRICARE could have been ignorant of the industry practice of allegedly inflating AWPs.

Even if the Court adopts the government's looser reading of *Escobar* to require "[a]ctual knowledge of violations" and not "awareness of allegations of violations," the record before the Court is clear that TRICARE knew of the precise activities complained of by the government in this case and yet continued to routinely reimburse claims covered by those allegations:

> DHA officials attributed the high cost of compounded drug prescriptions containing bulk drug substances to several factors, including the number of these substances used in each prescription, the aggressive marketing of compounded drugs containing these substances – which, according to DHA and Express Scripts officials, have been inflated by manufacturers of these substances.

Dkt. 84-1 at 23.[6] TRICARE acknowledged that it knew of the issues related to reimbursement of compounded medications containing bulk substances since at least July 2012, when it was informed by Express Scripts of the issues. *Id.* at 20. As noted in PCCA's Motion to Dismiss, TRICARE concurred in the GAO's findings of fact in its 2014 report. Dkt. 84 at 39. Furthermore, in concurring in the GAO's findings, TRICARE acknowledged that the conduct the report identified included products sold by PCCA. Dkt. 84-1 at App'd II ("PCCA custom lipo-max cream"). As PCCA's Motion to Dismiss points out and the government fails to address in its Response, the fact that TRICARE not only continued to pay claims knowing of the allegations in the Complaint, but knew of them when it chose the payment methodology in the first instance makes this case a kind of super-*Escobar*.

---

[6] The government rightfully does not object to the Court's taking judicial notice of the two GAO reports appended to PCCA's Motion to Dismiss and cites them in in its own Response. Dkt. 91 at 53.

In its response, the government seeks to gloss over this knowledge, and proudly proclaims that TRICARE implemented solutions to address the problem on May 1, 2015 and that those actions resulted in a reduction in reimbursement for the products at issue.[7]  However, the record laid out by the government in its Response and in the GAO report make clear that there was ample notice for TRICARE to have known of the alleged fraud as far back as 2003, and TRICARE has acknowledged it had actual knowledge of the issues raised in the Complaint at least as early as July of 2012.  Dkt. 84-1 at 29 (noting that TRICARE intended to continue paying for claims until at least 2015 for compounded drugs containing PCCA ingredients, despite its knowledge of allegedly improper marketing of the products and inflated AWPs).  As the government concedes, TRICARE did continue routinely paying the types of claims at issue in this case for at least eight months after it concurred with the GAO's findings in September of 2014.[8]  TRICARE's knowledge of the precise allegations contained in the government's Complaint is undeniable, and its routine practice of continuing to pay claims based on PCCA's AWPs is strong evidence that the alleged inflation of those AWPs and the marketing of the spreads was not material to its ultimate decision to pay.[9]

## III.    The Government Does Not Plead Actual Reimbursement by TRICARE.

The central allegation in the case is that claims were reimbursed based on PCCA's AWPs. Acknowledging that it fails to plead the basic fact that any specific claim was ever reimbursed based on PCCA's AWPs, the government implores the Court to find it "reasonable to infer that

---

[7] The government simply fails to mention the 2017 claim listed in Exhibit 22 that was paid **after** it alleges TRICARE took corrective actions in May 1, 2015.

[8] The government's claim that compounded medications that were not to be reimbursed under the TRICARE program could not be identified without the 2015 solution is perplexing given the fact that the GAO was able to do so and itemize the ingredients in 2014. Dkt. 84-1 at App'd II.

[9] At a minimum, the Court can dismiss all claims alleged in the government's Complaint that post-date TRICARE's public acknowledgement that it knew of the alleged fraud and yet continued to pay claims.

the claims identified in Exhibit 22 were reimbursed based on PCCA's AWPs, an inference further supported by the inflated amounts of the claims."[10] Dkt. 91 at 33. Notably, "inflated" is a comparative term, and the government has not pleaded any basis for the Court to infer that the claims listed in Exhibit 22 were inflated, nor even that they were based upon PCCA's AWPs.  In fact, the government expressly alleges in its Complaint that "Compound prescription claims generally had to include additional pricing information as well, such as the dispensing fee, patient paid amount, gross amount due, and the pharmacy's usual and customary charge."  Dkt. 66 at 44. The government does allege that PCCA advised customers not to show auditors their acquisition costs, but nowhere does it allege that even one PCCA customer ever violated the requirements identified in Paragraph 66 of the Complaint.

Unfortunately for the government, "the Court cannot simply 'fill in the blanks' for [the government]" and insert facts not pleaded in the Complaint. *Brinson v. Colon*, No. CV411-254, 2012 WL 1028878, at *1 n.2 (S.D. Ga. Mar. 26, 2012) (citation omitted). Here, the government's argument in its response brief (not its Complaint) that it is "reasonable to infer" that claims they identify "were reimbursed based on PCCA's AWPs" is rank speculation, not a well-pled allegation, which is not adequate under Rule 8, much less the heightened pleading standard of Rule 9(b). Dkt. 91 at 33. However, Exhibit 22 does not list the relevant AWPs for the ingredients listed, does not include any of the other pricing information the government alleges was required for compound medication claims, and provides no basis for the comparison required for the Court or

---

[10] The government's arguments about Exhibit 22 are further indicative of the unfair double standard it asks the Court to apply in this case.  Essentially, the government is arguing that the court can look at Exhibit 22 and deduce that claim amounts are inflated, without the necessary comparative pricing data that it says pharmacies were required to submit.  If this is true, then it is fair to infer that the amounts of the claims were sufficiently inflated to have put TRICARE on notice of the alleged inflation as it continued to routinely pay claims based on AWP during the entire period during which PCCA is alleged to have violated the FCA.  The government cannot have it both ways.  If the inflation is sufficiently obviously and notorious based on the sparse information included in Exhibit 22, then it would have been patently obvious to TRICARE when it paid claims including the pricing information described in paragraphs 44 and 45 of the Complaint.

PCCA to understand how, or even if, the reimbursement amounts listed were "inflated."  More troubling, Exhibit 22 lists a paid date of 1900 for several claims.  While the government seeks to downplay this error in its response, these errors are catastrophic to its case.  The government investigated this case for **more than six years** before filing its Complaint, and yet still seems to be relying on corrupted and/or incorrect data and cannot provide basic information that it alleges is required in the submission of a claim to establish its central claim that PCCA's AWPs were "inflated" compared to a standard the government has yet to define.[11]  In such a case, it would be improper for the Court to grant the government an inference where such an inference would fill in the blanks of the government's otherwise deficient complaint.

## IV.     The Government's Response Misrepresents *Safeco* and Misstates the Law.

The Response highlights the government's misreading of *Safeco* and its progeny. For example, the government declares, without citing any authority, that "*Safeco* applies, if at all, only to 'reckless' conduct under the FCA, not to situations when a defendant (like PCCA) acts with 'actual knowledge' or 'deliberate ignorance' of falsity." Dkt. 91 at 48 n.18. This is false. In fact, "***Safeco* covers all three of the scienter standards listed in §3729**. When relators cannot establish the standard articulated in *Safeco*, there is no liability under the FCA." *United States v. Supervalu Inc.*, 9 F.4th 455, 468  (7th Cir. 2021) (emphasis added).

Similarly, *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 579 U.S. 93 (2016), has no application to this case and does not say what the government says it does. *Halo* involved the Federal Circuit's test for enhanced damages under the Patent Act, and has nothing to do with the FCA or even the Fair Credit Reporting Act. *See, e.g., id.* at 107. The only statement in *Halo*

---

[11] In its Response, the government seems to acknowledge the unreliability of Exhibit 22 by trying to run away from it and arguing that it was not even required to include it.  Unfortunately for the government, however, they did include it and it is appropriate for the Court to consider the significant problems with that Exhibit as it evaluates the viability of the government's claims.

regarding *Safeco* is an explanation of the obvious point that "[n]othing in *Safeco* suggests that we should look to facts that the defendant neither knew nor had reason to know at the time he acted." *Id.* at 106. The Complaint does not even articulate PCCA's AWP interpretation, nor plead facts sufficient to show that it was unreasonable.  However, PCCA's position, which is permissibly based on the Complaint's exhibits, is that **at the time** it acted on a reasonable interpretation of AWP and the relevant regulations.[12] The important point is that **the government** failed to plead that PCCA's interpretation **at the time** was objectively unreasonable, which it must do to survive a motion to dismiss.[13]

Also, contrary to the government's argument, whether PCCA was "warned away" by "authoritative guidance" can be decided at the motion to dismiss stage. *See, e.g.*, *U.S. ex rel. Streck v. Allergan, Inc.*, 746 F. App'x 101, 106 (3d Cir. 2018) (affirming dismissal of FCA complaint under *Safeco* because government did not adequately plead that defendant's interpretation of "Average Manufacturer Price" (AMP) was unreasonable). As noted above, the products PCCA repackages and sells are fundamentally different than finished pharmaceutical products.  PCCA is not a "pharmaceutical manufacturer."  "Guidance" issued by a different agency (HHS), regarding

---

[12] PCCA's reasonable interpretation is not post-hoc, but is based on communications the government attached to its Complaint. At the motion to dismiss stage, "[w]hen a plaintiff attaches documents to the complaint, courts are not required to accept the plaintiff's interpretation of those documents." *Kamps v. Baylor Univ.*, 592 F. App'x 282, n.1 (5th Cir. 2014). Again, the government cannot attach documents to a Complaint and ask the Court to ignore them when it hurts their case.

[13] The government's reliance on *Heckler v. Cmty. Health Servs. Of Crawford Cty., Inc.*, 467 U.S. 51 (1984) is bizarre. The government states that "[t]he attempt to blame TRICARE and ESI also amounts to an impermissible attempt to estop the government from enforcing the law based on the supposed actions of its agents." Dkt. 91 at n. 21.  This wholly mischaracterizes PCCA's argument regarding knowledge.  First, TRICARE **is the government**, so its actions are clearly relevant to the issues in this case and the government is clearly accountable for those actions in pursuing an FCA case against PCCA.  Second, PCCA does not focus on ESI's conduct standing alone, but rather on the fact that TRICARE was aware of ESI's alleged profiting from inflated AWPs when it selected ESI as its contractor.  The fact of ESI's past conduct is relevant insofar as it is clear TRICARE, and the government more broadly, was aware of it when it took action.  So this case flips *Heckler* on its head:  PCCA is not arguing reliance on guidance from a contractor, but rather arguing that TRICARE's knowledge of the contractor's conduct is relevant to the elements of materiality, causation and knowledge.

a different statutory and regulatory regime, related to a different type of product (finished pharmaceutical products) and directed at a wholly distinct industry (pharmaceutical manufacturers) does not meet the definition of authoritative guidance discussed in *Safeco*.[14]

In addition, the First Circuit's footnote in *In re Pharmaceutical Industry Average Wholesale Price Litigation v. AstraZeneca Pharmaceuticals LP*, 582 F.3d 156, 170-71, n. 9-10 (1st Cir. 2009), is similarly not authoritative guidance under *Safeco*. PCCA has never stated its position was that it had "unfettered discretion" to set drug prices at any level, but rather that it has some discretion in the setting of AWPs to remain competitive in a competitive (and ultimately unregulated) market that the government itself knowingly and intentionally created with D.0 and other regulatory schemes.[15]

That case is also distinguishable from this case because the "challenged drug prices were those based on AWP from 1991 through 2003." *Id.* at 160.  The court endorsed the district court's finding that "by 2003, the term 'average wholesale price' had become a term of art … 'Congress clearly did understand AWP was different than average sales price and was not reflective of actual prices in the marketplace.'" *Id.* at 168 (citation omitted).  Thus, the First Circuit's decision and the footnote rejecting "AstraZeneca's purported technical definition" of AWP related to the pre-2003 era ***prior to*** the government's clear understanding that AWP was "a term of art" and not to

---

[14] If the government's argument regarding the 2003 OIG Guidance is to be credited, then it is essentially arguing that the guidance, though specifically addressed and targeted in its reach, was sufficient to put all providers and suppliers of all types on notice that such conduct should be avoided in all federal programs.  If that is the case, then the guidance and the knowledge of the conduct alleged in the guidance would be fairly attributable to all federal programs, and would weigh heavily against a finding of materiality under *Escobar* as discussed above.

[15] Rather, the government itself has previously acknowledged the broad discretion it granted companies in setting AWP when the GAO found that "[t]he term AWP is not defined in law or regulation, so the manufacturer is free to set AWP at any level, regardless of the actual price paid by purchasers." Dkt. 81-2.  If the government knew that the lack of a regulatory definition led to results it disfavored in 2003, its intentional choice to leave that term undefined even until the present (and in its own Complaint and Response) is strong evidence that how companies set their AWP was not material to its payment decisions involving compounded medications.  Indeed, Medicare **never** reimbursed compounded medications containing bulk powders, and incorporated an edit at the dawn of D.0 to avoid the submission and payment of such compounds. That TRICARE did not is telling of its intent.

the post-2003 era, as here, where the government has had clear knowledge of AWP practices for years and continued to pay claims.  *Id.* at 170 n.9.  At the very least, then, PCCA could not have been on notice that the First Circuit's footnote, which explicitly applied only to AWP practices from 1991 to 2003, should have authoritatively warned it away from its reasonable interpretation of the definition of AWP in 2012 and later.  Regardless, the **government does not plead the First Circuit's decision in the Complaint**, which is required. *U.S. ex rel. Streck*, 746 F. App'x at 106.

Finally, the government's effort to describe the 2014 GAO report as authoritative guidance warning PCCA away from the alleged conduct is nonsensical.  What's good for the goose is good for the gander, and if the government argues that the GAO report was sufficient to put PCCA on notice of its alleged unlawful conduct, then it was certainly sufficient to put TRICARE on notice that it was knowingly paying for uncovered products based on inflated AWPs.  In fact, a more appropriate takeaway from the GAO report's findings is that TRICARE was actively aware of PCCA's alleged practices and indicated its intention to continue its current reimbursement practices, regardless.  Such a clear and appropriate inference from the GAO report weighs heavily against the government's position.  The Court should reject the government's  improper attempt to plead facts in the Response not pleaded in the Complaint (which they had over six years to draft). The record before the Court is sufficient for it to assess the inefficiency of the government's claims, and delay in the dismissal of this action only serves to consume judicial resources and resources of the parties that are better spent elsewhere.  As such, the Court should dismiss the government's Complaint in Partial Intervention.

## V.     CONCLUSION

For the foregoing reasons and the for the reasons stated in its Motion to Dismiss, Defendant PCCA respectfully requests that the Court dismiss the government's Complaint-in-Partial-Intervention (Dkt. 66) under Federal Rules of Civil Procedure 12(b)(6) and 9(b).

Dated:  June 7, 2022

        Respectfully submitted,

        BARNES & THORNBURG LLP

        *By:*    /s/ Anthony J. Burba
        Anthony J. Burba
        Barnes & Thornburg, LLP
        One North Wacker Drive
        Suite 4400
        Chicago, IL 60606
        Telephone: (312) 338-5908
        Tony.burba@btlaw.com

        Michael A. Battle
        David A. Frazee
        Barnes & Thornburg, LLP
        1717 Pennsylvania Avenue, N.W.
        Suite 500
        Washington, D.C. 20006-4623
        Telephone: (202) 408-6922
        Fax: (202) 289-1330
        dfrazee@btlaw.com
        mbattle@btlaw.com

        Alicia M. Barrs
        Barnes & Thornburg, LLP
        2121 North Pearl Street, Suite 700
        Dallas, TX 75201
        Telephone: (214) 258-4105
        Alicia.barrs@btlaw.com

        *Counsel for Defendant PCCA*

**<u>Certificate of Service</u>**

I hereby certify that a copy of the foregoing was filed electronically with the Clerk of the Court upon all parties of record by filing in the Court's electronic filing system this 7th day of June 2022.

/s/ Anthony J. Burba