```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION

 3
     UNITED STATES OF AMERICA,      .
 4   EX REL,                        .
     AND PETER HUESEMAN,            .
 5                                  .
                    PLAINTIFFS,     .
 6          vs.                     . DOCKET NO. SA:14-CV-212-XR
                                    .
 7   PROFESSIONAL COMPOUNDING       .
     CENTERS OF AMERICA, INC.,      .
 8                                  .
                    DEFENDANT.      .
 9


10


11         TRANSCRIPT OF MOTION TO DISMISS PROCEEDINGS
           BEFORE THE HONORABLE XAVIER RODRIGUEZ
12              UNITED STATES DISTRICT JUDGE
                     JUNE 16, 2022
13


14


15   APPEARANCES:
     FOR THE PLAINTIFF:       JOHN DECK, ESQUIRE
16                            UNITED STATES ATTORNEY'S OFFICE
                              601 NW LOOP 410, SUITE 600
17                            SAN ANTONIO TX 78216

18                            SANJAY M. BHAMBHANI, ESQUIRE
                              DEPARTMENT OF JUSTICE
19                            CIVIL DIVISION, ROOM 3740
                              10TH & PENNSYLVANIA AVENUE NW
20                            WASHINGTON DC 20530

21

22   ON BEHALF OF RELATOR:    GLENN GROSSENBACHER, ESQUIRE
                              LAW OFFICE OF GLENN GROSSENBACHER
23                            24165 IH-10 W
                              SUITE 217766
24                            SAN ANTONIO TX 78257-1160

25
```

```
 1  ON BEHALF OF          ANTHONY J. BURBA, ESQUIRE
    DEFENDANT:            ALICIA M. BARRS, ESQUIRE
 2                        BARNES & THORNBURG LLP
                          ONE N. WACKER, SUITE 4400
 3                        CHICAGO IL 60606

 4

 5                        MICHAEL A. BATTLE, ESQUIRE
                          DAVID A. FRAZEE, ESQUIRE
 6                        BARNES & THORNBURG LLP
                          1717 PENNSYLVANIA AVENUE NW
 7                        SUITE 500
                          WASHINGTON DC 20006
 8

 9  REPORTED BY:          GIGI SIMCOX, RMR, CRR
                          OFFICIAL COURT REPORTER
10                        UNITED STATES DISTRICT COURT
                          SAN ANTONIO, TEXAS
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        (San Antonio, Texas; June 16, 2022, at 10:30 a.m., via
 2   Zoom videoconference.)
 3             THE COURT:  Let's turn to 14 civil 212, U.S.A., ex
 4   rel Hueseman versus Professional Compounding Centers of
 5   America.
 6             Who do we have for the plaintiff?
 7             Do I have somebody?
 8              (Crosstalk)
 9             MR. GROSSENBACHER:  Yes, Glenn Grossenbacher for
10   relator.
11             THE COURT:  Thank you.
12             And do we have anybody from the government?
13             MR. DECK:  Yeah.  Sorry, Your Honor.  I was on mute.
14             This is John Deck for the United States.  I'm also
15   joined by my colleagues, Sanjay Bhambhani, Nathan Green, and
16   Danielle (inaudible).
17             THE COURT:  Thank you.
18             And for PCCA?
19             MR. BURBA:  Yes, Your Honor.  Tony Burba for PCCA.
20             And also joining on the call are my partners, Mike
21   Battle, David Frazee, and Alicia Barrs.  We also have for
22   observation, representatives from our client, Mr. Marc DuPont
23   and Fabian Zaccardo.
24             THE COURT:  Thank you.
25             So we have this False Claims Act case, and I'll start
```

1  I guess with the plaintiff, the relator and/or the government
2  to help me understand this, but as best I can figure out, PCCA
3  makes ingredients that they sell to pharmacies and then the
4  pharmacies use these ingredients to make compound drugs.
5        And then when they make the compound drug they bill
6  that to TRICARE, and when they bill that to TRICARE they have
7  to identify each of the ingredients in that compound
8  medication.  And what they are doing there is billing to
9  TRICARE the ingredients based upon an average wholesale price
10  that PCCA gave them.
11        And the allegation is that — and I'll just make up
12  numbers, just for the sake of a hypothetical — they will bill
13  TRICARE $100 for this ingredient, when PCCA only charged them
14  $1.  And of course, I'm just making up numbers here.
15        Do I have the theory of this case right?
16        I'll start with the relator.
17        MR. GROSSENBACHER:  Yes, Your Honor, but I'll defer
18  to the government and concur with our arguments laid out in
19  the motion — response to the motion to dismiss.  That's
20  exactly what the allegation is, as you described it.
21        THE COURT:  And so if that's right then, and I'm
22  trying to understand PCCA's motion to dismiss, PCCA is giving
23  the pharmacy an AWP that it uses, and my understanding —
24  someone correct me if I'm wrong — when TRICARE receives that
25  bill, what they are doing is they are going to some third

1  party, and I'm not sure where they go look at this, and they

2  look to see, okay, how much is the AWP.  And PCCA is also

3  posting on that third site that number that's higher than what

4  the actual billing was.

5          Am I right on that?

6          And let me hear from the government.

7          MR. DECK:  Right, Your Honor.  You are right in your

8  explanation.

9          What I would point out, although it's not terribly

10  relevant is that PCCA doesn't actually manufacture these

11  ingredients.  As I understand it, they purchase them from

12  third parties and then they repackage them and they sell them

13  to their customers.

14          THE COURT:  Okay.

15          MR. DECK:  But you are right, they set the AWP and

16  they send it to these pricing compendia that are, you know,

17  standard pricing catalogs in the industry and the government

18  will reimburse the drug on one of three metrics, whichever is

19  lower, AWP, the price to the pharmacy, or the usual and

20  customary price, which is basically what a cash purchaser

21  would pay.

22          And the allegation here is that during the relevant

23  period the government was paying the AWP, in part because PCCA

24  customers, at PCCA's urging, were hiding their actual costs

25  and then manipulating the usual and customary costs so that

1  the government would pay the AWP.

2          THE COURT:  And what's the theory of the government?

3  How much money do you think was overpaid because of this

4  practice?

5          MR. DECK:  In the complaint we stated that the

6  government overpaid hundreds of millions of dollars for PCCA's

7  ingredients alone.  Although it's not pled in the complaint,

8  we think that number is a little like under a billion dollars

9  total, for PCCA's ingredients alone.

10          THE COURT:  Thank you.

11          So let me turn to PCCA and let me allow you to make

12  any arguments you have on your motion to dismiss.

13          MR. BURBA:  Thank you, Your Honor.

14          I would first say that if the government's position

15  is now that single damages are approaching a billion dollars,

16  that would be the first time that's been disclosed to us.  I

17  think the single damages number that have been presented to us

18  have been substantially lower than that number.

19          Our position is that this is not an FCA case and we

20  don't think that there are any disputed facts that the Court

21  needs to resolve to make that determination.

22          This case targets a company that does no business

23  with the government, never has.  A company that's never made

24  or sold anything that the government pays for.

25          They have never submitted any kind of claim for

1  payment, directly or indirectly to the government.  They have
2  never had any kind of contractual relationship with the
3  government.
4         They have never received payment from the government,
5  and they are alleged to have reported to nongovernmental third
6  parties AWPs that the government now says were inflated,
7  despite the fact that the term "AWP" still remains undefined
8  by the government, even in their most recent filing of their
9  response or in their complaint.
10        The government says that the fraud is actionable
11 under the False Claims Act, even though they don't allege that
12 PCCA was subject to any of the regulatory or sub-regulatory
13 guidance that they describe in the complaint.  And the
14 government doesn't even allege in their complaint that PCCA
15 was aware of any of that guidance, and has now suggested in
16 their response that they don't need to show that.
17        The government is essentially asking the Court to
18 infer the existence of conduct subject to the False Claims Act
19 because it says so.  It's asking the Court to draw inferences
20 in its favor based on little more than the use of the words
21 "fraudulent" and "false" in the complaint.
22        In fact, under the law in this district, falsity
23 requires an objective standard by which the Court and the
24 parties can measure AWP.  And the government points to no
25 authority suggesting otherwise, other than a recent criminal

1    case under a different statute.

2            Moreover, the government points to no objective

3    measure of AWP to which PCCA could have looked at the time

4    that they are alleged to have committed the fraud, nor even

5    any objective standard that we could look to now in defending

6    ourselves.

7            The government seeks to coddle together legal support

8    for its theory of materiality and falsity that's wholly

9    inapposite.  They talk about state Supreme Court cases and

10   out-of-circuit cases that examine AWP, not in the context of

11   materiality and the False Claims Act, but in the context of

12   state laws, and in most cases, state consumer fraud laws.  And

13   those cases were all dealing with the issue of AWP prior to

14   the Supreme Court's decision in *Escobar*.

15           By reading of the 2009 First Circuit opinion that the

16   court — or that the government cites in their response, I

17   think is instructive.  In that case, the Court was not looking

18   at materiality as defined under the state — or under the

19   False Claims Act, even at that time.

20           It was rather examining AWP as it related to a state

21   consumer fraud action.  And in fact, that court held, and I

22   will — and I can quote from that opinion, that this case —

23   paraphrasing — this case does not involve any

24   misrepresentations to Medicare.

25           So this case is not a False Claims Act case.  It's a

1    theory in search of facts and law to support it, and the
2    government's essentially trying to convince the Court here
3    that the old hits are the best, but their case is just a cover
4    band and the old hits don't possess any magic to convert their
5    baseless claims into a False Claims Act case.
6           The conduct of TRICARE in this case obviates any
7    proof of falsity, knowledge, causation, or materiality.  The
8    government is essentially looking to shift blame for an
9    alleged loss that was caused by its own mistakes.
10          The government could have stopped the reimbursement
11   of these claims for compounds based on AWP at any time, simply
12   by following its own regulations.  TRICARE has admitted in the
13   GAO report attached to our motion to dismiss that it knew of
14   these issues since at least July of 2012 and did nothing for
15   three years.
16          Even after the government alleges that TRICARE took
17   corrective action on May 1st of 2015, Exhibit 22 to the
18   government's complaint shows that TRICARE kept making payments
19   on claims which the government now takes issue with.  Twelve
20   of the government's 325 handpicked representative claims in
21   Exhibit 22 postdate the alleged corrective action taken by
22   TRICARE.
23          The Court should not allow the government to shift
24   the blame for its own mistakes to a company that had no reason
25   to believe it was beholden to the regulations that the

1   government itself was violating.

2          In closing, I would point the Court to the *Escobar*

3   opinion, pages 195 and 196 in the Westlaw citation.  We

4   reference in our motion to dismiss and our reply that the

5   government here, if its theory is to be accepted, is expanding

6   the False Claims Act well beyond the boundaries intended by

7   Congress, and well beyond the parameters that the court -- the

8   Supreme Court has set forth.

9          In *Escobar*, the government's theory of materiality

10  was that any violation of any regulatory requirement that

11  might allow the government to deny payment was material.

12         That rings of the government's argument here, which

13  is that because the government chose to consider information

14  outside the context of its own regulations and rely on that

15  information, that somehow that information was material.

16         But Justice Thomas, in the *Escobar* opinion, expressed

17  his concern about this theory and the breadth of it and that

18  the government could, for instance, in its Medicare contracts

19  could end a requirement that all providers use American-made

20  staplers, and that the use of a foreign-made stapler, even

21  though it's wholly irrelevant to the service the government is

22  seeking, could cause substantial liability under the False

23  Claims Act case.

24         Our position is that here the government is not going

25  after providers who used a noncompliant stapler, they are

1   going after the stapler company, and we believe that their

2   theory is well in excess of what the False Claims Act is

3   contemplated to cover.

4          And in the absence of having identified any product

5   controlled, sold, or otherwise relevant to PCCA's business,

6   that the government has ever paid for, it also falls short of

7   the requirements of the antikickback statute.

8          THE COURT:  Well, I was going to turn to that.  What

9   of the antikickback?

10          I mean, the complaint is stating that you-all had

11   your customers, these pharmacy companies, pay to belong to

12   some kind of like a membership club, and the allegations in

13   the complaint are you were telling your members/pharmacies not

14   to be disclosing to TRICARE the actual amount you were

15   charging them, and so these -- I'll ask the government here in

16   a little bit why we aren't going after the pharmacy companies,

17   I agree with that comment, but you guys are receiving monies

18   in exchange for this, so why isn't the complaint sufficient

19   for the antikickback statute?

20          MR. BURBA:  Well, I would suggest, Your Honor, that I

21   personally have received a gift basket at Christmas from

22   e-Discovery companies I use, but I don't think those

23   e-Discovery companies would consider themselves covered by the

24   False Claims Act just because they sent a lawyer who

25   represents health care companies a basket.

1          And our position here is the issue of remuneration is

2    irrelevant because the products at issue do not fit within the

3    parameters of the antikickback statute.  We don't sell

4    anything that would pull us into the antikickback statute.

5          We sell something that may be tangential to something

6    that the government paid for, frankly something the government

7    paid for that it shouldn't have, but no pharmacy has ever

8    submitted a claim for PCCA's products.  They have submitted

9    claims for compounded medications —

10         THE COURT:  Well, isn't that parsing things — that

11   seems to be parsing things way too thin.  Your ingredients are

12   going into the compound pharmaceutical, correct?

13         MR. BURBA:  Correct.

14         THE COURT:  Yeah.  Let's hear from the government.

15   What's your response to all this?

16         MR. DECK:  Your Honor, I'm not going to try to make a

17   point-by-point refutation of what Mr. Burba just said.

18         I think the complaint, which is nearly 50 pages,

19   sufficiently pleads all the claims here.  And I think our

20   briefing, which was, you know, over 60 pages, went point by

21   point to say why PCCA is wrong in saying this case warrants

22   dismissal.

23         I do want to focus in on three arguments that PCCA

24   makes.  The first is that TRICARE somehow didn't follow its

25   regulation because it supposedly didn't cover the ingredients.

1  To start, the allegations in the complaint, which the Court
2  must accept as true at this point, contradicts its contention.
3          They allege that PCCA knew TRICARE reimbursed its
4  customers.  In fact, it sought to delay changes in TRICARE's
5  policies so that the reimbursements would continue.  And then
6  once TRICARE stopped paying, this is alleged in the complaint
7  too, its president lamented because its purchases -- their
8  customers' purchases declined quickly and sharply.
9          And regardless, none of the elements of the AKS or
10 the FCA depend on TRICARE's coverage or authority to
11 reimburse.  And any negligence, or error, or mistake by the
12 government can't justify PCCA's fraud.
13         The second argument is that PCCA contends that its
14 AWP can't be false because there is no definition.  This has
15 been repeatedly rejected by courts.  Mr. Burba cited the First
16 Circuit opinion, which we also cite, and it says that the
17 government use of AWP does not grant the pharmaceutical
18 industry, quote, "unfettered discretion to report drug prices
19 that bear no relation to products actual prices."
20         And what the Court was doing there is that they were
21 affirming the trial court's finding that if AWPs in that case,
22 for a cancer drug, were more than 30 percent above the
23 acquisition cost for that drug, then they were false and
24 inflated.
25         Here, we have AWPs that were inflated between 1300

1   and 56,000 percent.  These AWPs were no relation to anything,
2   except profits for PCCA and its customers.  And the government
3   contends are false by any measure.

4          The third and final argument I want to focus in on is
5   this claim that the government continued to pay after it had
6   knowledge of wrongdoing.  Again, this is an incorrect
7   assertion given the facts alleged which the Court must accept
8   as true.

9          The government acted here when it had sufficient
10  knowledge of fraud in November 2014, which is just eight
11  months after the relator filed this lawsuit notifying the
12  government of its allegations.  The government acted to
13  curtail payment by recommending a control, prior authorization
14  for these claims.

15         Then in May 2015, after, you know, the required
16  administrative processes, the government enacted these
17  controls, and the number of claims declined sharply and PCCA's
18  sells plummeted.

19         What PCCA appears to argue is that if the government
20  generally knows about fraud, here AWP inflation, somewhere in
21  the pharmaceutical industry, then that's sufficient notice and
22  it precludes any prosecution.

23         Now, that position is absurd because the government
24  knows about all sorts of fraud generally.  If that was
25  sufficient, then the government even couldn't use the FCA and

1  the AKS at all.

2  The position is also inconsistent with the law.  What

3  *Escobar* says is that the government must have actual knowledge

4  that certain requirements were violated.  General knowledge is

5  not enough.

6  And regardless, you know, knowledge and then

7  continued payment is only one nondispositive factor under

8  *Escobar*, and it only goes to one element of the FCA.

9  In *Harman*, the case from the Fifth Circuit, has said

10  that no factor, including government knowledge, is

11  dispositive.

12  Mr. Burba says that the government knew about, I

13  guess, the fraud, the specific fraud here, since July of 2015.

14  Now, the document he cites is the October 24 GOA report.  I

15  think it's Exhibit 1 to their motion to dismiss.

16  Now, that document doesn't say that the government

17  knew about the inflation here.  It says, quote, "Since

18  July 2012 TRICARE has continued to pay for compound drug

19  prescriptions containing bulk drug substances."  That's not

20  saying the government knew about the fraud here.

21  Moreover, the document does not state that PCCA was

22  inflating the AWP, the extent of the inflation, or the

23  marketing of the spread.

24  And even if the government knew about the inflation

25  in October 2014, or even July 2012, the government here acted

1   in November of 2014 to stop payment.  And as this Court has
2   observed in the PVA case, quote, "Health care administration
3   is complicated.  The government does not enjoy the luxury of
4   refusing to reimburse health care the moment it suspects there
5   may be wrongdoing."
6          You know, TRICARE is a gigantic program.  It ensures
7   millions of people.  Many of them are active military.  The
8   government can't just, at the drop of a hat, stop payment.
9   And it's particularly rich for PCCA to be making this argument
10  when it's alleged in the complaint that at the time that
11  TRICARE is considering these changes, it was actively trying
12  to stop TRICARE from making the changes.
13         What PCCA really disputes here is what the government
14  knew and when it knew it.  Now, if these are matters at all,
15  they are matters of proof.  They are not legal grounds for
16  dismissal.  So we think that all of PCCA's arguments fail and
17  we think the motion should be dismissed in its entirety.
18         And I mean, I'll take any questions you have, Your
19  Honor, on those issues or on anything else.
20         THE COURT:  So let's act under the assumption that
21  the motion to dismiss is denied.  So I am curious about your
22  calculations here and how we got to a billion dollars.  This
23  is probably for another day, but I want to tee this up so
24  everybody is talking here amongst themselves if this is
25  possible.

1          So you know, the individuals or the companies that
2   made most of this money off TRICARE seem to be the pharmacies.
3   So how is it that we are going under this theory that all that
4   amount of loss is attributable to this defendant?  Under what
5   theory do you attribute the entirety of the loss to this
6   defendant?
7          MR. DECK:  Well, I mean, under the AKS, any claim
8   tainted by a kickback is in the damages, like you get the
9   entire claim.
10          THE COURT:  But is it that amount?
11          MR. DECK:  And so —
12          THE COURT:  Is that amount calculated by how much it
13   received, not the total amounts paid?
14          MR. DECK:  Yes.  It's the entire claim.  So it's the
15   entire claim paid by TRICARE.
16          Now, I think you're right that this discussion will
17   obviously go on throughout this case.  There will be
18   discovery.  There will be experts.  There may be some sort of
19   discount on, you know, perhaps an expert will opine what a
20   reasonable discount would be between the AWP and the
21   acquisition price, and damages may end up at the end of the
22   day not being the entirety of the claim, but at this point I
23   think it's premature.
24          THE COURT:  Yeah.  No.  So we are here on just the
25   motion to dismiss, but I just, in the event that the motion to

1  dismiss fails and this case continues, while you're all here

2  on the line, I wanted to raise that subject.

3         And so while we're still all on the line, under the

4  assumption — this isn't a ruling yet, I'm going to take this

5  under advisement, but under the assumption that the motion to

6  dismiss is denied, how do we go forward on discovery from the

7  government/relator standpoint?

8         MR. DECK:  I'm going to let my colleague,

9  Mr. Bhambhani address discovery.

10        THE COURT:  Counsel.

11        I don't see Mr. Bhambhani on the line.

12        MR. BHAMBHANI:  I'm trying to unmute.

13        MR. GROSSENBACHER:  There you go.

14        THE COURT:  There you are.

15        MR. BHAMBHANI:  Okay.  Is that better?  Can you hear

16  me, Your Honor?

17        THE COURT:  Yes, I can.  Thank you.

18        MR. BHAMBHANI:  Good morning, Your Honor.  This is

19  Sanjay Bhambhani from the Department of Justice.

20        Just to clarify a point that Mr. Deck made, the

21  billion dollars reference, the total amount that TRICARE paid

22  for all of PCCA's ingredients, what we've alleged in the

23  complaint, and we focused our complaint on ten ingredients,

24  and we focused on two of those ingredients, Fluticasone and

25  Resveratrol, but that's the total amount that TRICARE ended up

1  paying.  It goes to essentially refute the notion that the

2  government did not — or TRICARE did not pay for these

3  ingredients.  It paid a lot of money.

4          In terms of where we go from here, Your Honor, Your

5  Honor did ask for a revised scheduling order.  We have had

6  discussions with PCCA.  We've submitted that revised

7  scheduling order.  I think we've agreed in terms of the number

8  of depositions, that we are on 30 each, at least that's what

9  we've proposed.

10          There are certain lines of inquiry that we've laid

11 out as to what the government thinks it needs in terms of

12 discovery, and also the defendants of PCCA has also identified

13 what it claims it needs for its discovery.  And so I think

14 we're prepared to go forward.

15          We have proposed initial disclosures for July 1st,

16 and so we're ready to proceed on the assumption that the Court

17 denies the motion to dismiss.

18          THE COURT:  One second.  Let me go to my docket

19 sheet.  So, yes, I see on June 10th I received a proposed

20 scheduling order and so we have not entered that.  We need to

21 do so.

22          MR. BHAMBHANI:  That is correct.

23          THE COURT:  And that proposed scheduling order is

24 agreed to by PCCA, is that correct?

25          MR. BURBA:  Your Honor, based on Your Honor's minute

1  order, we are agreeing with this schedule now.

2          We did want to raise for the Court the point that,

3  you know, under the False Claims Act the government has

4  immense investigatory powers and used those for a period of

5  about eight years in this case.

6          The majority of the discovery we expect to take will

7  likely require *Touhy* requests and cooperation from the

8  government, and so we are concerned that the shorter discovery

9  period may not allow us to sufficiently go through that

10  process, depose the witnesses we need to depose, and request

11  and receive the documents that we are going to need.

12          I don't know that we have any relief we'd request

13  from the Court at this point other than to ask that the Court

14  keep an open mind and just recognize that in the event that

15  discovery does slow down, you know, out of just fairness,

16  given the government's eight-year investigation, we think

17  reasonable extensions of discovery may be necessary.

18          THE COURT:  No, that's understood.

19          Now, to the government, I mean, you-all have been

20  investigating for quite a period of time.  I mean, I don't see

21  why there's any reason why you can't turn over most of your

22  documents in some kind of a format that you-all can agree to

23  for any discovery platform to review.  I'm sure it's going to

24  be voluminous, and so I can't understand why there would be a

25  problem by the government production.

1           And then with regard to witnesses, Mr. Deck, or I'm

2    not sure who is in charge of that, witnesses, do we have to

3    actually go through the *Touhy* framework?  I mean, you know who

4    the individuals are that you need to present.

5           Who wants to respond to that?  Mr. Bhambhani or

6    Mr. Deck?

7           MR. BHAMBHANI:  Your Honor, as to whether or not

8    *Touhy* applies, it's my understanding, but I need to confirm

9    this, that *Touhy* applies when the government is a nonparty,

10   but —

11          THE COURT:  Well, you're not quite a nonparty here.

12   You are a beneficiary.

13          MR. BHAMBHANI:  No, no.  That's right.  So I'm not

14   sure that the *Touhy* process is necessarily — is necessary,

15   because the government obviously is a party in this case.

16          And, of course, we will make every effort to try to

17   comply with the discovery request here.  I mean, that goes

18   without saying, Your Honor.  We'll make every effort to

19   cooperate, of course, reserving our right to object to what we

20   consider to be unreasonable requests that might be overbroad,

21   unduly burdensome, et cetera.

22          THE COURT:  So I understand that, but when we are

23   talking about a billion dollars too and the proportionality

24   analysis, that's quite a large amount in controversy.

25          MR. BHAMBHANI:  Again, Your Honor, I do want to make

1  clear, that is not what we are claiming as the amount of

2  damages.

3         That was the amount that TRICARE ended up paying, and

4  we're focusing on a much narrower subset of claims.  And we're

5  focusing on -- and that's what we've tried to do in our

6  complaint, focusing on the ten ingredients that had the most

7  egregious AWP spreads.  So we're not going after every single

8  item or claim.

9         And we've also identified, in terms of the examples,

10  claims that were between $2,000 and above.  It's not every

11  ingredient.

12         THE COURT:  Yeah.  So let's try to -- if that's going

13  to be your contention here how you are going forward, let's

14  just make that clear so discovery is limited to those issues.

15  And then while you-all are talking we all know what to focus

16  in on the numbers regarding those issues.

17         I'll just wait for the inevitable discovery fights.

18  Hopefully, they will be minimal.  And if you-all -- either

19  side needs more time, I'm willing to work with you on a

20  scheduling order, but this is an old case, so we're going to

21  move it forward.

22         Anything else from the government/relators?

23         MR. DECK:  No, I don't think so.

24         THE COURT:  Thank you.

25         Anything else from PCCA?

1          MR. BURBA:  Your Honor, I know that we're proceeding

2   under an assumption related to the motion to dismiss.  I would

3   beg the Court's indulgence to address just a few of the points

4   that Mr. Deck made and also ask a question about a point that

5   Mr. Bhambhani just made.

6          THE COURT:  Sure.  Go ahead.

7          MR. BURBA:  So first is the government's position

8   then that they are limiting their claim for damages to the ten

9   ingredients listed in the complaint?

10          THE COURT:  That's a good question, because is it ten

11   or two?

12          Who wants to answer?

13          MR. BHAMBHANI:  Your Honor, we focused on the ten

14   ingredients.  We've identified ten ingredients, and those

15   ingredients themselves involve — would produce overpayments

16   of, you know, over $100 million.

17          Now, Your Honor, again, we're not talking about every

18   single ingredient but we are willing to focus our complaint

19   and we have limited our complaint to the ten ingredients.

20          And I'd also like to add, Your Honor, this case is a

21   TRICARE case.  It's not Medicare, Medicaid, VA, or anything

22   like that.  We have limited our case to TRICARE.  And I just

23   want to make that point very clear.

24          THE COURT:  Thank you.  So ten ingredients, TRICARE.

25          What else do you got, Mr. Burba?

1          MR. BURBA:  Well, I would note for Your Honor that

2    the reason it's only a TRICARE case is that Medicare and other

3    federal health programs took action upon the adoption of

4    Didado [phonetic] to avoid this exact issue, because it was

5    known to the government, but —

6          THE COURT:  Let me stop you there.  So, you know, I

7    understand that point, but right now, procedurally, I'm just

8    dealing with a motion to dismiss.  So you may or may not have

9    a point on other issues for summary judgment, but I'm just

10   dealing with a motion to dismiss.

11         MR. BURBA:  Understood.

12         And in that vein, Your Honor, I would say two points

13   are worth making.  The first is that — I'm sorry, three

14   points in response to the three points Mr. Deck made.

15         The first is the allegation that we knew that the

16   customers were submitting claims, I'm not sure that that's

17   really relevant to the argument that we've made in our motion

18   to dismiss.

19         I mean, even if our client is assumed to have known

20   the TRICARE claims were being submitted, there was no guidance

21   in the market as to how they should set their AWP.  The

22   exhibits to the complaint, which I'm sure Your Honor has

23   reviewed, show that at least, according to those emails, PCCA

24   thought that the conduct was legal because there had been no

25   guidance or effort from the government to give clarity.

1          THE COURT:  Well, Mr. Burba, let me stop you there.

2          I mean, isn't there some kind of reasonableness

3   standard that applies here?  I mean, a thousand percent charge

4   markup?

5          MR. BURBA:  Well, but I think, that's only if you —

6   I mean, if Your Honor looks to the acquisition cost as the

7   government suggests, then that may be the case, but I don't

8   think the government has given Your Honor any legal basis for

9   that.

10          In fact, if you look at the First Circuit case and

11   the *In Re* case from Mississippi, one of the key differences in

12   those cases was that AWP was not the actual measure being used

13   by the government.  It was estimated acquisition cost for

14   which AWP was standing in.

15          And so those courts were looking at this in a very

16   different setting, where, you know, estimated acquisition

17   costs was really the term that they were looking at, and so it

18   made more sense.

19          Here, there was no such guidance by TRICARE, despite

20   the fact that as the testimony we submitted as Exhibit B

21   shows, they knew that this was an undefined term allowing for

22   manufacturers to set AWP at whatever they wanted as far back

23   as 2002.

24          But we would take the position that if you review the

25   exhibits, which the Court is allowed to do, and interpret on

1   its own in a motion to dismiss because they are the documents

2   the government attached, what you ultimately see is that the

3   standard by which we set our AWPs was our competitors, and

4   what we saw going on in the market, which we believe is

5   reasonable commercial activity in the absence of any other

6   guidance by the government.

7            Now, the government has pointed to a settlement by

8   one of our competitors, but that was well after the events

9   that occurred here.  It was a no-fault settlement, no

10  liability acknowledged.  So it's not clear why that would be

11  relevant to the time that we were operating in.

12           We were a commercial actor who did no business with

13  the government, who were selling to customers who had a direct

14  relationship with the government, and were responding to

15  market factors that were created by the knowing conduct of the

16  government, and we don't believe that the government should

17  get the benefit of the doubt, or a pass, on the fact that it

18  created the environment in which these AWPs were determined.

19           THE COURT:  But what you are neglecting to say,

20  though, and what's alleged in the complaint, is that your

21  client was telling these pharmacies, "Don't tell TRICARE the

22  real price that you guys are paying, and if they ask, talk to

23  us first," and so you are omitting all of that from the

24  allegations.

25           MR. BURBA:  Well, and I would point out, if you look

1    at those Zaccarrian [verbatim] emails, I don't think that's

2    what they say, because what they say is the government was

3    already receiving — and I'm not looking at it right now but I

4    know that this is generally what they say — what they say is

5    that the government is receiving the invoices as part of the

6    claim, but which contains the information the government has

7    pleaded that they were required to submit which included

8    pricing information and the acquisition cost.

9           And then there was another document which I believe

10   was the claim where the AWP was listed.

11          But I mean, while those documents suggest that we

12   were telling them not to put the two numbers next to each

13   other, they also show clearly that the two numbers were still

14   going to the government with the claims.

15          I would also point out, if you look at the GAO

16   report, the GAO report indicates that TRICARE was running its

17   own medical facilities and that those medical facilities were

18   purchasing these ingredients for use in compound medications.

19          So TRICARE was a customer of either PCCA or one of

20   its competitors and was well aware, as a customer, of what the

21   acquisition costs were.  And this is not asking the Court to

22   assume facts outside the complaint.  This is asking the Court

23   to look at the record in front of it, which the government has

24   not objected to the Court looking at —

25          THE COURT:  But aren't you asking me to make fact

1  determinations at this pleading stage?  I mean, it seems like
2  you are making motion for summary judgment arguments.
3       MR. BURBA:  With all due respect, Your Honor, I don't
4  believe that I am.
5       I mean, you are required to consider the government's
6  allegations as true, and you are required to give them fair
7  inferences, but I don't think fair inferences involve or
8  prohibit the Court from looking at inconsistencies between the
9  allegations made in the complaint and questioning whether
10 those inconsistencies and apparent, you know, factual —
11 factually incorrect information based on the GAO report is
12 false.
13      You know, I would note the government has not
14 objected to the Court considering those GAO reports and
15 actually argued that the Court use them in support of its
16 argument.  They are the government's own document prepared at
17 the direction of Congress.  So I think those are perfectly
18 appropriate for the Court to consider in evaluating the
19 reasonableness of the allegations.
20      You know, I would point to one final factor, which is
21 the Court is required to give credence to and draw inferences
22 for the government, but, you know, the government investigated
23 this case for eight years.  Like eight years.
24      And they had eight years to write this complaint and
25 come up with their best — put their best foot forward for the

1  Court.  And they submitted an exhibit, Exhibit 28, that has

2  eight clear errors showing that claims were paid in 1900.

3          Now, we have not been given the TRICARE data relevant

4  here, but it draws into question for us the accuracy of the

5  government's information.

6          I understand that sounds like a summary judgment

7  argument, but my point here is if the government attaches the

8  documents, the Court can rely on the documents and a fair

9  interpretation of those documents at the summary — I'm

10 sorry — at the motion to dismiss stage, and that's what we're

11 asking the Court to do.

12         THE COURT:  Thank you.

13         I'll take the motion to dismiss under advisement.  I

14 could very well change my mind, and this is not a ruling, but

15 you-all ought to act under the assumption this case is going

16 forward.

17         To me, a lot of this seems to be disputed fact issues

18 that are appropriate for a summary judgment, but I'm keeping

19 an open mind.  I'm going to revisit the motion to dismiss in

20 light of the arguments and I'll try to get an order out as

21 soon as I can.

22         Anything else from the government/relators that we

23 need to take up today?

24         MR. DECK:  No, Your Honor.

25         THE COURT:  Anything else from the defendant?

1       MR. BURBA:  No, Your Honor.  And thank you for your

2  time and attention today.

3       THE COURT:  Thank you.

4       We're in recess until 1:30.

5    *(Concludes proceedings)*

6                          --o0o--

7    I certify that the foregoing is a correct transcript from

8  the record of proceedings in the above-entitled matter.  I

9  further certify that the transcript fees and format comply

10  with those prescribed by the Court and the Judicial Conference

11  of the United States.

12

13  Date:  07/19/22            /s/  *Gigi Simcox*
                             United States Court Reporter
14                             262 West Nueve Street
                             San Antonio TX 78207
15                             Telephone:  (210)244-5037

16

17

18

19

20

21

22

23

24

25