IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA <br> *ex rel.* PETER HUESEMAN, <br><br>     Plaintiff, <br><br> v. <br><br> PROFESSIONAL COMPOUNDING <br> CENTERS OF AMERICA, INC., <br><br>     Defendant. | ) <br> ) <br> ) <br> ) <br> )   **SA-14-CA-212-XR** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**UNITED STATES' OPPOSITION TO PCCA'S MOTION
TO COMPEL THE PRODUCTION OF DOCUMENTS AND INFORMATION**

The Court should deny PCCA's motion to compel production of documents and information (Dkt. 162) for several reasons.[1] *First*, the claims data—collected from TRICARE's Pharmacy Benefit Manager, Express Scripts, and produced to PCCA—is reliable, contains all relevant fields (including all pricing fields), and is the exact same data set used by the government's experts to determine damages. *Second*, PCCA has failed to explain the relevance of the additional fields it seeks, which have no bearing on damages.

*Third*, to the extent PCCA has questions about the claims data or how it is maintained, the proper vehicle for addressing those questions is a Rule 30(b)(6) deposition of Express Scripts, which adjudicates pharmacy claims on behalf of TRICARE and maintains the claims data produced to PCCA. In fact, PCCA had served Express Scripts with a Rule 30(b)(6) notice to

---

[1] The United States' response in opposition is supported by the attached Declaration of Rachel A. Ward. *See generally* Ex. 1, Ward Decl.

address its questions and scheduled a deposition for December 14, 2023. But then PCCA filed this motion to compel against the United States and postponed the 30(b)(6) deposition.

**Fourth**, the government had already asked Express Scripts to produce 23 network provider agreements specifically identified by PCCA before PCCA filed its motion. **Fifth**, PCCA's discovery as to offsets is premature, irrelevant to actual damages under controlling law, and disproportional to the needs of the case. Furthermore, the government's determination of damages as set forth in its expert reports excludes claims that were subject to offsets. **Finally**, discovery related to the government's settlement with a third party, Fagron Holding USA LLC, is irrelevant and has no bearing on any PCCA defense.

## LEGAL STANDARD

Under Rule 26(b)(1), parties may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Although the scope of discovery is generally broad, "Rule 26(b) has never been a license to engage in an unwieldy, burdensome, and speculative fishing expedition." *Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258, 262, 264 (5th Cir. 2011) (cleaned up).

"A discovery request is relevant when the request seeks admissible evidence or 'is reasonably calculated to lead to the discovery of admissible evidence.'" *Id.* at 262 (quoting *Wiwa v. Royal Dutch Petrol. Co.*, 392 F.3d 812, 820 (5th Cir. 2004)). "The [C]ourt must balance the need for discovery by the requesting party and the relevance of the discovery to the case against the harm, prejudice, or burden to the other party." *Cmedia, LLC v. LifeKey Healthcare, LLC*, 216 F.R.D. 387, 389 (N.D. Tex. 2003) (quoting *Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207, 1210 (Fed. Cir. 1987)). The Court enjoys wide discretion in determining the scope and effect of discovery. *EEOC v. BDO USA, LLP*, 876 F.3d 690, 698 (5th Cir. 2017).

After a party has attempted in good faith to obtain discovery without court action, that party may move for an order compelling disclosure or discovery. Fed. R. Civ. P. 37(a)(1). Once a party moving to compel discovery establishes that the materials and information it seeks are relevant or will lead to the discovery of admissible evidence, the burden rests on the party resisting discovery to substantiate its objections. *Lozano v. Baylor Univ.*, 339 F.R.D. 447, 450 (W.D. Tex. 2020) (cleaned up).

## ARGUMENT

### I. The Court Should Deny PCCA's Motion to Compel Regarding the Claims Data.

The claims data is reliable and contains all relevant fields. PCCA has failed to explain the relevance of the additional fields it seeks. Additionally, Express Scripts has already agreed to a 30(b)(6) deposition. It is unclear what additional relief the government can provide.

### A. The Claims Data Collected from Express Scripts and Produced to PCCA Is Reliable.

TRICARE contracts with Express Scripts to administer prescription drug coverage for TRICARE beneficiaries, including the processing, adjudication, and payment of compound prescription claims submitted by pharmacies for reimbursement by TRICARE. Dkt. 164 ¶ 40 (admitting allegations in Dkt. 66 ¶ 40 (Government Complaint)); Ward Decl. ¶ 3.

In June 2023, the government produced to PCCA claims data collected from Express Scripts for all compound prescription drug claims submitted to TRICARE containing at least one PCCA ingredient for the time period January 1, 2012 to May 31, 2015. That production consisted of two separate files: (1) data for each compound drug as a whole (Compound Data); and (2) data for each individual ingredient contained within each compound claim (Ingredient Data). *See* Dkt. 160-23 at 10 (Expert Report of Eric Hines); Ward Decl. ¶ 4. The Compound Claims Data contained 132 separate fields and over 3.1 million records. *See* Dkt. 160-23 at 10 (Hines Rep.).

The Ingredient Data contained 19 separate fields and approximately 14.9 million records. *See id.* That data set included all National Council for Prescription Drug Programs ("NCPDP") pricing fields submitted by the pharmacy, *see* Ward Decl. ¶ 6, and is the exact same data the government provided to its experts for use in the preparation of their expert reports on damages.

In July 2023, the government reproduced—at PCCA's request—the same claims data in smaller file sizes and identified for PCCA software programs the government was using to open, view, and query the claims data. In October 2023, the government transmitted to PCCA a data dictionary prepared by Express Scripts for the claims data. The data dictionary included a cross-reference between the names of the fields in the Compound and Ingredient Data and the corresponding NCPDP D.0 fields. *See* Ward Decl. ¶ 5.

Contrary to PCCA's contentions (at 2, 7), the claims data is reliable and includes all relevant fields—in total 151 fields among the two data files. Specifically, the data includes all pricing fields submitted by pharmacies. *See* Ward Decl. ¶ 6. PCCA maintains that the data does not contain the pharmacies' submitted AWP and U&C price. Dkt. 162 at 6. Not so. When pharmacies submit an ingredient's AWP with a claim, they report the AWP for that ingredient in NCPDP Field # 449-EE (NCPDP Field Name "Compound Ingredient Drug Cost"), which corresponds to the INGRED_COST_AMT_SBMT field in the Ingredient Data, along with a code entered in a separate field (NCPDP Field # 490-UE) to signify AWP as the basis of the cost submitted. *See* Dkt. 160-23 at 13, 26 & n.75 (Hines Rep.). In fact, during the relevant time frame, AWP-coded ingredient costs accounted for 93 percent of the total ingredient costs submitted by

4

pharmacies for the relevant PCCA products in compound claims paid by TRICARE. *See id.* at 12–13.[2]

Pharmacies report the Usual and Customary (U&C) price for the compound at the claim level. This is submitted in NCPDP Field # 426-DQ (NCPDP Field Name "Usual and Customary Charge"), which corresponds to the FINAL_INGRED_CST_AMT_SBMTD field in the Compound Data. *See id.* at 27 (Hines Rep.). Regardless of the names used by Express Scripts for the fields maintained in its internal claims database, PCCA is wrong to contend that the claims data does not contain the submitted AWP and U&C prices.

PCCA attempts to make much of a code "ACQ," which Express Scripts used internally to signify AWP as the basis for payment on a compound claim. According to internal Express Scripts documentation, however, the code "ACQ" "refers to the AWP for the specific 11-digit NDC number[.] . . . The average wholesale price (AWP) of a specific package size of a drug." *Id.* at 13 n.36 (Hines Rep.). It does not refer to the pharmacy's acquisition cost.

PCCA appears to argue that the data should contain a separate acquisition cost field. Dkt. 162 at 9 ("The Government has alleged that three metrics, Usual and Customary Price, AWP and acquisition cost, were required to be submitted for a claim to be paid."). But once again, PCCA mischaracterizes the government's allegations. The government has not alleged that pharmacies were required to submit their acquisition costs in their claims to TRICARE. *See* Dkt. 66 ¶ 45; *see also* Dkt. 91 at 42; Dkt. 121 at 11; Dkt.160 at 13, 21. PCCA repeatedly conflates the ingredient cost submitted for reimbursement with "acquisition cost." Rather, the government alleges that PCCA established and reported fraudulently inflated AWPs knowing that its pharmacy

---

[2] As alleged in the government's complaint, Express Scripts also uses AWP data published by commercial pricing compendia such as Medi-Span. *See* Dkt. 66 ¶ 54. PCCA reports its AWPs to those compendia. *Id.* ¶¶ 53, 60, 72, 186.

5

customers would use those AWPs to seek inflated reimbursements from TRICARE for PCCA products. And, as discussed above, the cost submitted for reimbursement by pharmacies routinely reflected the ingredient's AWP.[3]

### B. PCCA Does Not Explain the Relevance of the Additional Fields It Seeks.

PCCA seeks to compel the government "to produce all missing data fields." Dkt. 162 at 8. But PCCA neither points to a single missing pricing field nor explains why it needs any additional fields. By PCCA's own admission, "[n]ot every field [] is necessarily material to our analysis." *See* Ex. 2 at 1 (email dated Oct. 26, 2023). Some additional fields are plainly irrelevant to damages or any PCCA defense, like gender, cardholder first and last name, patient relationship, and help desk phone number. And, PCCA has the same data utilized by the government's experts.

Moreover, because Express Scripts adjudicates and maintains the claims information submitted by pharmacies, government's counsel wrote to PCCA's counsel, "we are willing to work with Express Scripts to get additional data your experts believe they need to complete their analysis, within reason . . . the more targeted your requests, the more expeditiously we can get them to you." Ex. 3 at 7–8 (email dated Nov. 17, 2023); *see also* Ward Decl. ¶¶ 8–10.

In an effort to be fully transparent, government's counsel relayed information from Express Scripts that "there is a complicated mapping process that [Express Scripts] needs to conduct in order to match the requested additional fields with appropriate tables where the data resides." Ex. 3

---

[3] The cases PCCA cites (at 8) are inapposite. *Jalex Medical* does not discuss the production of data, whereas *Saginaw Chippewa Indian Tribe* and *Haywood* address unanalogous situations in which data is clearly deficient—i.e., missing fields that were present in a prior production and unreadable column headers. *Nvision Biomed. Techs., LLC v. Jalex Med., LLC*, No. SA–15–CA–284–RP, 2016 WL 8259333, at *5–10 (W.D. Tex. Jan. 5, 2016); *Saginaw Chippewa Indian Tribe of Mich. v. Blue Cross Blue Shield of Mich.*, No. 1:16-cv-10317, 2023 WL 1452062, at *5–6 (E.D. Mich. Feb. 1, 2023); *Haywood v. Wexford Health Sources, Inc.*, No. 16-cv-3566, 2021 WL 2254968, at *7–9 (N.D. Ill. June 3, 2021).

at 4 (email dated Nov. 22, 2023); *see also* Ward Decl. ¶ 8. Government's counsel further explained based on information from Express Scripts that "the data is kept in multiple tables and [] the mapping is necessary before information in the additional fields can be pulled from the specific tables." Ex. 3 at 4. Thus, "[i]t is the mapping process (as opposed to the production process) that is time consuming." *Id.*[4]

PCCA takes issue with this mapping process and incorrectly claims that it is "transforming" the data. *See* Dkt. 162 at 7 n.6. Rule 34 anticipates that parties may produce data compilations in civil discovery. *See* Fed. R. Civ. P. 34(a)(1)(A) (permitting a party to produce "data or data compilations—stored in any medium from which information can be obtained either directly, or if necessary, after translation by the responding party into a reasonably usable form"); Fed. R. Civ. P. 34(a) advisory committee's note to 2006 amendment (noting specifically that "Rule 34(a) was amended to include discovery of data compilations, anticipating that the use of computerized information would increase").

That is precisely what Express Scripts did here. The claims data is housed in multiple tables. *See* Ex. 3 at 4; *see also* Ward Decl. ¶ 8. The mapping process described by Express Scripts is necessary to identify and retrieve the requested additional fields from these different tables. The process neither alters the underlying data nor renders it unreliable. Instead, it compiles the data in a form that is more usable. And, as noted above, the data provided to PCCA is the exact same data set used by the government's experts to prepare its expert reports on damages.

---

[4] PCCA's request to receive this data by December 10, 2023—a Sunday, and the day before the government's response was due—is unreasonable and logistically unworkable as explained.

7

### C. A Deposition of Express Scripts—Which PCCA Had Already Scheduled and Cancelled—Is the Proper Vehicle to Address PCCA's Questions.

PCCA further contends that the government has been uncooperative in answering questions about the data. Dkt. 162 at 6. Not so. PCCA requested that the government "make someone available to speak with PCCA's expert to answer some technical questions regarding the data, why certain fields were missing, and what the meaning of certain codes were that were not defined in the data dictionary or in other discovery produced by the Government." *Id.* But, as explained to PCCA, because Express Scripts adjudicates and maintains the claims data, the government directed PCCA to Express Scripts for answers to technical questions about the claims data.

The proper mechanism to have such questions answered is through a Rule 30(b)(6) deposition.[5] PCCA served a Rule 30(b)(6) notice on Express Scripts on November 3, 2023. *See* Ex. 4 (Express Scripts 30(b)(6) notice). The topics attached to the notice included:

> The Claim dataset ESI provided to the United States of America in this matter . . .including the following:
>
> a. The definition of fields produced and acronyms used in the Claim dataset ESI provided to the United States of America . . . .
> b. How the decision was made to select the fields included in the Claim dataset ESI provided to the United States of America . . . .
> c. The reason for, background on, and nature of missing National Counsel for Prescription Drug Program (NCPDP) D.0 fields in the data produce[d] . . . .

*Id.* at 7. Express Scripts agreed to produce a 30(b)(6) witness on December 14, 2023. Shortly before the deposition, however, PCCA filed the present motion and cancelled that deposition. *See* Ex. 5 at 1 (email dated Dec. 6, 2023). Rather than proceed with the deposition to ask its questions about the claims data—answers to which it contends it must have for its experts' work—PCCA

---

[5] Neither PCCA nor the government can compel Express Scripts, a non-party, to answer written questions about the data. *See, e.g.*, *Ward v. Empire Vision Ctrs., Inc.*, 262 F.R.D. 256, 261 (W.D.N.Y. 2009) (citing Fed. R. Civ. P. 33(a)(1)) ("[T]he federal rules provide that interrogatories may only be served upon parties to the lawsuit.").

apparently rescheduled the deposition to a future date in January 2024, well after its initial expert reports are due. *See id.* Thus, PCCA filed a motion to compel answers it was going to receive from a previously scheduled 30(b)(6) deposition, which it has now cancelled. The government does not understand PCCA's tactics. Regardless, the Court should deny the motion on this point as moot.

PCCA further requests "documents from the government, like the one provided to their expert but not produced to PCCA, that bear on the potential meaning or definition of these codes." Dkt. 162 at 6 n.4. The government has provided PCCA all "the facts or data considered by the [experts] in forming" their opinions along with all the other materials Rule 26 requires. *See* Fed. R. Civ. P. 26(a)(2)(B)(ii). To the extent PCCA seeks documents defining Express Scripts' internal codes, the government provided PCCA with a data dictionary provided by Express Scripts. It is unclear what other specific documents PCCA seeks, and the motion on this point should be denied too.

## II. The Court Should Deny the Motion to Compel Regarding the Pharmacy Contracts Because the Government Has Asked Express Scripts to Provide the Contracts PCCA Specifically Requested.

Next, PCCA seeks to compel "contracts between ESI or TRICARE, and any pharmacy that allegedly submitted a false claim[.]" Dkt. 162 at 10. The contracts at issue are provider agreements between Express Scripts and pharmacies along with accompanying rate sheets. As such, Express Scripts possesses them. The government's counsel offered to request from Express Scripts 20 provider agreements and to produce them to PCCA. *See* Ex. 3 at 5 (email dated Nov. 22, 2023). PCCA's counsel responded by asking for the agreements of "the 20 highest billers, plus three specific pharmacies to the extent those pharmacies don't fall in the top 20." *Id*. at 3. PCCA's counsel added, "[p]lease confirm that you agree to produce the top 20 plus the three requested. We'd like to know this as soon as possible, otherwise we will need to move to compel the

production of all 1900." *Id*. The government's counsel indicated that the government would request Express Scripts to produce the requested agreements if that would satisfy PCCA's request. *Id.* at 1. PCCA then filed the instant motion.

This week, the government will produce provider agreements recently received from Express Scripts for 20 pharmacies. Additionally, the government has asked Express Scripts to provide the agreements for any other pharmacies within the 23 that PCCA requested. If, upon review of these agreements, PCCA contends that it needs additional agreements, the government will work with PCCA in good faith to come to an agreement on the production of a reasonable number of additional agreements.

The government disputes PCCA's contention (at 13 n.10) that the agreements are "vital" to any claim or defense in this case. The claims data already reflects the actual reimbursement information for the claims submitted by the pharmacies and paid by TRICARE. *See Reyna v. Kroger Tex. LP*, No. 3:14-cv-0373-P-BK, 2014 WL 11460391, at *3 (N.D. Tex. Oct. 21, 2014) ("The undersigned cannot discern any connection between the contractual arrangements that Defendant has with these vendors and Plaintiff's falling in water that may have come from one or more of the vendors' machines. Without some further explanation, these requests for production appear to be nothing more than a fishing expedition[.]"). PCCA has not articulated why it needs every provider agreement.

On top of that, it would be unduly burdensome and disproportional to the needs of the case for Express Scripts to produce the agreements for 456 pharmacies, whose claims make up the government's damages—let alone the supposed 1,900 pharmacies referenced in PCCA's motion. *See* Ward Decl. ¶¶ 11–14. Because the government has agreed to produce more than the 23 agreements specifically requested by PCCA, the limited evidentiary value of the agreements, and

the undue burden of producing all 456 agreements, the Court should deny the motion to compel on this point.

**III.   The Court Should Deny the Motion to Compel regarding Offsets Because Such Discovery is Premature, Irrelevant to Actual Damages, and the Government Is Not Seeking Damages on Claims Subject to Those Offsets.**

Additionally, PCCA demands "documents and communications relating to 'offsets,' which refer to the amount of money paid back or that was later remitted to the Government by pharmacies that allegedly submitted false claims[.]" Dkt. 162 at 10. PCCA points specifically to offsets resulting from audits conducted by Express Scripts. *Id*. at 12 n.9. PCCA's demand for this information should be rejected.

Courts have found discovery into issues of potential credits or offsets premature prior to any determination of liability. *See Thomasian v. Wells Fargo Bank, N.A.*, No. 3:12-cv-1435, 2013 WL 4498667, at *2 (D. Or. Aug. 22, 2013) ("Offset issues, if there are any, will not be presented to the jury, and can be handled post-trial by the trial judge, as necessary."); *see also Hoerchler v. Equifax Info. Servs., LLC*, 568 F. Supp. 3d 931, 935–39 (N.D. Ill. 2021) (similar holding). This is particularly true under the FCA, where any offset is applied after actual damages are trebled. *See United States v. Bornstein*, 423 U.S. 303, 315–17 (1976).

In *Bornstein*, a subcontractor had falsely branded certain electron tubes included in radio kits supplied by the prime contractor to the government. *Id.* at 307. After discovering the fraud, the government recovered certain amounts from the prime contractor for each tube falsely branded by the subcontractor. *See id.* The Supreme Court had to decide how these payments from the prime contractor to the government should be considered when determining the "computation of double damages"[6] against the subcontractor under the FCA. *Id.* at 308. The Supreme Court

---

[6] At the time, the FCA awarded double damages, which was later increased to treble damages.

11

"h[e]ld that, in computing the double damages authorized by the [FCA], the Government's actual damages are to be doubled before any subtractions are made for compensatory payment previously received by the Government from any source." *Id.* at 316. Thus, under *Bornstein*, if PCCA is found liable in this case, the government's actual damages must first be trebled by the Court, after which the Court would then apply any relevant offset or credit. In other words, under *Bornstein*, such credits or offsets do not reduce or impact the government's "actual damages" but are only applied to the multiplier.

In its Motion for Relief from ADR, however, PCCA expressly states that it "is not capable of paying the $333,583,192 that the Government's damages' expert has now calculated as being the lowest of five different damages scenarios." Dkt. 163 at 2. In light of PCCA's admission that it is not capable of paying even the "lowest" level of single or actual damages, let alone any multiplier, PCCA's requested discovery into credits or offsets is irrelevant and disproportional to the needs of the case.

Moreover, it is the government's understanding that offsets resulting from Express Scripts audits are reflected in the claims data as adjustments or reversals. And the government is not seeking damages on any claim that was subject to an adjustment or reversal. As the government's expert explained, "I only considered as part of the Claims Base those Claims that resulted in a reimbursement payment by TRICARE, as indicated by having a [CLAIM_STATUS] of 'Accepted/Paid' and a [TRANSACTION_RESPONSE_STATUS] of 'P'. . . . I only considered as part of the Claims Base those Claims that were not the subject of an adjustment or reversal, the identification of which I describe in the previous section." *See* Dkt. 160-23 at 17–18 (Hines Rep.) (footnotes omitted).

Because claims subject to the type of offset PCCA discusses in its motion are not at issue in this case, documents related to those claims are neither relevant to any claim or defense nor reasonably calculated to lead to the discovery the admissible evidence. *See Davis v. U.S. Marshals Serv.*, 849 F. App'x 80, 87 (5th Cir. 2021) (affirming denial of motion to compel where documents were not relevant to plaintiff's remaining claim); *Curry v. Strain*, 262 F. App'x 650, 652 (5th Cir. 2008) (finding no abuse of discretion where district court denied motion to compel because, among other reasons, the discovery related to dismissed claims); *McRae v. Am. Prots. Plans LLC*, No. SA-19-CV-00945-DAE, 2020 WL 1941290, at *1 (W.D. Tex. Apr. 21, 2020) (denying motion to compel discovery related to issue "not in dispute").[7]

### IV. Discovery Related the Government's Settlement with Fagron Is Irrelevant.

Finally, PCCA seeks to compel the government to "produce discovery related to its prior settlement with Fagron Holding USA LLC used to support its allegations against PCCA." Dkt. 162 at 13 (emphasis omitted). It is unclear what discovery regarding the settlement PCCA seeks. Regardless, any such discovery is neither relevant to any claim or defense nor reasonably calculated to lead to the discovery of the admissible evidence.

Fagron is a third party to this lawsuit. The relator named its subsidiary, Freedom Pharmaceuticals Inc., as a defendant in his complaint. In 2019, before the government intervened, Fagron entered a settlement to resolve, among other things, the government's contention that Freedom falsely inflated AWPs for its own ingredients. *See generally* Dkt. 114-1 (Settlement Agreement). When the government intervened in 2021, it named neither Fagron nor Freedom as

---

[7] In addition, it would be disproportional to the needs of the case to collect, review, and produce all documents related to claims that were subject to adjustment or reversal, which are not part of the claims base for which the government seeks damages. *See* Dkt. 160-23 at 12 (discussing 806 claims that were adjusted or reversed); Ward Decl. ¶ 7 (discussing burden to produce adjustment and/or reversal documents underlying 806 claims).

13

defendants. PCCA was the sole defendant. The present action involves only PCCA's fraudulent scheme to inflate AWPs and offer kickbacks to induce the purchase of its ingredients. Discovery concerning the Fagron settlement is irrelevant to PCCA's alleged actions and its currently remaining defenses of statute of limitations, offset, and excessive fines.

PCCA points out that the government's complaint references the Fagron settlement. But, in its complaint, the government simply cited the publicly available fact that it had "used the FCA to recover from other compound ingredient suppliers for monies TRICARE paid for compound ingredients with grossly inflated AWPs[]" and cited to the settlement. Dkt. 66 at ¶ 174. This was cited in support of materiality, as an example of the government acting against entities that have fraudulently inflated their AWPs. But that does not make discovery beyond the settlement itself, which PCCA possesses, permissible. And, any settlement negotiations between the government and Fagron have no bearing on PCCA's defenses this case.[8]

PCCA also references the documents Freedom produced during the government's investigation of it. Again, PCCA makes no effort to explain how documents relating to a different defendant have any bearing on PCCA's defenses in this case. Freedom produced over 960,000 documents. At PCCA's request, the government contacted Fagron's counsel to ascertain its position on the production of its documents to PCCA. In response, Fagron's counsel notified the government's counsel that Fagron objects to the disclosure of its documents to PCCA, a

---

[8] Confidential settlement negotiations may also be privileged. *See Goodyear Tire & Rubber Co. v. Chiles Power Supply. Inc.*, 332 F.3d 976, 979–83 (6th Cir. 2003) (holding that confidential settlement negotiations are shielded from discovery under a settlement privilege). *But see Two-Way Media LLC v. AT&T Inc.*, No. SA-09-CA-476-OG, 2011 WL 13113724, at *3 (W.D. Tex. Mar. 7, 2011) ("[T]he Court concludes that an absolute settlement privilege should not be recognized in the context of settlement agreements and negotiations in patent cases."). The Court need not reach this issue because the discovery sought is irrelevant.

competitor, because, among other reasons, the documents contain confidential and proprietary information.

Because PCCA has not explained how these documents would be relevant, and because Fagron would be prejudiced by their disclosure, the Court should deny PCCA's motion to compel on this point. *See Fox v. City of Austin*, No. 1:22-CV-00835-DAE, 2023 WL 6119383, at *5 (W.D. Tex. Sept. 18, 2023) ("The Court finds that this request is a classic fishing expedition and the relevance of the documents sought is easily outweighed by the harm in the form of harassment of the named witnesses."); *Ramos v. Capitan Corp.*, No. MO:16-cv-00075-RAJ-DC, 2017 WL 1278737, at *4 (W.D. Tex. Feb. 2, 2017) ("Defendant has failed to identify specific reasons for seeking Plaintiff's litigation history such as inconsistent statements or proof of bias. Instead, Defendant requests this information to see what *might* turn up in its request." (emphasis in original)).

## CONCLUSION

For the forgoing reasons, the Court should deny PCCA's motion to compel production of documents and information.

Dated: December 11, 2023.                    Respectfully submitted,

| | |
|---|---|
| JAIME ESPARZA | MICHAEL D. GRANSTON |
| United States Attorney | Deputy Assistant Attorney General |
| Western District of Texas | Civil Division |
| | |
| */s/ John M. Deck* | */s/ F. Elias Boujaoude* |
| JOHN M. DECK | JAMIE ANN YAVELBERG |
| Assistant United States Attorney | NATALIE A. WAITES |
| Texas Bar No. 24074120 | SANJAY BHAMBHANI |
| 601 N.W. Loop 410, Suite 600 | DANIELLE L. SGRO |
| San Antonio, Texas 78216 | NATHAN P. GREEN |
| Tel: (210) 384-7388 | F. ELIAS BOUJAOUDE |
| Fax: (210) 384-7322 | Attorneys, Civil Division |

john.deck@usdoj.gov

MARY F. KRUGER
Georgia Bar No. 6282540
Assistant United States Attorneys
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216
Tel: (210) 384-7630
Fax: (210) 384-7322

Commercial Litigation Branch
Post Office Box 261
Ben Franklin Station
Washington, D.C.  20044
Tel: (202) 307-0804
f.e.boujaoude@usdoj.gov

*Attorneys for the United States of America*

## CERTIFICATE OF SERVICE

I certify that, on December 11, 2023, I served the foregoing document via CM/ECF on all counsel of record registered to receive CM/ECF notifications.

>  */s/ F. Elias Boujaoude*
>  F. ELIAS BOUJAOUDE