**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

UNITED STATES OF AMERICA      §
*ex rel.* PETER HUESEMAN      §
*Plaintiff*      §
     §          SA-14-CV-00212-XR
-vs-      §
     §
PROFESSIONAL COMPOUNDING      §
CENTERS OF AMERICA, INC.,      §
         *Defendant*      §

## <u>ORDER DENYING MOTION TO DISMISS FOR WANT OF PROSECUTION</u>

On this date, the Court considered Defendant Professional Compounding Centers of America, Inc.'s motion to dismiss this case for want of prosecution under Rule 41(b) (ECF No. 193), the Government's response (ECF No. 202), Defendant's reply (ECF No. 204). After careful consideration, the motion is **DENIED**.

## BACKGROUND

Defendant Professional Compounding Centers of America ("PCCA") sells chemical ingredients to compounding pharmacies. Compounding is a practice in which a licensed pharmacist combines, mixes, or alters ingredients of a drug to create a medication tailored to the needs of an individual patient. PCCA's pharmacy customers ("members") use these ingredients to prepare and dispense compound medications for patients. The United States of America (the "Government") alleges that, from 2012 to 2015, PCCA and its members reported fraudulently inflated prices for its ingredients for reimbursement purposes and thereby enriched themselves at the expense of the federal TRICARE program, which provides health care coverage for active-duty military personnel, military retirees, and military dependents.

On March 10, 2014, Relator Peter Hueseman, a licensed pharmacist who previously worked for Pharmacy Solutions, Inc., d/b/a Bellevue Pharmacy ("Bellevue"), filed a *qui tam* complaint under seal against PCCA and eleven other named defendants, alleging a nationwide fraud scheme against several federal healthcare programs in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a), and the Anti-Kickback Statute ("AKS"), 42 U.S.C. §§ 1320a–7b(b). ECF No. 1. The other defendants included (1) another supplier of compounding ingredients— Freedom Pharmaceuticals, Inc. ("Freedom" and, together with PCCA, the "Supplier Defendants"), *see id.* ¶¶ 52–53, 55–58; (2) Bellevue and several of its principals and affiliated retail pharmacies (the "Bellevue Defendants"), *see id.* ¶¶ 14–51; and (3) a licensed physician alleged to have a kickback arrangement with the Bellevue Defendants, *see id.* ¶¶ 59–60.

In its first request for an extension of its statutory 60-day deadline to decide whether to intervene in the case under 31 U.S.C. § 3730(b)(2), the Government warned the Court that "[a]n extensive investigation will likely be necessary to determine whether to intervene." ECF No. 6 at 2. After requesting—and obtaining from this Court—fifteen extensions of its deadline, the government filed a notice of intervention against PCCA in August 2021, and filed its complaint in partial intervention on November 1, 2021. *See* ECF Nos. 64, 66.

In the meantime, the Government investigated the allegations in the Relator's complaint. As authorized by the statute, 31 U.S.C. § 3733(a)(1), the Department of Justice ("DOJ") issued Civil Investigative Demands ("CIDs") to PCCA and other defendants for documents, written interrogatory answers, and oral testimony. Based on the timeline set forth in the Government's response—which PCCA does not materially dispute—the Government's investigation over the next seven years proceeded as follows:

**In 2014**, the Government marshalled an investigative team, including personnel from: the U.S. Attorney's Office for Western District of Texas, Eastern District of Texas, and Middle District of Florida, the DOJ's Civil Fraud Section in Washington, D.C., the Defense Health Agency ("DHA"), the Defense Criminal Investigative Service, the Federal Bureau of Investigation, the Drug Enforcement Administration, the U.S. Postal Service, and the Department of Labor. The Government developed an investigative plan to accommodate and organize interagency investigative efforts; interviewed the relator and requested additional documents from him; collected and reviewed internal government materials related to the allegations; and drafted and served CIDs on several named defendants, including PCCA.

**In 2015**, the Government negotiated the scope and timeline for the production of materials responsive to the CIDs *and made reasonable accommodations to PCCA and other CID recipients to extend their time for compliance*. PCCA initially produced about 7,000 documents.

**In 2016**, the Government had multiple meetings with PCCA and other defendants while it simultaneously reviewed documents and information produced by these parties in response to the Government's CIDs. In early 2016, PCCA, Freedom, and the Bellevue Defendants made separate presentations to the DOJ regarding their respective company practices. After several face-to-face meetings in summer and early fall, the Government presented its preliminary findings to PCCA in August, and PCCA made a counter-presentation in November. Following these meetings, the Government requested additional materials from defendants and, *at the request of the defendants (including PCCA), granted various extensions of time to provide additional materials*. PCCA produced about 7,500 documents in 2016. Meanwhile, the investigative team started interviewing PCCA employees and collected additional information from agencies potentially affected by the alleged scheme.

**In 2017**, PCCA produced about 240,000 documents in response to the government's follow-up requests. PCCA. Based on these productions, the investigative team requested additional interviews and CID examinations of current and former PCCA employees, which continued throughout 2017. Meanwhile, Freedom and the Bellevue Defendants requested an ability-to-pay settlement and worked with the government to provide the requested financial materials.

**In 2018**, the Government continued with its interviews and CID examinations of current and former PCCA employees. In May 2018, the Government held, at PCCA's request, an in-person meeting in Washington,

D.C., including the Acting Assistant Attorney General for the Civil Division along with other senior DOJ officials. The investigative team also continued discussions with Freedom and the Bellevue defendants and held many in-person and telephonic meetings to discuss settlement on an ability-to-pay basis.

**In 2019**, the Government continued to conduct CID examinations of current and former PCCA employees. In November 2019, the Government entered into a settlement with Freedom and the Bellevue defendants resolving the allegations against those entities. The Court entered a stipulation of dismissal as to the settling defendants in November 2019.

**In 2020**, the COVID-19 pandemic interrupted the Government's investigation, and the CID examination of PCCA's Chief Operating Officer (Fabian Zaccardo), who was responsible for setting the company's AWPs, was delayed. Despite the pandemic, the Government continued to hold telephone conferences with PCCA regarding omissions from its document productions. And served CIDs on two additional parties. In October 2020, the Government presented its views and findings to PCCA, which delivered a counter-presentation in November. Following these presentations, the parties discussed the possibility of resolving the matter on an ability-to-pay basis, but PCCA declined to submit the requested financial information.

**In 2021**, the parties continued settlement discussions until the summer of 2021 when it became clear that an out-of-court resolution was impossible. The Government filed a notice of intervention against PCCA in August 2021 (ECF No. 64), and filed its complaint in partial intervention on November 1, 2021 (ECF No. 66).

*See* ECF No. 202 at 3–6.

PCCA moves to dismiss this case for failure to prosecute under Rule 41(b) based on the fifteen extensions on the intervention deadline requested by the Government—and granted by this Court—between the filing of the Relator's original complaint on March 10, 2014, and the Government's Intervention on November 21, 2021. *See* ECF No. 193. The Court held a hearing on the motion on May 1, 2024.

**DISCUSSION**

I.     **Legal Standard**

Rule 41(b) of the Federal Rules of Civil Procedure permits a district court to dismiss a case for want of prosecution or failure to comply with a court order. FED. R. CIV. P.41(b). The Court's authority in this regard stems from its inherent power to control its docket and prevent undue delays in the disposition of pending cases. *Boudwin v. Graystone Ins. Co.*, 756 F.2d 399, 401 (5th Cir. 1985) (citing *Link v. Wabash R. Co.*, 370 U.S. 626 (1962)); *see also Griggs v. S.G.E. Mgmt., LLC*, 905 F.3d 835, 844 (5th Cir. 2018) (reviewing Rule 41(b) dismissal for abuse of discretion) (citation omitted).

Where a dismissal would preclude further litigation of the case due to the expiration of the statute of limitations, the dismissal operates as a dismissal with prejudice. *McGowan v. Faulkner Concrete Pipe Co.*, 659 F.2d 554, 554 (5th Cir. 1981). A dismissal with prejudice is an extreme sanction that deprives the litigant of an opportunity to litigate his claim. *Callip v. Harris County Child Welfare Dep't*, 757 F.2d 1513, 1519 (5th Cir. 1985). Consequently, when limitations bars, or arguably bars, refiling, dismissal is appropriate only when (1) there is a clear record of delay or contumacious conduct by the plaintiff and (2) the court determines that lesser sanctions would not prompt diligent prosecution, or lesser sanctions have been employed but proved to be futile. *Id.* at 1519–21.

A clear record of delay is found when there have been significant periods of total inactivity. *Berry v. Cigna/RSI Cigna*, 975 F.2d 1188, 1191 n.5 (5th Cir. 1992); *see also Bullard v. Burlington N. & Santa Fe. Ry. Co.*, 368 F. App'x 574, *7 (5th Cir. 2010) ("We have "recognized that 'delay which warrants dismissal with prejudice must be longer than just a few months; instead, the delay

must be characterized by significant periods of total inactivity.'"). Contumacious conduct is a "stubborn resistance to authority." *McNeal v. Papasan*, 842 F.2d 787, 792 (5th Cir. 1988).

Additionally, in most cases, at least one of three aggravating factors must be present. Those factors are: (1) delay caused by the plaintiff personally; (2) actual prejudice to the defendant; or (3) delay caused by intentional conduct. *Berry*, 975 F.2d at 1191. The presence of one aggravating factor, along with a record of delay or contumacious conduct and consideration of lesser sanctions, will support a dismissal with prejudice. *Price v. McGlathery*, 792 F.2d 472 (5th Cir. 1985).

## II.    Analysis

Congress charged the Attorney General with a mandate to "diligently [] investigate" any potential violations of the False Claims Act. 31 U.S.C. § 3730(a). When potential violations are identified in the filing of a qui tam action by a Relator, Congress prescribed a 60-day period in which the Government can perform its "diligent" evaluation to determine whether it wishes to intervene. 31 U.S.C. § 3730(b)(2). After the initial 60-day period during which a FCA *qui tam* complaint is sealed, 31 U.S.C. § 3730(b)(2), "[t]he Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal," *id.* § 3730(b)(3).

The FCA itself contains no definition of the "good cause" that would suffice to extend the congressionally mandated 60-day period for intervention**.** 3730 U.S.C. § 3730(b)(3). The "good cause" standard is "a uniquely flexible and capacious concept, meaning simply a legally sufficient reason" that is "neither a burdensome nor unfamiliar obligation." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 429 n.2 (2023) (quoting *Polansky v. Exec. Health Res. Inc.*, 17 F.4th 376, 387 (3d Cir. 2021)) (citing 31 U.S.C. § 3730(c)(3) (good cause requirement to intervene post declination)). Indeed, the Supreme Court recently held that "good cause" can exist

6

for intervention even long *after* the sealing period has ended and the Government has declined to intervene the case. *See United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 429 n.2 (2023) (concluding that Government could intervene in relator's suit to dismiss the case years after it declined intervention during the sealing period).

In support of its motion, PCCA largely relies on the Fifth Circuit's recent criticism of the 18 extensions of the sealing period granted by the district court in *United States ex. rel. Aldridge v. Corp. Mgmt., Inc.*, 78 F. 4th 727 (5th Cir. 2023) ("*Aldridge*"). In *Aldridge*, the Fifth Circuit agreed "that the Government's incessant delay in intervening is inexcusable," and "lament[ed] that, faced with eighteen increasingly rote requests for extension of the seal period, the district court enabled the Government's gamesmanship." *Id.* at 745–46. The Fifth Circuit nonetheless declined to find that the district court should have dismissed the Government's complaint outright:

> Irrespective of the FCA's provisions requiring dismissal of claims in certain instances, "[t]he authority of a federal [ ] court to dismiss a plaintiff's action with prejudice because of [its] failure to prosecute cannot seriously be doubted." *Link v. Wabash R. Co.*, 370 U.S. 626, 629 (1962). But the district court here declined to exercise that authority, and Appellants fail to pinpoint when the court's cumulative indulgence of the Government's snail's pace rose to an abuse of discretion. **More importantly, Appellants provide no precedent, and we are aware of none, where such an extraordinary sanction as dismissal has been awarded because of the Government's inexcusable delays in intervening in a relator's case. We decline to break new ground today by granting such drastic relief.**

*Aldridge*, 78 F.4th at 747 (citation omitted) (emphasis added). Thus, *Aldridge* itself does not provide precedent for the extraordinary sanctions requested here. Rather, *Aldridge*'s teachings are prospective in nature, urging the Government to move more expeditiously and to provide more specificity in future motions to extend the sealing period and cautioning courts to scrutinize the basis for the future extension requests more carefully.

PCCA seeks to distinguish this case from *Aldridge* based on two sets of allegations provided to the Government *before* the Relator's complaint was filed in March 2014 that allegedly gave the Government a "head-start" in its investigation: (1) a draft of the Relator's complaint, provided to the Government in May 2013 and (2) a report by TRICARE's pharmacy benefits manager, Express Scripts, referring PCCA for investigation by the DHA based on its inflated AWPs. *See* ECF No. 193-1. PCCA maintains that the investigative referral is "the most critical" fact in its motion because the referral "contain[s] a veritable roadmap to the claims that the Government would eventually assert against PCCA—eight years later." *Id.* at 5.

But PCCA itself characterizes the referral as mere allegations—not evidence—that it violated the FCA. ECF No. 193 at 6; *id.* at 9 ("[T]he Government knew all of its material *allegations* against PCCA before the Relator even filed his original complaint in this Court.") (emphasis added). The same is true for the draft complaint provided to the Government before the Relator filed suit. Neither the draft complaint nor the referral relieved the government of its statutory obligation to investigate the allegations in the *qui tam* complaint. Indeed, a well-drafted qui tam complaint should likewise provide a "roadmap" to the Government's claims; the FCA still provides that the Attorney General "shall investigate" and "may bring a civil action" if he "finds that a person has violated or is violating [the FCA]." 31 U.S.C. § 3730(a). In other words, the FCA does not permit the Government to intervene on the basis of well pled allegations; the DOJ *must* investigate and *must* find that the FCA has been violated before filing a complaint.[1]

---

[1] In an FCA investigation, the DOJ is not only determining whether the FCA has been violated but also whether intervention is appropriate from a policy perspective; hence, the statute's permissive language noting that the Government "may" file suit where it finds a violation. Thus, in reality, the Government is also determining whether to (a) intervene against one or all of the defendants under one or more theories of liability addressed in the relator's complaint, (b) decline to intervene but permit the relator to prosecute the case, and/or (c) dismiss the case in part or in whole. At the same time, it may be considering whether to pursue criminal sanctions (alongside or in lieu of a civil suit) or other enforcement mechanisms at its disposal, such as recommending policy changes or entering into settlement agreements.

And, while Express Scripts identified that PCCA's AWPs had increased and estimated pharmacies' profits based on PCCA's catalog prices, the DHA referral lacked "actual PCCA sales prices for each pharmacy" necessary to calculate the true extent of PCCA's AWP spreads. Similarly, the referral presumed that PCCA was marketing its AWP spreads based on select materials but included no communications between PCCA sales representatives and pharmacy customers, PCCA's marketing plan or information about how AWP spread was used in sales interactions. *See generally* ECF No. 193-3. The information that the Government uncovered during its investigation—as evidenced by the additional allegations in its complaint-in-intervention—was not merely cumulative or even of minor importance to the Government's claims and intervention decision. PCCA's marketing efforts form the basis for the Government's scienter and causation requirements and demonstrate how PCCA marketed its inflated spreads to pharmacy customers. *See generally* ECF No. 66. Likewise, the investigation into the prices PCCA actually charged its members for certain ingredients allowed the Government to confirm the nature and magnitude of PCCA's AWP inflation to get a sense of the potential damages in this case. How could the Government *possibly* decide whether to intervene in a case without sufficient evidence that the legal claims set forth in a relator's complaint are legally and economically viable?

PCCA complains that the primary reason for the delay was the Government's "ongoing one-sided discovery, investigation and settlement negotiations with *entirely different defendants*." ECF No. 193 at 3. But the very presence of the other defendants involved in the AWP inflation scheme itself supports good cause for the delay—the Government could not plausibly have intervened against PCCA *alone* (on the basis of the mere allegations in the DHA referral) while it was still investigating claims against Bellevue Pharmacies and Freedom because *all the defendants were alleged to have participated in the same scheme*. Moreover, the Government's presentation

of evidence and the subsequent settlement discussions were consistent with Executive Order 12988, which provides that: "No litigation counsel shall file a complaint initiating civil litigation without first making a reasonable effort to notify all disputants about the nature of the dispute and to attempt to achieve a settlement[.]" 61 Fed. Reg. 4729(1)(a) (Feb. 7, 1996).

As an alternative to dismissal, PCCA seeks a so-called "lesser sanction" barring the government from recovering damages or penalties for claims submitted before October 31, 2015. ECF No. 193 at 19. But as PCCA acknowledges, this "lesser sanction" would have the same effect as a dismissal or a "Take Nothing Judgment" because the Government limited its damages to claims submitted between March 1, 2012, and May 31, 2015. *Id.* Moreover, PCCA's "lesser sanction" appears to be based on a statute-of-limitations argument that has been rejected with respect to the Government's claims sounding in AWP-inflation (*see* ECF No. 218) and, in any event, has no connection to the "good cause" requirement.

The Court declines to exercise its discretion to "break new ground" by dismissing this case for want of prosecution under Rule 41(b). *Aldridge*, 78 F.4th at 747. In *Aldridge*, the Fifth Circuit acknowledged that it found no authority for such an extraordinary sanction as dismissal because of the Government's delay in intervening. *Id*. The Court finds no such authority here.

While nothing in the FCA defines "good cause" for an extension of the Government's intervention deadline, *Aldridge* and PCCA relied a statements made in the Senate Judiciary Committee Report on the 1986 FCA amendments that "[t]he Committee feels that with the vast majority of cases, 60 days is an adequate amount of time to allow Government coordination, review and decision. Consequently, 'good cause' would not be established merely upon a showing that the Government was overburdened and had not had a chance to address the complaint."

*Aldridge*, 78 F.4th at 746 (citing S. Rep. No. 99-345, at 24-25, reprinted in 1986 U.S.C.C.A.N. 5266, 5289-90); ECF No. 193 at 2 (same).

The Committees' "feelings" did not make it into the text of the statute. [2] Even so, the record does not reveal long periods of inactivity, let alone suggest that the investigation was delayed because the Government "had not had a chance to address the complaint." In fact, the record shows that just the opposite is true: the Government promptly assembled a large team and engaged in an active investigation of the Relator's allegations—a complex, nationwide fraud scheme involving many defendants, several government healthcare programs, tens of thousands of compound prescriptions resulting in hundreds of millions of dollars in claims.

Neither the DHA referral nor the production of the Relator's draft complaint relieved the Government of its obligation to investigate the allegations against PCCA or the other defendants named in the Relator's complaint—none of whom were the subject of the DHA referral. Indeed, recognizing the complexity and magnitude of the case from the outset, the Government warned the Court in its first extension request that "[a]n extensive investigation will likely be necessary to determine whether to intervene." ECF No. 6 at 2. The realities of managing such an investigation continued to color the good-cause analysis in later extensions. The CIDs and requests for documents, interrogatories, and oral testimony are authorized by statute, and the Government negotiated with recipients about their responses. PCCA, for its part, requested and received a number of extensions to the investigative timeline, but never and never sought judicial relief from its obligations to comply with the CIDs (though such relief is also permitted by statute).

Here, as in *Aldridge*, PCCA has failed to pinpoint when the Court's "cumulative indulgence of the Government's snail's pace rose to an abuse of discretion." *Aldridge*, 78 F.4th at 747. There

---

[2] It is worth noting that there were 31 qui tam cases filed in 1987, the year after the Committee's report. There were 712 new qui tam matters filed in the first 9 months of 2023 alone. https://perma.cc/D2AM-VD47.

is no evidence of contumacious conduct by the Government or any aggravating factor that would warrant retroactive, case-terminating sanctions. If the Court had denied an extension request at an earlier date, the Government would have had to decide whether to intervene, dismiss the case, or decline to intervene but allow the Relator to pursue the action. The denial of the Government's extension requests would *not* have resulted in the termination of the action—as PCCA now seeks.

Furthermore, the Court typically affords notice and an opportunity to respond before dismissing a case for failure to prosecute under Rule 41(b). Although *sua sponte* dismissal without notice is permissible under some circumstances, such dismissals are "reserved for the most egregious of cases, usually cases where the requisite factors of clear delay and ineffective lesser sanctions are bolstered by the presence of at least one of the aggravating factors." *Rogers v. Kroger*, 669 F.2d 317, 320 (5th Cir. 1982). It is not clear to the Court how it could ascertain that lesser sanctions—such as forcing the Government to make an election decision before it had completed its investigation—would be ineffective without giving the Government an opportunity to respond to the Court's concerns about the timeliness of intervention. Obviously, no such notice was given here—in fact, by granting the extensions, the Court assured the Government that any intervention would be considered timely. To retroactively impose case-terminating sanctions under these circumstances would be manifestly unfair. The "lesser sanction" PCCA proposes—effectively barring an award of damages—is equally unwarranted for the same reasons and is untethered to the "good cause" analysis under the FCA.

*Aldridge* is a prospective warning to the Government and district courts to devote greater attention to future requests for extensions of time to make intervention decisions. To apply it retroactively under these circumstances would be manifestly unjust.

**CONCLUSION**

For the foregoing reasons, PCCA's motion to dismiss under Rule 41(b) (ECF No. 193) is

**DENIED**.

It is so **ORDERED**.

**SIGNED** this 3rd day of May, 2024.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE