IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| *ex rel.* PETER HUESEMAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | No. SA-5:14-CV-212-XR |
| v. | § | |
| | § | |
| PROFESSIONAL COMPOUNDING | § | |
| CENTERS OF AMERICA, INC., | § | |
| | § | |
| Defendant. | § | |

_____

## THE UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT
_____

## TABLE OF CONTENTS

INTRODUCTION....................................................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS.......................................................4

I.    PCCA's Business and Membership Model......................................................4

II.   Reimbursement under the TRICARE Program. ..............................................6

III.  Fraud, Waste, and Abuse Provisions .............................................................9

IV.   PCCA Knew that TRICARE Used AWPs to Determine Reimbursement and that Its
      Customers Valued High AWPs and Spreads..................................................10

V.    PCCA Substantially Increased Its AWPs in March 2012 Despite "Red Flags" and Internal
      Opposition.......................................................................................................13

VI.   PCCA Knew that Inflating AWPs Was Risky, Unsustainable, and Could Result in
      Increased Scrutiny from Third-Party Payers and Enforcement Actions.................................19

VII.  PCCA Marketed Its Inflated AWPs and Spreads to Sell Its Products. ...........................21

      A.    PCCA's Senior Management Directed Its Sales Team to Market PCCA Products
            Based on AWPs and Spreads. ...........................................................21

      B.    The Sales Team Promoted PCCA Products and Formulas with High AWPs. ...23

VIII. PCCA Helped Customers Bill TRICARE Based on Its AWPs and Maximize Profits....26

      A.    PCCA Held Training Seminars on Billing Third Party Payers. .......................26

      B.    PCCA Told Customers to Hide Their Acquisition Costs..................................27

      C.    PCCA Helped Customers Manipulate Usual and Customary Price to Obtain
            Payment Based on AWP..................................................................29

IX.   PCCA and Its Shareholders Realized Record Profits from Its AWP Scheme.................30

X.    PCCA's Actions Harmed TRICARE, which Paid Excessive Reimbursements on
      Compound Claims with PCCA Ingredients. ..................................................31

XI.   TRICARE Implemented Controls That Stopped the Fraud...........................................33

LEGAL STANDARD ........................................................................................................36

ARGUMENT......................................................................................................................38

I.    The False Claims Act and Anti-Kickback Statute. ........................................38

II.   The Government Is Entitled to Summary Judgment under the AKS..............................40

      A.    PCCA Knowingly and Willfully Offered Remuneration to its Customers to
            Induce Them to Purchase PCCA's Products. ..................................................40

      B.    Payment for PCCA's Products May Be Made under a Federal Health Care
            Program. .........................................................................................43

      C.    PCCA's AKS Violations Establish Falsity and Materiality as a Matter of Law
            under the FCA......................................................................................43

III.  The Government Is Entitled to Summary Judgment under the FCA ............................. 47

    A.    PCCA Made False Statements and Engaged in a Fraudulent Course of Conduct. ...................................................................................... 47

        i.    PCCA Made Fraudulent Statements Material to False Claims—§ 3729(a)(1)(B) ............................................................. 48

            1.    PCCA's AWPs Bore No Rational Relationship to Actual Prices ... 48

            2.    PCCA's AWPs Are Actionable Misrepresentations ................. 50

        ii.    PCCA Caused the Submission of False or Fraudulent Claims for Payment—§ 3729(a)(1)(A) ...................................................... 52

    B.    PCCA's False Statements and Fraudulent Conduct Are Material. ................. 53

        i.    PCCA's False Statements of its AWPs Are Material under the FCA's Definition ...................................................................... 54

        ii.    Materiality Under *Escobar* ...................................................... 54

            1.    PCCA's Fraudulent Conduct Is Material under *Escobar* ........... 55

            2.    *Escobar* Factors ...................................................................... 56

    C.    PCCA Acted with Actual Knowledge, Deliberate Ignorance, or Reckless Disregard. ......................................................................... 59

    D.    PCCA Proximately Caused the Government to Pay Out Money. ..................... 62

IV.  The Government Suffered Damages ............................................................ 64

CONCLUSION ............................................................................................. 65

CERTIFICATE OF SERVICE .......................................................................... 66

# TABLE OF AUTHORITIES

## Cases

*Allison Engine Co. v. United States ex rel. Sanders*,
  553 U.S. 662 (2008)...................................................................................................48

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...................................................................................................37

*Brown v. City of Houston*,
  337 F.3d 539 (5th Cir. 2003).....................................................................................37

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)...................................................................................................37

*First Colony Life Ins. Co. v. Sanford*,
  555 F.3d 177 (5th Cir. 2009).....................................................................................37

*Guilfoile v. Shields*,
  913 F.3d 178 (1st Cir. 2019)......................................................................................47

*Guillory v. Domtar Indus., Inc.*,
  95 F.3d 1320 (5th Cir. 1996).....................................................................................60

*In re EpiPen Direct Purchaser Litig.*,
  No. 20-cv-0827, 2021 WL 147166 (D. Minn. Jan. 15, 2021).................................43

*In re Lupron Mktg. & Sales Pracs. Litig.*,
  295 F. Supp. 2d 148 (D. Mass. 2003)...........................................................48, 50, 51

*In re Miss. Medicaid Pharm. AWP Litig.*,
  190 So. 3d 829 (Miss. 2015)......................................................................................49

*In re Pharm. Indus. AWP Litig.*,
  478 F. Supp. 2d 164 (D. Mass. 2007).................................................................48, 64

*In re Pharm. Indus. AWP Litig.*,
  582 F.3d 156 (1st Cir. 2009)................................................................................48, 52

*Int'l Shortstop, Inc. v. Rally's, Inc.*,
  939 F.2d 1257 (5th Cir. 1991)...................................................................................60

*Kuzma v. Northern Ariz. Healthcare Corp.*,
  607 F. Supp. 3d 942 (D. Ariz. 2022).........................................................................45

*Little v. Liquid Air Corp.*,
  37 F.3d 1069 (5th Cir. 1994).....................................................................................37

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024)....................................................................................50

*Massachusetts v. Mylan Labs.*,
357 F. Supp. 2d 314 (D. Mass. 2005)....................................................................51

*Massachusetts v. Mylan Labs.*,
608 F. Supp. 2d 127 (D. Mass. 2008).................................................................passim

*MedPricer.com, Inc. v. Becton, Dixon & Co.*,
240 F. Supp. 3d 263 (D. Conn. 2017)....................................................................43

*Paroline v. United States*,
572 U.S. 434 (2014)....................................................................................63

*People ex rel. Spitzer v. Pharmacia Corp.*,
895 N.Y.S.2d 682 (N.Y. Sup. Ct. 2010)....................................................................49

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000)....................................................................................37

*Renwick v. PNK Lake Charles, L.L.C.*,
901 F.3d 605 (5th Cir. 2018)....................................................................37

*RSR Corp. v. Int'l Ins. Co.*,
612 F.3d 851 (5th Cir. 2010)....................................................................37

*Ruckh v. Salus Rehab., LLC*,
963 F.3d 1089 (11th Cir. 2020)....................................................................63

*U.S. ex rel. Bunk v. Gosselin World Wide Moving, N.V.*,
741 F.3d 390 (4th Cir. 2013)....................................................................64, 65

*U.S. ex rel. Jamison v. McKesson Corp.*,
900 F. Supp. 2d 683 (N.D. Miss. 2012)....................................................................41

*United States ex rel. Aldridge v. Corp. Mgmt., Inc.*,
78 F.4th 727 (5th Cir. 2023)....................................................................59, 60, 62, 63

*United States ex rel. Bibby v. Mortgage Inv'rs Corp.*,
987 F.3d 1340 (11th Cir. 2021)....................................................................56

*United States ex rel. Cairns v. D.S. Medical LLC*,
42 F.4th 828 (8th Cir. 2022)....................................................................44

*United States ex rel. Campbell v. KIC Dev., LLC*, No. EP-18-CV-193-KC, 2019 WL 6884485
(W.D. Tex. Dec. 10, 2019) ....................................................................55

*United States ex rel. Capshaw v. White*, No. 3:12-CV-4457-N,
   2018 WL 6068806 (N.D. Tex. Nov. 20, 2018) ................................................................ 47

*United States ex rel. Colquitt v. Abbott Labs.*,
   858 F.3d 365 (5th Cir. 2017) ....................................................................................... 53

*United States ex rel. Drummond v. BestCare Lab. Servs., L.L.C.*,
   950 F.3d 277 (5th Cir. 2020) ....................................................................................... 62

*United States ex rel. Fitzer v. Allergan, Inc.*,
   No. 1:17-cv-00668, 2022 WL 3599139 (D. Md. Aug. 23, 2022) ......................................... 45

*United States ex rel. Freedman v. Suarez-Hoyos*,
   No. 8:04-cv-933-T-24 EAJ, 2012 WL 4344199 (M.D. Fla. Sept. 21, 2012) ......................... 63

*United States ex rel. Greenfield v. Medco Health Sols., Inc.*,
   880 F.3d 89 (3d Cir. 2018) ...................................................................................... 44, 63

*United States ex rel. Grubbs v. Kanneganti*,
   565 F.3d 180 (5th Cir. 2009) ................................................................................... 39, 48

*United States ex rel. Harman v. Trinity Indus. Inc.*,
   872 F.3d 645 (5th Cir. 2017) ................................................................................... 54, 57

*United States ex rel. Hart v. McKesson Corp.*,
   96 F.4th 145 (2d Cir. 2024) ......................................................................................... 41

*United States ex rel. Hueseman v. Pro. Compounding Ctrs. of Am., Inc.*,
   664 F. Supp. 3d 722 (W.D. Tex. 2023) .................................................................... passim

*United States ex rel. Int'l Brotherhood of Electrical Workers Local Union No. 98 v. Farfield Co.*,
   5 F.4th 315 (3d Cir. 2021) ........................................................................................... 48

*United States ex rel. Kester v. Novartis Pharm. Corp.*,
   41 F. Supp. 3d 323 (S.D.N.Y. 2014) .............................................................................. 45

*United States ex rel. King v. Solvay Pharms., Inc.*,
   871 F.3d 318 (5th Cir. 2017) ....................................................................................... 41

*United States ex rel. Lemon v. Nurses To Go, Inc.*,
   924 F.3d 155 (5th Cir. 2019) ....................................................................................... 56

*United States ex rel. Longhi v. Lithium Power Techs., Inc.*,
   575 F.3d 458 (5th Cir. 2009) ............................................................................. 39, 60, 62

*United States ex rel. Martin v. Hathaway*,
   63 F.4th 1043 (6th Cir. 2023) ...................................................................................... 44

*United States ex rel. Montcrieff v. Peripheral Vascular Associates, P.A.,*
    649 F.Supp.3d 404 (W.D. Tex. 2023) ................................................................ 58

*United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.,*
    507 F. Supp. 3d 734 (W.D. Tex. 2020) ....................................................... 39, 62

*United States ex rel. Montcrieff v. Peripheral Vascular Assocs.,*
    SA-17-CV-00317-XR, 2024 WL 390091 (W.D. Tex. Jan. 30, 2024) ................... 61

*United States ex rel. Parikh v. Brown,*
    587 F. App'x 123 (5th Cir. 2014) ..................................................................... 45

*United States ex rel. Parikh v. Citizens Med. Ctr.,*
    977 F. Supp. 2d 654 (S.D. Tex. 2013) .............................................................. 45

*United States ex rel. Rahimi v. Zydus Pharm., Inc.,*
    No. 15-cv-6536, 2017 WL 1503986 (D.N.J. Apr. 26, 2017) ............................. 48

*United States ex rel. Riley v. St. Luke's Episcopal Hosp.,*
    355 F.3d 370 (5th Cir. 2004) ........................................................................... 39

*United States ex rel. Ruscher v. Omnicare, Inc.,*
    663 F. App'x 368 (5th Cir. 2016) ..................................................................... 41

*United States ex rel. Schutte v. SuperValu, Inc.,*
    598 U.S. 739 (2023) ................................................................................... 60, 61

*United States ex rel. Thomas v. Bailey,*
    No. 4:06-cv-465, 2008 WL 4853630 (E.D. Ark. Nov. 6, 2008) .................... 43, 44

*United States ex rel. Ven-A-Care v. Actavis Mid Atl. LLC,*
    659 F. Supp. 2d 262 (D. Mass. 2009) .............................................................. 54

*United States ex rel. Wheeler v. Union Treatment Ctrs., LLC,*
    No. CV SA-13-CA-4-XR, 2019 WL 571349, (W.D. Tex. Feb. 12, 2019) .......... 39, 44, 46, 47

*United States v. Berkeley Heartlab, Inc.,*
    No. 9:14-cv-230-RMG, 2017 WL 6015574 (D.S.C. Dec. 4, 2017) ..................... 47

*United States v. Bollinger Shipyards, Inc.,*
    775 F.3d 255 (5th Cir. 2014) ........................................................................... 61

*United States v. Bornstein,*
    423 U.S. 303 (1976) ........................................................................................ 65

*United States v. Davis,*
    132 F.3d 1092 (5th Cir. 1998) ......................................................................... 41

*United States v. Hodge*,
  933 F.3d 468 (5th Cir. 2019)............................................................................62

*United States v. Howard*,
  28 F.4th 180 (11th Cir. 2022).........................................................................59

*United States v. Luce*,
  873 F.3d 999 (7th Cir. 2017)..........................................................................59

*United States v. Marlin Med. Sols., LLC*,
  579 F. Supp. 3d 876 (W.D. Tex. 2022) ....................................................40, 41

*United States v. Medtronic, Inc.*,
  No. 17-cv-2060, 2021 WL 4168140 (D. Kan. Sept. 14, 2021)......................45

*United States v. Pro. Compounding Ctrs. of Am., Inc.*,
  No. SA-14-CV-00212-XR, 2024 WL 1904343 (W.D. Tex. Apr. 30, 2024) ........36

*United States v. Pro. Compounding Ctrs. of Am., Inc.*,
  No. SA-14-CV-00212-XR, 2024 WL 1979109 (W.D. Tex. May 3, 2024)..........36

*United States v. Regeneron Pharms., Inc.*,
  No. CV 20-11217-FDS, 2023 WL 7016900 (D. Mass. Oct. 25, 2023).............44

*United States v. Rogan*,
  517 F.3d 449 (7th Cir. 2008)..........................................................................64

*United States v. Shah*,
  95 F.4th 328 (5th Cir. 2024)......................................................................41, 43

*United States v. St. Junius*,
  739 F.3d 193 (5th Cir. 2013)..........................................................................41

*United States v. Teva Pharm. USA, Inc.*,
  No. 13-cv-3702, 2019 WL 1245656 (S.D.N.Y. Feb. 27, 2019) .....................45

*United States v. Teva Pharms. USA, Inc.*,
  682 F. Supp. 3d 142 (D. Mass. 2023)............................................................44

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
  579 U.S. 176 (2016)................................................................................ passim

## Statutes, Regulations, & Other Authorities

31 U.S.C. § 3729 ............................................................................................ passim

42 U.S.C. § 1320a-7b ..................................................................................... passim

Fed. R. Civ. P. 56 ................................................................................................... 36

32 C.F.R. § 199 ................................................................................................ 6, 9

56 Fed. Reg. 35952 ............................................................................................. 40

68 Fed. Reg. 23731 ..................................................................................... passim

155 Cong. Rec. S10 ............................................................................................ 43

**INTRODUCTION**

From 2012 to 2015, PCCA engaged in a fraudulent pricing and marketing scheme that enriched its shareholders and pharmacy customers at the direct expense of the TRICARE program. PCCA's actions caused the submission of nearly 130,000 false and fraudulently inflated compound prescription claims to TRICARE ranging in amounts from $2,000 to $80,000 per prescription. The Government brought this action against PCCA under the False Claims Act ("FCA") and Anti-Kickback Statute ("AKS") for its role in causing TRICARE to pay for these claims and suffer damages in excess of $333 million.

The Government files this motion for partial summary judgment because the material facts are not in dispute, and it is entitled to judgment as a matter of law. The Government has compiled an extensive record—detailed below in the Statement of Undisputed Material Facts—that relies primarily on the sworn testimony of PCCA's own senior executives and officials, its own documents and related materials, and PCCA's admissions in this case. That record establishes PCCA's knowing and willful manipulation and inflation of its Average Wholesale Prices ("AWPs") and marketing of spreads, which resulted in the submission of hundreds of thousands of false and inflated compound claims to TRICARE for reimbursement. Based on that record, the Government seeks summary judgment as to PCCA's violations of the AKS, which establish falsity and materiality under the FCA as a matter of law. The Government also seeks summary judgment as to the FCA elements of falsity, materiality, knowledge, and causation as a matter of law. Finally, the Government seeks summary judgment as to the number of claims at issue and the amount of damages premised on PCCA's violations of the AKS and FCA before trebling and penalties. For the following reasons, the Court should grant the Motion.

***Anti-Kickback Statute***.  PCCA violated the AKS by knowingly and willfully offering remuneration to its customers through inflated AWPs and large profit spreads to induce the sale of

its products, which TRICARE reimbursed. PCCA's AKS violations establish falsity and materiality under the FCA as a matter of law.

*Falsity.* The government is entitled to summary judgment on falsity for two additional reasons. First, PCCA reported false and fraudulent AWPs that were material to TRICARE's payment for the compound claims. By reporting those AWPs, PCCA also caused its customers to submit claims that contained false and fraudulent AWPs that were material to TRICARE's payment for the compound claims. TRICARE used the reported AWPs for each ingredient or base included within a claim to determine the total amount of reimbursement for the claim. PCCA's AWPs for its products were false and fraudulent because they were fictitious numbers that bore no rational relationship to its actual selling prices. On average, PCCA's AWPs were marked up from about 1,100% to 43,000% over their respective selling prices during the relevant time. A reasonable markup of pharmacy reimbursements over pharmacy acquisition costs ranged from about 40% to 165%.

Second, PCCA engaged in a fraudulent course of conduct that caused TRICARE to pay inflated amounts for compound claims with PCCA's products. PCCA reported fraudulently inflated AWPs, marketed the resulting spreads, promoted high-AWP formulas, held seminars where it taught customers how to work the spread, offered software that enabled pharmacies to manipulate pricing to get reimbursed based on AWP, and worked to conceal its selling prices from payers like TRICARE.

*Materiality.* The government is entitled to summary judgment on materiality for two additional reasons as well. First, PCCA's fraudulent AWPs are material under the FCA's statutory definition because, as part of TRICARE's reimbursement calculation, they had "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C.

§ 3729(b)(4).  Second, PCCA's fraudulent conduct is material under *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016) ("*Escobar*").  A reasonable person would attach importance to PCCA's AWP inflation, and PCCA knew or had reason to know that the Government attached importance to it in making payment decisions.  Moreover, each *Escobar* factor—conditions of payment, essence of the bargain, and government action—weighs in favor of materiality.

*Knowledge.*  PCCA acted with actual knowledge, deliberate ignorance, or reckless disregard as to the falsity of its AWPs and AWP pricing scheme.  PCCA knew that: its AWPs were inflated and bore no rational relationship to its selling prices; its AWPs induced customers to purchase and submit claims for ingredients because of their reimbursement potential; its customers submitted claims to TRICARE for reimbursement of PCCA products based on the inflated AWPs; TRICARE in turn reimbursed PCCA's customers based on those AWPs; its AWPs were material to payment because PCCA actively sought to conceal its AWP spreads; manipulating and inflating its AWPs would trigger red flags and bring scrutiny, audits, investigations, and enforcement actions; and inflating AWPs was unsustainable and a "house built on sand."  Further, the 2003 HHS-OIG Guidance put PCCA on notice that its actions were illegal, and that the Government considered AWP manipulation material and strong evidence of an AKS violation.

*Causation.*  PCCA proximately caused TRICARE to pay hundreds of millions of dollars in inflated reimbursements.  PCCA's actions were (1) a substantial factor in causing its customers to submit inflated claims to TRICARE; and (2) the submission of claims to TRICARE was reasonably foreseeable or anticipated as the natural consequence of PCCA's actions.  PCCA undertook several affirmative acts that caused or assisted its customers to submit false claims.

***Damages.*** The Government is entitled to the full value of the 129,975 claims tainted by PCCA's AKS violations. Nevertheless, for purposes of summary judgment only, the government seeks only the full amount TRICARE paid within each tainted claim for the 13 relevant PCCA products. For the claims at issue, TRICARE paid $385,002,776 for the relevant products. Alternatively, the Government is entitled to damages reflecting the difference between what TRICARE paid based on PCCA's inflated AWPs and what TRICARE would have paid if PCCA's AWPs had not been inflated. Based on this measure, for the claims at issue the Government is entitled to a minimum of $333,583,192 in damages for the 13 relevant products. These damages are subject to mandatory trebling under the FCA plus statutory penalties.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.    PCCA's Business and Membership Model

1.    PCCA is a supplier of active pharmaceutical ingredients and bases for use in drug compounding. *See* ECF No. 66 ¶ 1 (Compl.); ECF No. 164 ¶ 1 (Answer) (admitted). Compounding is a practice in which a licensed pharmacist combines, mixes, or alters ingredients of a drug to create a medication tailored to the needs of an individual patient. ECF No. 66 ¶ 2 n.1; ECF No. 164 ¶ 2 (admitted). During the relevant period of 2012 to 2015, PCCA purchased active pharmaceutical ingredients from chemical and ingredient manufacturers, repackaged those ingredients, and resold them to pharmacies for use in compound medications. *See* ECF No. 66 ¶¶ 2, 19; ECF No. 164 ¶¶ 2 (admitted), 19 (admitted with explanation). PCCA also manufactured and sold bases, such as creams and gels, into which ingredients were added during the compounding process. ECF No. 66 ¶ 2; ECF No. 164 ¶ 2 (admitted); Ex. 1, Zaccardo Dep. Vol. I at 27:3-9.

2.    Generally, for each ingredient and base PCCA sold, PCCA reported an AWP to commercial publishers of drug pricing data. ECF No. 66 ¶ 2; ECF No. 164 ¶ 2 (admitted). To

purchase products from PCCA, a customer usually had to become a PCCA member and abide by the terms of a membership agreement. ECF No. 66 ¶ 48; ECF No. 164 ¶ 48 (admitting as "generally true"). PCCA's membership agreements required a prospective member to pay a nonrefundable membership fee of about $13,000. *E.g.*, Ex. 2, PCCA007095.000001. Customers renewed their membership by paying an annual fee. *Id.* at 2; ECF No. 66 ¶ 49; ECF No. 164 ¶ 49 (admitted); Ex. 1, Zaccardo Dep. Vol. I at 61:18–23 (members also paid a $250 monthly service fee). For members joining after 2007, PCCA's membership agreements required customers to purchase at least ninety percent of their products, including ingredients and bases, from PCCA. PCCA had discretion to terminate membership if a customer did not meet this commitment. *E.g.*, Ex. 2, PCCA007095.000001, 2; ECF No. 66 ¶ 50; ECF No. 164 ¶ 50 (admitted with qualification).

3.     PCCA also sold pharmacy software and laboratory equipment to customers and provided them with suggested formulas for compound drugs, third-party billing support, and other consulting, training, and education. ECF No. 66 ¶ 19; ECF No. 164 ¶ 19 (admitted with explanation). The services included educational seminars about various topics, including billing support and ways to seek reimbursement or payment for their products. *Id.*

4.     PCCA members had access to consultant pharmacist support; training and educational programming for pharmacists, pharmacy technicians, and marketers; and access to PCCA's Member's-Only website and Formula Database, which contained more than 8,000 proprietary compound drug formulas. ECF No. 66 ¶ 51; ECF No. 164 ¶ 51 (admitted with explanation). For an additional fee, PCCA provided customers with a consulting service called Compounding Pharmacy Management Services ("CPMS"). That service included pharmacy business management, billing support, and "custom prescription pricing strategies." ECF No. 66

¶¶ 51, 114; ECF No. 164 ¶¶ 51 (admitted with explanation), 114 (approximately 100 PCCA members participated in this service).

## II.    Reimbursement under the TRICARE Program.

5.    TRICARE is a federal entitlement program administered by the Defense Health Agency ("DHA"), a component of the U.S. Department of Defense, that provides healthcare coverage for active-duty military personnel, military retirees, and their families.  ECF No. 66 ¶ 39; ECF No. 164 ¶ 39; Ex. 3, Woodson Dep. at 23:9-20.  To qualify for reimbursement from TRICARE, a drug must be "medically or psychologically necessary [for] the diagnosis and treatment of illness or injury."  32 C.F.R. § 199.4(a)(1)(i); *see also* 32 C.F.R. § 199.4(g)(15).  For a drug to be medically or psychologically necessary, it must, among other things, constitute "appropriate medical care."  32 C.F.R. § 199.2.  This required that the care be "furnished economically."  *Id*.  Compound claims that did not meet the coverage requirements in 32 C.F.R. §§ 199.4(a)(1)(i) and 199.4(g)(15) were not reimbursable by TRICARE.

6.    Since 2008, Express Scripts, Inc. has served as the Pharmacy Benefits Manager ("PBM") for TRICARE.  *See* Ex. 4, US_00010010, 32.  As the PBM, Express Scripts administered prescription drug coverage for TRICARE beneficiaries, including the processing, adjudication, and payment of compound prescription claims submitted by pharmacies for reimbursement from TRICARE.  *See id*.  To receive reimbursement, a pharmacy had to enter into a Provider Agreement with Express Scripts or contract with a pharmacy services administrative organization to contract with Express Scripts on the pharmacy's behalf.  Express Scripts' Provider Agreements incorporated the Express Scripts Provider Manuals as part of those agreements.  ECF No. 66 ¶ 41; ECF No. 164 ¶ 41 (admitted with qualification).

7.    Pharmacies typically submitted electronic claims to Express Scripts.  Generally, each compound prescription claim submitted to Express Scripts for reimbursement from

TRICARE contained, among other things, information about the patient, prescriber, pharmacy, ingredients in the compound drug, certain pricing information for the ingredients, and the date the prescription was filled.  ECF No. 66 ¶ 42; ECF No. 164 ¶ 42 (admitted with explanation); *see also* Ex. 5, US_00071279, 79-95 (sample payer sheet); Ex. 6, US_00009580, 592-606 (2012 Express Scripts Provider Manual).  Pharmacies were required to submit compound claims to TRICARE in the current National Council for Prescription Drug Programs ("NCPDP") Telecommunications Standard format.  The NCPDP is a non-profit standards development organization.  The NCPDP format was developed to provide a common format for the electronic submission of prescription drug claims and other transactions between pharmacy providers, insurance carriers, third-party administrators, and other responsible parties.  ECF No. 66 ¶ 43; ECF No. 164 ¶ 43 (admitted).

8.      During the relevant period, the industry standard for submission and adjudication of compound pharmacy claims was the NCPDP D.0 standard.  Under this standard, for each claim, pharmacies were required to submit specific and detailed information about each ingredient contained within a compound formulation.  For example, for each ingredient, a pharmacy was generally required to provide information about: (1) the ingredient's National Drug Code ("NDC"); (2) the quantity of the ingredient; and (3) pricing information for the ingredient.  Compound prescription claims generally had to include additional pricing information, such as the dispensing fee, patient paid amount, gross amount due, and the pharmacy's usual and customary charge for the medication.   ECF No. 66 ¶ 44; ECF No. 164 ¶ 44 (admitted with qualification).

9.      Throughout the relevant period, PCCA's reported AWPs primarily determined TRICARE's reimbursement for compound prescription claims submitted by PCCA's customers.  *See* Ex. 7, Hines Rep. ¶ 44. *See also* Ex. 27, Carr Rep. at 6 ("TRICARE and ESI reimbursed PCCA's customers based on the published AWP amount"); Ex. 32, DeAngelis Report at 34

(discussing TRICARE's "continued reliance on AWP"); Ex. 28, Carr Dep. at 97:2-9; Ex. 34, DeAngelis Dep. at 126:6-17.

10.     Prior to July 2013, TRICARE compound claims were generally reimbursed based on the lesser of the following amounts: (1) the sum total of the costs submitted by the pharmacy for all ingredients in the compound drug, plus a dispensing fee and level of effort fee, or (2) the pharmacy's usual and customary charge for the medication. *See* Ex. 6, US_00009580, 596, 601. Starting in July 2013, the claims were generally reimbursed on the lesser of numbers (1) and (2) above or (3) the sum total of the AWP (minus a contracted discount) for all ingredients in the compound drug, plus a dispensing fee and level of effort fee. *See* Ex. 9, US_00155752, 879; *see also* Ex. 7, Hines Rep. ¶¶ 78-79.

11.     The sum total of costs submitted by the pharmacy [NCPDP Field 409-D9] refers to the amount submitted as the cost to insurance, not the pharmacy's acquisition costs. *See* Ex. 11, Klomp Dep. at 59:3-12; 68:17-23. It is the sum total of the individual "compound ingredient drug costs" [NCPDP Field 449-EE]. Ex. 10, US_00008702, 24 (Dec. 2013 Express Scripts Provider Manual). Typically, the costs submitted by a pharmacy reflected the AWP. *See* Ex. 11, Klomp Dep. at 60:21-61:15; Ex. 12, O'Neill Dep. at 69:5-18. Each of the 129,975 claims at issue in this case was submitted by the PCCA customer using the code for AWP and in amounts reflecting AWP. Ex. 7, Hines Rep. ¶ 64; Ex. 69, Hines Rebuttal Rep. ¶ 24.

12.     Express Scripts' Provider Manuals defined AWP as "[t]he average wholesale price as defined and distributed by Medi-Span . . . based on the 11-digit NDC number of the dispensed medication." Ex. 6, US_00009580, 9694. It further notes that "AWP prices will be updated on a daily basis." *Id*. Express Scripts' Provider Manuals described the usual and customary charge submitted by the pharmacy [NCPDP Field 426-DQ] as the usual and customary retail price of a

covered medication in a cash transaction at the dispensing pharmacy (in the quantity dispensed) on the date the medication was dispensed, including any discounts or special promotions offered on such date.  Ex. 10, US_00008702, 836.

### III.    Fraud, Waste, and Abuse Provisions

13.    TRICARE's regulations provided that fraud or abuse by a pharmacy or other provider could result in denial of the provider's claims or the exclusion or suspension of the provider from participation in the TRICARE program.  32 C.F.R. §§ 199.9(b), (f).  TRICARE's regulations stated that fraudulent situations included arrangements between a supplier and provider that resulted in claims with unnecessary costs or charges to TRICARE.  *Id.* § 199.9(c)(13). Fraudulent situations also included arrangements between suppliers and providers, including kickback arrangements, designed to overcharge TRICARE. *Id.* § 199.9(c)(12). Abusive situations included billing TRICARE at rates more than those routinely charged to the general public or other third-party payers for similar services or billing substantially in excess of customary or reasonable charges. *Id.* § 199.9(b)(2), (7).  TRICARE's regulations specified that "[a]ll fraud, abuse, and conflict of interest requirements [in section 199.9] are applicable to the TRICARE pharmacy benefits program."  32 C.F.R. § 199.21(p).  TRICARE's contract with Express Scripts also incorporated the provisions of 32 C.F.R. § 199.  *See* Ex. 4, US_00010010, 34; Ex. 82, US_00012440, 471.

14.    Express Scripts' Provider Manuals prohibited pharmacies from submitting compound claims with inflated AWPs or for amounts more than the pharmacy's acquisition costs, "taking into account a reasonable markup." Ex. 10, US_00008702, 23 (Dec. 2013 Express Scripts Network Provider Manual); ECF No. 66 ¶ 47; ECF No. 164 ¶ 47 (admitted).  Such claims were subject to recoupment and offset.  *See* Ex. 10, US_00008702, 23.  Express Scripts' Provider Manuals also prohibited pharmacy providers from undermining the usual and customary or

compound price by manipulating the usual and customary price or separating cash business from third-party payer business. *See* Ex. 10, US_00008702, 19 (Dec. 2013 Express Scripts Network Provider Manual); ECF No. 66 ¶ 46; ECF No. 164 ¶ 46 (admitted with qualification).

15.    In 2003, HHS-OIG published guidance that addressed among other things the AKS implications of AWP manipulation. *See* Ex. 14, OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731, 23737 (May 5, 2003) (OIG Guidance). The Guidance noted that in certain federal programs, "pharmaceutical manufacturers control not only the amount at which they sell a product to their customers, but also the amount those customers who . . . thereafter bill the federal health care programs will be reimbursed." *Id.* at 23736. The OIG Guidance explained, "[t]o the extent that a manufacturer controls the 'spread,' it controls [the] customer's profit." *Id.* Because various "payers base reimbursement for drugs and biologicals on AWP," the OIG warned manufacturers not to manipulate AWPs to induce customers to purchase products:

> If a pharmaceutical manufacturer purposefully manipulates the AWP to increase its customers' profits by increasing the amount the federal health care programs reimburse its customers, the anti-kickback statute is implicated. . . . [I]t is illegal for a manufacturer knowingly to establish or inappropriately maintain a particular AWP if one purpose is to manipulate the "spread" to induce customers to purchase its product.

*Id.* at 23737. The OIG Guidance specified, "[t]he conjunction of manipulation of the AWP to induce customers to purchase a product with active marketing of the spread is strong evidence of the unlawful intent necessary to trigger the anti-kickback statute." *Id.*

## IV.    PCCA Knew that TRICARE Used AWPs to Determine Reimbursement and that Its Customers Valued High AWPs and Spreads.

16.    PCCA did not submit claims for reimbursement to TRICARE. Instead, PCCA sold to its customers ingredients used in prescription compound drugs billed to TRICARE. ECF No. 66 ¶ 52; ECF No. 164 ¶ 52 (admitted). PCCA reported an AWP for all its ingredients and bases

used in compound drugs billed to TRICARE.  ECF No. 66 ¶ 53; ECF No. 164 ¶ 53 (admitted in relevant part).  PCCA reported those AWPs to publishers of pharmaceutical pricing data, such as Medi-Span.  ECF No. 66 ¶ 53; ECF No. 164 ¶ 53 (admitted in relevant part).

17.    PCCA knew that many of its customers submitted compound prescription claims to third-party insurance payers, including TRICARE, and that those customers placed value and importance on ingredients with large AWP spreads.  *See* ECF No. 66 ¶ 59; ECF No. 164 ¶ 59 (admitted).  Generally, a larger AWP spread meant a greater profit for the pharmacy.  *See* Ex. 1, Zaccardo Dep. Vol. I at 73:10-14 (agreeing that "the higher the AWP, the greater [] the reimbursement to the pharmacy"); *id*. at 94:3-10 (agreeing that a majority of PCCA's customers placed value and importance on high AWPs because AWPs were a component of reimbursement); *id*. at 94:11–15 (agreeing that by increasing "AWPs, you're essentially increasing the reimbursement").

18.    PCCA knew that AWPs were used to determine a product's reimbursement amount and often used the terms "AWP" and "reimbursement" interchangeably.  Ex. 15, Smith Dep. Vol. I at 82:4-7 (acknowledging that PCCA "understood AWP to be synonymous with reimbursement by third-party payors").[1]  For example, in a July 2012 email, PCCA's Director of Outside Sales— Danyce Ashton—explained that AWPs "for the ingredients are how the members are being paid." Ex. 17, US_00086699; *see also* Ex. 18, PCCA2015-093CID-227368 (PCCA September 2012 newsletter) ("As AWPs play a bigger role in pharmacy revenue generation, we've seen decision-making around chemical purchasing that was traditionally Price v. Quality now have a new, third dimension added to it: reimbursement (AWP)."); Ex. 19, PCCA008768 at 4 (presentation defining

---

[1]  PCCA's President, Jim Smith, testified in both his personal capacity and as the company's 30(b)(6) witness.

"Assumed Insurance Reimbursement" as "AWP – 16%"). Thus, "if PCCA increased AWPs, that would increase the amount that TRICARE would reimburse those pharmacies for compound[] claims containing PCCA ingredients." Ex. 1, Zaccardo Dep. Vol. I at 74:19-75:20.

19.      Some members encouraged PCCA to increase its AWPs. Ex. 15, Smith Dep. Vol. I at 93:7-19. On one occasion, PCCA's Chief Operating Officer Fabian Zaccardo received a request from Ray to "bump up" the AWP for Levocetirizine. Ex. 45, PCCA2015-093CID-0002552309 (June 20, 2012 email). Zaccardo responded: "AWP is at $35/g. I think for the price of the product, it's pretty good. If I raise AWP then I have to raise the prices." *Id.* Nonetheless, less than 30 minutes later, Zaccardo instructed his assistant to "[p]lease raise the AWP for [Levocetirizine] to $75.00/g"—a 114 percent increase in the AWP. Ex. 80, PCCA2015-093CID-0002552318. Zaccardo informed Ray. *Id.*; *see also* Ex. 20, PCCA2015-093CID-0002550640; Ex. 70, PCCA2015-093CID-0002551946 (Zaccardo: "The AWP is already double what it should be but I'll . . . raise it to $1000/g.").

20.      PCCA understood that "for some customers, AWP was more important than the quality of the ingredients." Ex. 15, Smith Dep. Vol. I at 84:21-23. PCCA "tracked customers who were motivated by AWPs." *Id.* at 169:10-13. PCCA also knew that TRICARE was one of the largest third-party payers for compound prescriptions. *See* Ex. 22, PCCA21079.000028 (presentation listing TRICARE as the first of the "Top Four Insurances Nationwide"); Ex. 1, Zaccardo Dep. Vol. I 67:9-11; *id.* at 69:17-19; Ex. 23, Harwood Dep. at 161:9-19. PCCA knew that many of its members submitted compound prescription claims containing PCCA's products to TRICARE for payment. *See* Ex. 16, Smith Dep. Vol. II at 271:7-18 (admitting that in March 2012 "[t]he company knew some of its customers billed TRICARE for compound prescriptions"); Ex.1, Zaccardo Dep. Vol I at 68:5–17 ("I knew [TRICARE] was an important piece because we had

customers complain as early as 2013, 2014 that they had stopped coverage for a certain period. So I know there was a big base of customers that depended on TRICARE.").

**V.    PCCA Substantially Increased Its AWPs in March 2012 Despite "Red Flags" and Internal Opposition.**

21.    In early March 2012, PCCA considered at a senior management meeting whether to increase AWPs for its products. Ex. 1, Zaccardo Dep. Vol. I at 84:6-9. Attendees at that meeting included PCCA's President (Jim Smith), Chief Executive Officer (David Sparks), Vice President of R&D, Formulations, and Consulting (Dr. Gus Bassani), and COO (Zaccardo). *Id.* at 84:6-21; *see also* Ex. 21, PCCA Organizational Chart at 2 (listing senior management members). A majority of senior management opposed the AWP increases for two reasons. *See* Ex. 1, Zaccardo Dep. Vol. I at 84:22-86:8. First, the AWP increases would trigger "greater scrutiny" and "red flags" to third party payers such as Express Scripts, which would start questioning the AWP increases and eventually "cut PCCA off, cut the NDC[s] off, which we saw throughout the years." *Id.* at 85:18-25, 86:9-13, 87:14-16. Second, the increases would result in a "race to the top" with PCCA's competitors further raising AWPs in response. *Id.* at 86:2-87:5.

22.    Despite senior management's opposition, Smith decided as PCCA's President to increase AWPs on its ingredients and bases—more than doubling them in some instances. *See* ECF No. 66 ¶ 72; ECF No. 164 ¶ 72 (admitting that prices reflected are "accurate"); *see also* Ex. 15, Smith Dep. Vol. I at 124:6-125:19; Ex. 1, Zaccardo Dep. Vol. I 101:6-12. Smith instructed Zaccardo to increase the AWPs so that its customers would purchase PCCA products over its competitors. ECF No. 66 ¶¶ 69, 71; ECF No. 164 ¶¶ 69, 71 (admitted with explanation).

23.    Smith explained to senior management that the "objective" of these AWP increases was to "give our members every reason to choose PCCA when faced with an option of using" a competitor's product. Ex. 25, PCCA2015-093CID-0002485717 (March 7, 2012 email from Smith

informing senior management); *see also* Ex. 15, Smith Dep. Vol. I at 120:7-121:15.  Smith acknowledged that PCCA's AWP increases were adopted to maintain or increase its sales and market share and in response to the decision to inflate AWPs of its main competitor, Freedom Pharmaceuticals.  Ex. 15, Smith Dep. Vol. I at 129:14-130:11; *see also* Ex. 1, Zaccardo Dep. Vol. I at 94:11-15 (admitting that by increasing AWPs, "you're essentially increasing the reimbursement" thereby "making PCCA's products more attractive to purchase"); Ex. 27, Carr Rep. at 21 (opining that PCCA's "described reason for these AWP increases all relate to PCCA's commercial objective of maintaining or increasing sales volume"); Ex. 28, Carr Dep. at 141:2-21 (agreeing that increasing AWPs makes PCCA's products more attractive to PCCA's customers, incentivizing customers to purchase more from PCCA, which would "increase PCCA's sales" "in terms of volumes").

24.    Per Smith's directive, PCCA increased AWPs substantially on many products. *See* ECF No. 66 ¶ 72; ECF No. 164 ¶ 72 (admitting prices in chart are accurate).  PCCA viewed Freedom to be a "bad actor" because "their primary reason for communicating to the marketplace that they were valuable was that they had the highest AWPs[.]" Ex. 15, Smith Dep. Vol. I at 92:10-93:2.  For the products that Freedom also sold, Zaccardo set PCCA's AWPs at Freedom's level minus 5%.  *See* Ex. 1, Zaccarrdo Dep. Vol. I at 97:3-98:1.

| Ingredient | NDC | Prior AWP | New AWP | Percent Increase |
|---|---|---|---|---|
| Fluticasone Propionate | 51927-4330-00 | $1,500.00 | $3,325.00 | 121.67% |
| Gabapentin | 51927-4213-00 | $34.80 | $52.25 | 50.14% |
| Resveratrol | 51927-4367-00 | $620.40 | $749.70 | 20.84% |
| Lidocaine | 51927-1213-00 | $2.16 | $3.80 | 75.93% |
| Pentoxifylline | 51927-4389-00 | $4.92 | $7.98 | 62.20% |

| Ingredient | NDC | Prior AWP | New AWP | Percent Increase |
|---|---|---|---|---|
| Prilocaine | 51927-1720-00 | $4.92 | $16.72 | 239.84% |
| Levocetirizine* | 51927-4654-00 | $35.00 | $75.00 | 114.29% |
| Flurbiprofen | 51927-2701-00 | $24.60 | $35.15 | 42.89% |
| Ketamine | 51927-2790-00 | $22.80 | $32.30 | 41.67% |
| Cyclobenzaprine HCL | 51927-2501-00 | $36.00 | $44.65 | 24.03% |

* increased on June 20, 2012

25.     PCCA determined the selling prices for its products.  ECF No. 66 ¶ 57; ECF No. 164 ¶ 57 (admitted).  PCCA's AWP increases in March 2012 did not correspond to changes in PCCA's selling prices.  *See* Ex. 26, Saha Rep. at 54 (AWP for fluticasone propionate more than doubled, from $1,500 to $3,325 per gram in first quarter of 2012, while PCCA's average selling price *decreased* from $165 to $144 per gram); *id.* at 55 (AWP for gabapentin increased from approximately $35 per gram to approximately $52 per gram in first quarter of 2012, although PCCA's average selling price *decreased* from approximately $0.80 per gram to approximately $0.70 per gram).

26.     PCCA referred to its selling price also as the pharmacy's "acquisition cost."  PCCA defined the "spread" as follows: "SPREAD = AWP − ACQUISITION COST."  *E.g.*, Ex. 29, PCCA2015-093CID-000367688 (presentation at slides 15-16); Ex. 30, McCrory Dep. at 15:10–12.  By inflating the AWP for PCCA products relative to the acquisition cost to the pharmacy, PCCA generated enormous "spreads" or percentage markups.  The government's expert, Dr. Saha, analyzed PCCA's sales transaction data and AWPs for the 13 products at issue.  He concluded that on average PCCA's AWPs were marked up from 1,146% to 43,143% over their respective selling prices during the relevant period.

**Exhibit 2D: PCCA's Reported AWPs and Percent Markups**
**(Averaged Over 2012 to 2015)**

| | Ingredients and Bases | PCCA's Cost to Acquire Ingredient Drugs | PCCA's Selling Price to Pharmacies | PCCA's Reported AWP | $ Markup (AWP Minus Selling Price) | % Markup ($ Markup Over Selling Price) |
|---|---|---|---|---|---|---|
| 1 | Fluticasone Propionate | $45.53 | $189.32 | $3,551.35 | $3,362.02 | 1,776% |
| 2 | Gabapentin | $0.09 | $1.00 | $55.84 | $54.85 | 5,508% |
| 3 | Ketamine HCL | $0.70 | $1.58 | $34.52 | $32.95 | 2,090% |
| 4 | Flurbiprofen | $0.24 | $1.81 | $37.57 | $35.76 | 1,981% |
| 5 | Resveratrol | $0.32 | $1.85 | $800.80 | $798.95 | 43,143% |
| 6 | Cyclobenzaprine HCL | $0.19 | $2.49 | $47.73 | $45.23 | 1,815% |
| 7 | Levocetirizine DHCL | $0.36 | $6.43 | $80.17 | $73.74 | 1,146% |
| 8 | Prilocaine HCL | $0.23 | $0.94 | $17.97 | $17.03 | 1,821% |
| 9 | Pentoxifylline | $0.10 | $0.54 | $8.56 | $8.02 | 1,486% |
| 10 | Lidocaine HCL | $0.03 | $0.18 | $4.06 | $3.88 | 2,109% |
| | | | | | | |
| 11 | Base Lipo-Max Cream | n/a | $0.16 | $2.74 | $2.58 | 1,594% |
| 12 | Base Pracasil Plus | n/a | $0.67 | $12.07 | $11.40 | 1,712% |
| 13 | Base Spira-Wash | n/a | $1.20 | $17.06 | $15.87 | 1,326% |

Ex. 26, Saha Rep. at 15.  These figures are not disputed by PCCA's experts.  *See* Ex. 28, Carr Dep. at 135:13–136:12; Ex. 34, DeAngelis Dep. at 112:2-15 ("I don't have any reason to dispute" the "percentage markups AWP over selling prices" determined by Dr. Saha.).  Following its March 2012 AWP increases, PCCA continued to increase its already inflated AWPs by an additional 3% to 5% annually.  For example, PCCA continued to annually increase its inflated AWP for fluticasone propionate so that by 2015, its AWP was $3,758 per gram whereas its selling price was under $200 per gram.



Ex. 26, Saha Rep. at 54.

27.    Similarly, PCCA continued to annually increase its inflated AWP for gabapentin so that by 2015, its AWP was $59 per gram whereas its selling price was approximately $1.20 per gram. *Id.* at 55.  PCCA annually increased its inflated AWP for resveratrol so that by 2015, its AWP was $847 per gram even though its average selling price was under $2 per gram. *Id.* at 58. As a result of these annual increases, by 2015, PCCA's AWPs were higher than both of its primary competitors for several of the ingredients at issue. *See* Ex. 31, US_00636385 at 7 (chart prepared by Dr. Saha summarizing AWP data produced by PCCA).

28.    Based on his review of a wide range of sources and pharmaceutical pricing data, Dr. Saha opined that a reasonable markup between pharmacy reimbursements and pharmacy acquisition costs ranges from 43% to 167%, far lower than the markups reflected in PCCA's reported AWPs. *See* Ex. 26, Saha Rep. at 6, 35.  No PCCA expert retained for this matter disagrees. To the contrary, PCCA's own expert report by Dorothy DeAngelis corroborated Saha's conclusions.  *See* Ex. 32, DeAngelis Rep. at 32.  DeAngelis included a chart comparing various

other pharmaceutical prices and pricing benchmarks as a percentage of AWP. *See id.* Below is a chart created by Saha, which replicates the chart by DeAngelis expressed both in terms of a percentage of AWP and the percentage markup of AWP over the respective pricing benchmark. *See* Ex. 33, Saha Rebuttal Rep. at 10. Based on DeAngelis' figures, AWPs as a "list price" are typically marked up between 27% to 144% over various pharmaceutical pricing benchmarks.

Exhibit 1: Replication of the DeAngelis Report's Figure 3

| Price | Average Price as % of List Price | AWP Markup Over the Benchmark |
|---|---|---|
| Average Wholesale Price (AWP) | 100 | 0% |
| Average Manufacturer Price (AMP) | 79 | 27% |
| Non Federal Average Manufacturer Price (Non-FAMP) | 79 | 27% |
| Best Price | 63 | 59% |
| Federal Supply Schedule (FSS) Price | 53 | 89% |
| Medicaid Net Manufacturer Price | 51 | 96% |
| 340B Ceiling Price | 51 | 96% |
| Federal Ceiling Price (FCP) | 50 | 100% |
| Price Available to the Big Four | 49 | 104% |
| VA Average Price | 42 | 138% |
| DoD's Military Treatment Facility (MTF) Average Price | 41 | 144% |

29.    PCCA has not offered any expert opinion or otherwise attempted to demonstrate that its AWPs bore a rational relationship to, or reflected a reasonable markup over, its selling prices. *See* Ex. 28, Carr Dep. at 89:22-90:5 (Dr. Carr has "not offered an opinion as to what a reasonable mark-up over a pharmacy's acquisition cost would be" or whether "PCCA's AWPs for the 13 products at issue . . . reflect a reasonable markup over pharmacy's costs"); *id.* at 135:8-136:1 ("I've done no analysis comparing AWPs to selling – to selling prices"); Ex. 34, DeAngelis Dep. at 122:16-22 ("I'm not addressing the AWPs, how they're set, how they've been categorized over acquisition costs, so I really don't have a view on it one way or another.").

VI.    **PCCA Knew that Inflating AWPs Was Risky, Unsustainable, and Could Result in Increased Scrutiny from Third-Party Payers and Enforcement Actions.**

30.    PCCA knew that inflating AWPs was risky and could attract scrutiny from third party payers. PCCA's COO (Zaccardo) made clear in an email to PCCA's President (Smith) that "[w]e do not increase AWP on a whim, in this environment such action can create red flags for auditors." Ex. 35, PCCA2015-093CID-0000903307. Members of PCCA's sales department also recognized that inflated AWPs could result in increased scrutiny from third-party payers. For example, in a February 2012 email to several members of senior management, the Regional Sales Manager for the Eastern United States (Richard Harwood) said, "We are aware of Freedom's and Medisca's practice inflating AWP's [sic] to the point of ridiculous . . . [T]his practice brings attention to the member and [] our industry to future audits and potentially destroying the compounding market for 3rd party members." Ex. 36, PCCA2015-093CID-0002486807. He continued, "It certainly could raise a red flag with the payers when the AWPs that they submit begin to double from what they ha[ve] been historically submitted." *Id.*

31.    PCCA knew as early as December 2012 that Express Scripts was auditing some of its customers for having "consistently overbilled for claims" by "billing [] products with inflated average wholesale price (AWP) [and] artificially inflating UC (usual and customary pricing)," among other things. *See* Ex. 37, PCCA22552.000001 (Express Scripts audit findings for Pensacola Apothecary sent to Zaccardo in December 2012). In addition, PCCA knew that Richie Ray's pharmacy—Richie's Specialty Pharmacy—was subject to a fraud, waste, and abuse investigation by Express Scripts in late 2012 and early 2013. *See* Ex. 90, PCCA2015-093CID-0002548066; Ex. 91, PCCA22554.000001. The investigation resulted in findings in January 2013 that the pharmacy had "consistently overbilled for claims in a manner that is inconsistent with the Pharmacy's provider agreements[.]" Ex. 38, PCCA2015-093CID-0001798704, 05. Subsequently, Ray

reached an agreement with Express Scripts to receive set reimbursement amounts for the products it billed. *See* Ex. 39, Ray CID Test. at 172:3–7.

32.     PCCA officials, including senior management, knew that its AWPs were inflated. *See* Ex. 40, PCCA2015-093CID-0002477572 (April 2012 email from Zaccardo describing PCCA's new AWP prices as "the inflated pricing based on the Freedom AWPs"); Ex. 1, Zaccardo Dep. Vol. I at 159:9–17 (indicating that in April 2012, PCCA raised its AWPs higher than Medisca and just five percent below Freedom); Ex. 41, PCCA2015-093CID-0002574731 (January 2012 email from Dr. Bassani stating that "arbitrarily raising AWPs to an inflated value, just because you can, is not a good strategy and not one that we advocate or support").

33.     In a July 2012 email, PCCA's Director of Outside Sales (Ashton) expressed concerns that PCCA had "lots of members charging the system $2500 - $3000 per script that normally would sell for around $75.00[]" and that she was "very uncomfortable with the way people are billing." Ex. 17, SAN015658. Ashton concluded by observing that PCCA has "had the biggest revenue year in our history but this house is built on sand. And I'm anxious in advance over the air coming out of the balloon." *Id.* Smith referred to the AWP marketplace as a "bubble" that would eventually pop "and go back to something rational." Ex. 15, Smith Dep. Vol. I at 116:2-118:18; 124:6-22; *see also* Ex. 42, PCCA2015-093CID-0002516621 (June 21, 2013 email from Harwood stating "looks like that bubble may burst sooner than anticipated[]"); Ex. 24, PCCA2015-093CID-0002516625. Many PCCA employees acknowledged that the profit margins resulting from its AWPs were "excessive." *See* Ex. 30, McCrory Dep. at 153:24–154:21 (opining that a $1,300 reimbursement over acquisition cost "would probably be excessive" on a typical compound); Ex. 44, Michael Dep. at 171:2–172:1 (acknowledging that 3,000% difference between AWP and acquisition price is "big number" and $39,000 spread would be "large").

20

34.     PCCA's senior management also knew that PCCA could subject itself to enforcement actions for inflating its AWPs.  In November 2013, Smith sent an email entitled "AWP Issues" to Zaccardo, PCCA's CEO (Sparks), and its CFO (Marc DuPont).  Ex. 92, PCCA2015-093CID-000904667.  The email forwarded a news article about a pharmaceutical wholesaler that had entered into a settlement with the state of Wisconsin to resolve allegations of Medicaid fraud based on "inflating reported drug prices to increase pharmacies' reimbursement[.]"  *Id.* Specifically, the pharmaceutical wholesaler allegedly reported "false, fraudulent and inflated average wholesale prices" to pricing compendia "who published this false information, causing the Wisconsin Medicaid program to overpay for drugs it purchased."  *Id.*

35.     PCCA's senior management also knew that its inflated AWPs resulted in excessive reimbursement and abusive billing practices.  In August 2014, PCCA's treasurer and one of its three largest shareholders, Charlie Armstrong, wrote an email to PCCA's senior management lamenting the exorbitant amounts pharmacies were billing third-party payers.  Ex. 93, PCCA2015-093CID-0001605999.  Zaccardo forwarded the message to PCCA's Vice President of Sales Ari Pailakian, who commented that "all those increases in our dividends are mostly due to insurance." *Id.*  Zaccardo responded that PCCA's sales to customers billing insurance had made Armstrong a "multimillionaire."  *Id.*

## VII.    PCCA Marketed Its Inflated AWPs and Spreads to Sell Its Products.

### A. PCCA's Senior Management Directed Its Sales Team to Market PCCA Products Based on AWPs and Spreads.

36.     PCCA used its inflated AWPs and spreads as a marketing tool to induce sales. Ex. 15, Smith Dep. Vol. I at 172:15–10 ("Q: And the company instructed its sales personnel to use AWPs to sell the products?  A: To use them to sell it.  Well, to communicate what our AWPs are and be part of that conversation that was important to members, yes.").  About a week after its

AWP increases in March 2012, PCCA held a two-day senior sales meeting, where PCCA senior management, including PCCA's President, instructed sales representatives on topics such as "the AWP marketplace" and "AWPs—How to maximize our sales in this new pharmacy landscape[.]" *See* Ex. 46, PCCA2015-093CID-0002516225, 26-27 (cover email and agenda).

37.    Because PCCA's selling prices for its ingredients were typically higher than its competitors, senior management instructed sales personnel to compete on AWP reimbursement and spreads to spur sales of PCCA products.  For example, Zaccardo advised a sales representative: "Our prices are higher for all these products but you cannot approach them just on price.  Our AWPs are significantly more profitable for them if they buy PCCA products.  I have provided a breakdown that you can share with them.  This needs to be conveyed directly to the owner as this [is] profit dollars he is losing."  Ex. 47, PCCA2015-093CID-0002547424; *see also* Ex. 1, Zaccardo Dep. Vol. I at 178:17-24 (admitting that he instructed sales staff to emphasize the AWP spread in sales efforts); *id.* at 194:15–24 (discussing email that instructed sales representative to convey to PCCA member that while PCCA's selling prices were higher than the competitor, it was significantly more profitable for the customer to purchase from PCCA).

38.    PCCA's Vice President of Sales, Ari Pailakian, admitted that AWPs were an important component in PCCA's sales.  *See* Ex. 8, Pailakian Dep. at 126:14-127:23; 188:21-190:11.  PCCA's Director of Member Services at the time, Menia Costopoulos, encouraged her sales team to emphasize AWPs in sales efforts between 2012 to 2015.  *See* Ex. 43, Costopoulos Dep. at 152:16–22 (admitting that she "instructed" her sales representatives to emphasize AWP in their interactions).  In an August 2012 email to one sales representative, Costopoulos asked, "Is AWP important to [the customer]?"  *See* Ex. 48, PCCA2015-093CID-0002490085.  "If so," she continued, "then you know what to do.  Our AWPs far outweigh[] any cost difference between us

22

and [a competitor]. [The customer's] re-imbursement would be significantly greater. Please have the conversations in advance." *Id*.

39. PCCA's Director of Outside Sales for the West Coast, Erin Michael, would emphasize the value AWPs could bring to a member if it was important to them.[2] *See* Ex. 44, Michael Dep. 142:24–143:4; *see also See* Ex. 49, PCCA2015-093CID-0002580832 (July 13, 2012 Pivotal[3] sales system entry submitted by Michael stating, "Discussed the high awp's"). And Michael knew her sales representatives wanted to "know how" their customers could "maximize their gross profit with using AWP." *See* Ex. 50, PCCA36211.000001 (January 9, 2014 email from Michael forwarding "feedback" from a sales representative for inclusion in an upcoming sales training); *see also* Ex. 44, Michael Dep. at 122:14–123:3 (reimbursement "could be a talking point" with customers).

### B. The Sales Team Promoted PCCA Products and Formulas with High AWPs.

40. Consistent with these instructions, PCCA sales representatives marketed PCCA's products using its AWPs. *See* ECF No. 66 ¶¶ 88–111; ECF No. 164 ¶¶ 88–111 (admitting numerous examples of sales representatives using AWPs and spreads with customers).

| Date | PCCA Sales Representative Communication |
|------|----------------------------------------|
| May 13, 2012 | "We talked about awp's and the major differences that are between pcca and [a competitor]. [She] was really blown away with the difference between the numbers, she realizes that going with pcca they have an opportunity to really make money." Ex. 85, Excerpts of Pivotal Entries at 4; *see also* Ex. 51, Native Excel of PCCA2015-093CID-0002045318. |

---

[2] The outside sales team visited the customers in the field; in contrast, the inside sales team made calls to customers. Ex. 8, Pailakian Dep. at 32:7-24.

[3] Pivotal was a Customer Relationship Management ("CRM") software used by PCCA to monitor sales interactions with customers. Ex. 8, Pailakian Dep. at 38:9-24. PCCA required its sales personnel to document and input their interactions with customers in the Pivotal system. *See id*. at 38:25-39:3.

| May 31, 2012 | "Praca-sil and Spira-Wash are used [] for wound care. I attached the promo flyers above. You can make a killing off this stuff. Praca-sil is used similar to polyox bandage but has healing properties as well and used for scarring or stretch marks. Spira-Wash is similar but can be used with open wounds. These two products have killer AWP's." Ex. 85, Excerpts of Pivotal Entries at 6. |
|---|---|
| August 29, 2012 | "I also asked if they were billing more 3rd party and they are. We then discussed AWP's and the benefit of buying our chemicals. They do understand that it may cost more to buy our superior product but that they will make it back and then some thru reimbursement." *Id*. at 11. |
| Sept. 6, 2012 | "Here is the NDC list, I am sure when you look at our awp compared to what the [competitor's] are it will be no comparison ours are far better and will make you guys more money." *Id*. at 12. |
| April 5, 2013 | "I met with [the customer] in her new store. I went over complete AWP picture and how to bill 3rd party effectively. After I started talking she would not let me leave." *Id*. at 20. |
| May 1, 2013 | "I will say that most of the time I will not be cheaper than [a competitor]. When ordering large quantities I can be much more competitive but price is only part of the equation. PCCA will excel in the AWP arena and you and your bosses will be very pleased with the results." *Id*. at 22. |
| Sept. 17, 2013 | "Also, look into using Fluticasone with wound care and especially with Loxasperse. Formulas are available online. The AWP on that item is very lucrative." *Id*. at 25. |
| Oct. 15, 2013 | "He is looking for something else to get into so we talked about scar and wound care. He said our Pracasil is expensive especially since they don't get reimbursed for it. I mentioned how he would for the API's. I gave him some formulas along with #10261 with Fluticasone and we talked about the AWP's. He began to grow interested and sees the potential." *Id*. at 25. |
| April 7, 2014 | "I asked if he is taking advantage of our formulas and AWP's with fluticasone and collagenase. He didn't know about these so I gave him the formula numbers and he jotted them down." *Id*. at 29. |
| May 8, 2014 | "I called [the customer] to check in and talk about Fluticasone. He orders Pracasil from us but order[s] Fluticasone from [a competitor]. I let him know that [another competitor] has this in customs and not sure about [the competitor], but we have plenty in stock. Although he doesn't buy it from us, I talked about our higher AWP and how it also goes towards his Rewards and GIB [Growth Incentive Bonus]." *Id*. at 30. |

24

| Oct. 15, 2014 | "Typically we do not raise our AWP's unless the price increases mainly at the first of the year. We have found if these AWP's are changed too many times the insurance companies have concern[](example, has the mfg cost really gone up or is this a means to obtain more money from the prescription going through the insurance company)." *Id*. at 33. |
|---|---|

41.    The record is full of other similar examples.  *See generally* Ex. 85, Excerpt of Pivotal Entries, PCCA2015-093CID-0002045318 (providing over 125 examples).

42.    PCCA's sales representatives also marketed products with high AWPs despite known clinical concerns with these products.  For example, one sales representative (Linda Dobbie) highlighted fluticasone propionate as PCCA's "top selling" chemical with an AWP of "$3,630/g" that made the customers money.  Ex. 52, PCCA2015-093CID-0000827334.  Dobbie acknowledged "some controversy on how this chemical is used."  *Id*.  And though "[t]here are a lot of other chemicals that can be used in place of Fluticasone that are just as beneficial," she noted "reimbursements are higher and members are making a lot of money."  *Id*.

43.    On another occasion, another sales representative (Mayerling Brennan) sent her colleagues "a sample email I sent to one of my members" highlighting several formulas that included flurbiprofen—"a 'hot' chemical" with a "high AWP of $38.39" that could be used as a replacement for "Ketoprofen's $3.83 AWP."  Ex. 53, PCCA13635.000001 (April 2014 email).  Brennan "thought this may help when trying to advise [] members on how to make money!"  *Id*.  Years earlier, however, PCCA's President (Smith) had asked a scientist in PCCA's Pharmacy Consulting Division, about "flurbiprofen being thought to cause burns."  Ex. 54, PCCA2015-093CID-0002574983, 85 (August 2012 email).  The scientist replied, "I've had several calls this year about flurbiprofen and blister formation with subsequent scarring. . . . Most people are adding it just to crank up the awp."  *Id*.  He continued, "My research shows that flurbiprofen can cause

25

this and in my opinion there is no clinical advantage of adding flurbiprofen over a more traditional

nsaid that we know works and we know from experience has fewer side effects." *Id.*

## VIII.    PCCA Helped Customers Bill TRICARE Based on Its AWPs and Maximize Profits.

### A. PCCA Held Training Seminars on Billing Third Party Payers.

44.     PCCA held trainings for its pharmacy customers on how to submit claims to third-

party payers like TRICARE.  At these trainings, PCCA personnel advised customers about the

AWP spread and the submission of claims.  *See* Ex. 29, PCCA2015-093CID-000367688 at 13-18

(presentation demonstrating how to calculate the spread).  PCCA personnel discussed how to

utilize its AWPs to "work the spread" and "get the widest spread possible." Ex. 30, McCrory Dep.

at 60:11-62:14, 111:24–114:9; *see also* Ex. 86, McCrory Audio Clip 1 (McCrory Dep. Ex. 8); Ex.

87, McCrory Audio Clip 2 (McCrory Dep. Ex. 19).

45.     PCCA further offered its customers the consulting service CPMS, which provided

members with "[c]ustom prescription pricing strategies."  *See* Ex. 56, PCCA2015-093CID-

0000612334 (flyer describing CPMS offerings).  For instance, CPMS provided advice to

customers on setting their usual and customary price or cash price.  *See* Ex. 55, Letendre Dep.

28:5–12.  PCCA's Vice President of CPMS, Bill Letendre, and other PCCA personnel served as

business coaches to participating customers, helping them achieve target profit margins for their

pharmacy businesses.  *See* ECF No. 66 ¶ 115; ECF No. 164 ¶ 115 (admitted); Ex. 55, Letendre

Dep. 24:2-10.  This entailed analyzing a customer's prescription data to generate a "prescription

pricing and profitability analysis." *See* Ex. 56, PCCA2015-093CID-0000612334, 35; ECF No. 66

¶ 115; ECF No. 164 ¶ 115 (admitted).  These reports measured the pharmacy's sales and profits

and identified changes to increase the pharmacy's profitability.  ECF No. 66 ¶ 115; ECF No. 164

¶ 115 (admitted).  CPMS also provided advice to customers on their arrangements with marketers,

who pursued compound prescriptions for the customers in exchange for a fee or commission. *See* Ex. 55, Letendre Dep. 70:2-71:6; 97:19-98:21.

46.    PCCA also encouraged its customers to invite prescribers to PCCA seminars to learn about PCCA products and how to write prescriptions using these products. *See* Ex. 13, Horrell Dep. 129:3-24; 279:21-281: *see also* Ex. 84, PCCA2015-093CID-0001316992 (pain, wound, and scar symposium flyer stating to customers, "Bring Your Practitioners! This is a great opportunity to build your relationship with prescribers; we've even developed a dedicated practitioner track that will cover patient care concerns, specific patient case studies and how to write a compound prescription."); Ex. 83, PCCA2015-093CID-0001285300 (sample letter for customers to send to prescribers stating, "We plan to attend PCCA's . . . Symposium . . . and would like to invite you to join us. . . . Discover the potential of these therapies utilizing PCCA's proprietary compounding bases to restore your patients' health.").

**B. PCCA Told Customers to Hide Their Acquisition Costs.**

47.    PCCA was concerned that if third party payers learned of a pharmacy's acquisition costs relative to AWP, they might lower payments or discontinue paying for compound claims. PCCA's CEO (Sparks) testified that PCCA did not want to reveal its selling prices to insurers because "if they knew what the cost of the ingredient was, the true cost to us of an ingredient, they would perhaps lower their reimbursement for that ingredient." Ex. 58, Sparks CID Test. Vol. II, at 40:6-41:3. That would be a detriment to PCCA because if the customer gets less reimbursement for PCCA's products, it may choose a competitor over PCCA. *Id.*

48.    In a March 2013 email, a PCCA senior account representative advised Smith and other senior management members that a PBM had conducted a 12-month audit of a PCCA customer and "disallowed almost all compounds using PCCA chemicals because the cost was overcharged." Ex. 57, PCCA2019-093CID-0002480476, 77. The PBM was "questioning the

prices because the [PBM's] auditor said they had a PCCA pricing book," i.e., "$300 submit and $37 was the amount [PBM] said was the cost according to the PCCA pricing book." *Id*.

49.     At training seminars, PCCA advised its customers never to disclose their acquisition costs to third party payers.  In 2014, a PCCA consultant (Gary McCrory) gave a presentation on behalf of PCCA entitled "Navigating Third-Party Billing for Compounds" to PCCA customers.  *See* Ex. 59, PCCA2015-093CID-0001137578.  The purpose of the presentation was to "teach you how to become more efficient, how to reduce audits, and what to do when you get audited and more."  *Id*.  McCrory told participants, "If you get a request from a PBM to give you – to give them proof of purchase, stop right there, make a phone call to PCCA to your inside sales team and tell them what's going on and the request you have."  Ex. 30, McCrory Dep. at 46:23-47:6; 54:19-12; *see also* Ex. 88, McCrory Audio Clip 3 (McCrory Dep. Ex. 6).   He continued, "Remember, they have no business seeing your acquisition cost. . . .  Don't let them see your acquisition cost.  That is a disaster waiting to happen."  Ex. 30, McCrory Dep. at 55:18-24; *see also* Ex. 88, McCrory Audio Clip 3.

50.     PCCA went to great lengths to conceal its selling prices from third-party payers. For instance, one sales representative (Sheila Palm) received a request in December 2013 from a pharmacy member for invoices subject to a third-party payor's audit.  *See* Ex. 61, PCCA2015-093CID-0000689785, 86.  PCCA sent the customer invoices without selling prices.  *See id*.  Later, the customer notified Palm that the invoices received from PCCA "did not have pricing information on them" and that she needed "those invoices again with pricing information on them." *Id*. (emphasis omitted).  Zaccardo then said, "We don't ever release the customer's pricing to insurance companies as this may create major issues for the Pharmacy."  *Id*.; *see also* Ex. 62, PCCA2015-093CID-0002551687 (email from Zaccardo stating that adding AWP to PCCA

invoices "would not be a very good idea" because "insurance companies request copies of the invoice and they would be able to see both the AWP and cost in one location[]").

### C. PCCA Helped Customers Manipulate Usual and Customary Price to Obtain Payment Based on AWP.

51.     PCCA sold billing software (PK Software), which contained an online billing module for submitting compound prescription claims to third party insurance including TRICARE. *See* Ex. 30, McCrory Dep. at 42:12-16; Ex. 11, Klomp Dep. at 14:6-11, 21:23-23:17. More than 200 PCCA customers purchased the online billing module. Klomp Dep. at 46:14-21 & errata. PCCA provided detailed instructions on how to use the module. *See* Ex. 63, Compounder Rx Advanced Training Guide at 188 (Ch. 15 D.0 Online Billing – explaining how to bill insurance under D.0). The module contained two separate features that enabled pharmacies to manipulate the Usual and Customary ("U&C") amount to equal the AWP-based price submitted by the pharmacy.

52.     One feature was a "button" next to the U&C charge. *See* Ex. 11, Klomp Dep. at 118:10-21. If the U&C amount was less than the AWP-based amount, then by pressing the button, the software automatically increased the U&C price to equal the AWP-based amount. *See id.* at 118:22-25; 126:12-14. In a webinar demonstrating this feature to customers, PCCA's Director of Pharmacy Software (Paul Klomp) explained how this feature operated with an example of a sample claim with a U&C of $50 but a higher Ingredient Cost Submitted of $176.61, based on AWP. *Id.* at 126:3-11. Klomp acknowledged that if the claim was submitted with the lower $50 U&C and a higher Ingredient Cost Submitted of $176.61, the pharmacy would get paid the lower amount of $50 by insurance under a "lesser of" formula. *Id.* at 126:17-20. By pressing the button, however, the software increased the U&C from $50 to $176.61 so that the pharmacy would be paid the higher amount based on AWP. *Id.* at 126:21-24.

29

53.     The second feature was a "checkbox" in the insurance setup module.  *See id*. at 127:12-128:24.  If this "checkbox" was activated, the software automatically checked to see if the U&C was less than the "Gross Amount Due" just prior to transmitting the claim.  *Id*. at 128:17-24 (discussing Ex. 64, PCCA2015-093CID-0001414751).  If the U&C amount was less, the software automatically increased the U&C to equal the Gross Amount Due (which pharmacies could set based on AWPs).   Ex. 11, Klomp Dep. at 129:12-130:14.  These features enabled PCCA's pharmacy customers to manipulate the U&C price to obtain payment based on AWP, rather than a lower U&C price.  *See* Ex. 65, PCCA2015-093CID-0001372247, 62 ("If you use this check box, and get audited, you will need to justify to the insurance the reason you raised for U&C.  Also, if this box is not checked the software will stop before you transmit a claim and give you a warning about the U&C being less than the calculated Gross Amount Due.").

**IX.    PCCA and Its Shareholders Realized Record Profits from Its AWP Scheme.**

54.     By increasing its AWPs and marketing them to its customers, PCCA achieved rapid and historic growth in its sales. *E.g.*, Ex. 1, Zaccardo Dep. Vol. I at 57:4-7 (admitting that PCCA's sales overall grew very rapidly from 2011 to 2014); Ex. 15, Smith Dep. Vol. I 75:23-76:12 (admitting that the growth rate for PCCA's pharmacy customers was historic and, in turn, the company's sales of its ingredients and bases increased); Ex. 26, Saha Rep. at 67-80 (showing growth in sales and revenue for each of the 13 relevant products); Ex. 60, PCCA's Sales of the 13 Products (chart of sales 2011 to 2016).  In 2011, PCCA's annual revenue was approximately $71 million.  ECF No. 66 ¶ 158; ECF No. 164 ¶ 158 (admitted in relevant part).  PCCA's revenue grew to over $100 million in 2012, $161 million in 2013, and almost $250 million in 2014.  *Id.* (admitted).

55.     During this same period, PCCA earned substantial profits and paid out significant dividends to its shareholders.  Ex. 15, Smith Dep. Vol. I at 56:15-10.  For example, PCCA's gross

profits grew from $57 million in 2011 to nearly $83 million in 2012. Ex. 66, PCCA 103836.000036. In 2013, gross profits increased to $131 million, peaked at almost $178 million in 2014, and declined to $115 million in 2015. Ex. 76, PCCA 101967.000034; Ex. 94, PCCA88702.000028; Ex. 67, PCCA 101844.000033. During this period, PCCA paid out almost $250 million in distributions to its shareholders: $31 million in 2012; $68 million in 2013; $98 million in 2014; and $51 million in 2015. *See* Ex. 66, PCCA 103836.000037; Ex. 76, PCCA 101967.000048; Ex. 94, PCCA88702.000029; Ex. 67, PCCA 101844.000035. PCCA had about 40 shareholders, but three individuals (Sparks, Lawson Kloesel, and Charlie Armstrong) collectively owned about 85% of the stock. Ex. 15, Smith Dep. Vol. I at 54:13-25. Compensation for PCCA's senior management also increased significantly during this period. *Id*. at 55:15–25. To illustrate, Smith, who was also a shareholder, received distribution payments of over a million dollars in addition to compensation for his work as president of over a million dollars from 2012 to 2014. *See id*. at 55:15-25, 56:11-13.

## X. PCCA's Actions Harmed TRICARE, which Paid Excessive Reimbursements on Compound Claims with PCCA Ingredients.

56. PCCA's AWP pricing and marketing scheme produced record sales, profits, and dividends for PCCA, but at the expense of TRICARE, which saw a seventeen-fold increase in its overall spending on compound drugs, from $92 million to $1.6 billion dollars. Ex. 26, Saha Rep. at 21. TRICARE's average cost for a compound drug prescription rose from $170 to $2,135. *See* Ex. 68, US_00069275, 306. Below is a chart contained in a DHA Report to Congress demonstrating the explosive growth in TRICARE expenditures on compound drugs during the relevant period, and a subsequent drop after TRICARE implemented controls. *Id.*



57.     There was "a distinct relationship between PCCA's sales volumes for the 13 products at issue and TRICARE's ballooning compound drug reimbursement expenditures during the period 2012 through 2015." Ex. 26, Saha Rep. at 5.  PCCA's experts do not dispute this finding. *See* Ex.28, Carr Dep. at 243:4-15.

58.     Between March 2012 and May 2015, PCCA's customers submitted and received reimbursement for over 940,000 compound claims containing one or more PCCA ingredients. *See* Ex. 7, Hines Rep. at 10-11.  The government seeks damages on 129,975 of those claims (the "Claims Base").  *See id*. at 23-24.  All of these 129,975 claims were submitted by PCCA's customers for TRICARE reimbursement for the relevant PCCA ingredients using the code for AWP and in amounts reflecting the ingredients' AWPs.  *Id*. at 22.  The 129,975 claims were paid by Express Scripts in amounts that reflected the ingredient's AWP or AWP less a discount.  Ex. 69, Hines Rebuttal Rep. at 13.  The amount paid by TRICARE for claims in the Claims Base ranges from $2,000 up to approximately $80,000 per claim.  *See* Ex. 89, Hines Rep. Exhibits at Ex. 15 (rows 5761 & 123226).  The average amount paid per claim was approximately $5,920.  Ex. 69, Hines Rebuttal Rep. at 3.

59.     As explained above, Express Scripts' reimbursement formula for compound claims submitted to TRICARE was modified in July 2013.  The chart below shows the breakdown of claims between the two periods (i.e., pre- and post-July 2013).  *See* Ex. 89, Hines Rep. Exhibits at Ex. 6A.  For the period through July 9, 2013, the amount TRICARE paid reflected the ingredient cost submitted by the pharmacy.  *Id.*  For all claims in the Claims Base, this reflects the AWP.  *See* Ex. 7, Hines Rep. at 22; Ex. 69, Hines Rebuttal Report at 9.  For the period after July 9, 2013, each of the relevant products were paid based on a discount (averaging approximately 15.62%) off of PCCA's AWPs.  *See* Ex. 89, Hines Rep. Exhibits at Ex. 6A.

Source: Queries of the Claims Data
Note: Includes Relevant Products in Claims Base

| SUMMARY | | *1-AWP* | *2-ACQ (i.e., AWP)*<br>*7-STMAC (i.e., Sbmtd Cost)* | | | | |
|---|---|---|---|---|---|---|---|
| **Period<br>(Adjud Date)** | **INGRED COST CDE<br>SBMTD** | **INGRED COST CDE PAY** | | **INGRED COST AMT<br>SBMTD** | *Average<br>Discount* | **INGRED COST AMT<br>PAY** | **Count of<br>Unique Claims** |
| Through 7/9/13 | 1 | 7 | | $ 30,220,155 | 0.00% | $ 30,220,155 | 14,152 |
| Post 7/9/13 | 1 | 2 | | $ 420,449,431 | 15.62% | $ 354,782,621 | 115,823 |
| | | | | $ 450,669,586 | 14.57% | $ 385,002,776 | 129,975 |

60.     The government is pursuing damages under the following three theories:

- The difference between what TRICARE paid for each PCCA ingredient with false or fraudulently inflated AWPs and what TRICARE would have paid had the AWPs not been falsely or fraudulently inflated (i.e., the excessive reimbursement).  For the 129,975 claims at issue, TRICARE paid excess reimbursement of at least $333,583,192. Ex. 7, Hines Rep. at 39-40.

- For AKS violations, damages may be calculated by taking the full amount TRICARE paid within each tainted claim for the relevant PCCA products (i.e., the full amounts paid for the "tainted products").  For the claims at issue, TRICARE paid $385,002,776 for the 13 PCCA products.  *Id.*

- For AKS violations, damages may also be calculated by taking the entire amount TRICARE paid for each tainted claim.  For the claims at issue, TRICARE paid $768,950,067.  *Id.*

## XI.    TRICARE Implemented Controls That Stopped the Fraud.

61.     In July 2012, Express Scripts implemented a system upgrade that gave TRICARE Management Activity (TMA), which later became DHA, visibility into all ingredients contained

in a compound claim, including bulk powders and chemicals. Ex. 71, US_00041915, 16. In January 2013, Express Scripts completed an in-depth review of compound drug costs and usage and provided analysis and recommendations to TMA. *Id.* Due to rising compounding costs and the presence in compound claims of bulk powders and chemicals not approved by the FDA, in April 2013, TRICARE decided to implement a new screening capability and no longer reimburse for bulk powders and chemicals in compound claims. *Id.* at 916. In June 2013, Express Scripts sent letters to TRICARE beneficiaries notifying them that certain compound prescription claims containing bulk ingredients would not be covered effective July 24, 2013. *Id.*

62.    PCCA "[a]bsolutely" had an interest in preserving TRICARE coverage for compound prescriptions. *See* Ex. 16, Smith Dep. Vol. II at 289:20-22. In response to Express Scripts' notification to TRICARE beneficiaries, PCCA coordinated an organized effort to preserve TRICARE coverage for compound claims containing PCCA's products. *E.g.*, *id.* at 290:14-17; Ex. 77, PCCA40725.000001 (detailing PCCA's efforts in June 2014); Ex. 72, US_00064558 (DHA email chain noting similarities in messages received regarding continued coverage of compound medications). PCCA orchestrated a letter writing campaign targeting TRICARE officials. *E.g.*, Ex. 73, US_00058290 (July 2013 email chain with several TRICARE officials discussing PCCA's letter writing campaign and attaching ten sample letters); Ex. 74, US_00058324 (August 2013 email from Rear Admiral Thomas McGinnis to his executive assistant discussing an upcoming meeting with a PCCA lobbyist and warning her "not to let this guy bully you he is only a consultant trying to make money on this issue").

63.    In December 2013, PCCA's Vice President of R&D (Dr. Bassani) informed a member that "[w]e continue to work behind the scenes with Tricare[.]" Ex. 75, PCCA2015-093CID-0002614011, 12. PCCA's goal was "to encourage Tricare to further delay any action until

[a GAO study] is complete." *Id.* According to Bassani, PCCA was "ready to get members of Congress (who are on the right committees) to put pressure on Tricare to delay any further action until the study is done." *Id.* Bassani also attached "a draft letter" the member could "have [their] representatives send to Tricare[.]" *Id.* at 13.

64.    Because of concerns raised by beneficiaries, industry groups, and others like PCCA, TRICARE temporarily delayed the implementation of cost controls for 6-months until February 2014 to address those concerns. *See* Ex. 71, US_00041915, 16; *see also* Ex. 3, Woodson Dep. at 114:7-14 (describing the reason for the delay as conducting "due diligence" in response to "feedback from Congress and industry and other stakeholders"). When TRICARE delayed that decision even further due to anticipated guidance from the FDA, Ex. 71, US_00041915, 16, a PCCA lobbyist wrote to Smith "another delay equals another victory for PCCA and ALL your member pharmacies." Ex. 78, PCCA2015-093CID-0001315986. While TRICARE continued to await further FDA guidance, PCCA continued to increase its AWPs on an annual basis. *See* Ex. 26, Saha Rep. at 53-66. PCCA's inflated AWPs fueled a further increase in the submission of fraudulently inflated compound claims submitted to TRICARE, which accelerated in mid-2014. *See* Ex. 68, US_00069275, 306.

65.    In November 2014, the Department of Defense's Pharmacy and Therapeutics ("P&T") Committee unanimously recommended a prior authorization process for compound claims. Ex. 71, US_00041915, 16-17. The P&T Committee found that the recommended prior authorization process would maintain accessibility for compound drugs when appropriate while allowing for needed scrutiny. *Id.* Following input from the Beneficiary Advisory Panel, in March 2015, the Director of DHA approved a plan for an enhanced electronic screening and prior authorization process for compound claims. *Id.* at 17-21. PCCA had encouraged the Panel to

reject the proposed enhanced screening and prior authorization process. *See* Ex. 79, PCCA009130.000001. The enhanced screening process became effective on May 1, 2015. Ex. 71, US_00041915, 17-21.

66.    After TRICARE implemented controls, the number of compound claims submitted to TRICARE declined sharply. *See* ECF No. 66 ¶ 161; ECF No. 164 ¶ 161 (admitted); Ex. 68, US_00069275, 306. PCCA's sales also plummeted; its annual revenue declined from $244 million in 2014 to under $90 million in 2015. *See* ECF No. 66 ¶¶ 162-63; ECF No. 164 ¶¶ 162-63 (admitted); Ex. 1, Zaccardo Dep. Vol. I at 66:9-13 (attributing the declining trend in PCCA sales to insurance companies "no longer accept[ing] compounding or reimburs[ing] compounding[]"); Ex. 15, Smith Dep. Vol. I at 80:3-24 (estimating that sales decreased by about 70% because third-party payers "weren't paying for compounds"); Ex. 16, Smith Dep. Vol. II at 294:3-18 (PCCA lost sales and revenue due to TRICARE changes); Ex. 81, PCCA2015-093CID-0001264922 (Smith: "Tricare changes in reimbursement took a huge toll on our members' purchases. Wowzer!").[4]

## LEGAL STANDARD

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. "A 'material' fact is one that might affect the outcome of the suit under governing law,

---

[4] Since the filing of the government's complaint in intervention in November 2021, PCCA has filed four dispositive motions, which the Court has denied. *See United States ex rel. Hueseman v. Pro. Compounding Ctrs. of Am., Inc.*, 664 F. Supp. 3d 722 (W.D. Tex. 2023) ("*PCCA I*") (ECF No. 109) (denying motion to dismiss); *United States v. Pro. Compounding Ctrs. of Am., Inc.*, No. SA-14-CV-00212-XR, 2024 WL 1904343, at *1 (W.D. Tex. Apr. 30, 2024) ("*PCCA II*") (ECF No. 218) (denying statute of limitations motion except as to government's allegations regarding all-inclusive trips); *United States v. Pro. Compounding Ctrs. of Am., Inc.*, No. SA-14-CV-00212-XR, 2024 WL 1979109, at *1 (W.D. Tex. May 3, 2024) ("*PCCA III*") (ECF No. 220) (denying motion to dismiss for want of prosecution); ECF No. 219 (denying motion for summary judgment as to causation and damages). The Court has also denied PCCA's motion to exclude the government's experts. *See* ECF No. 224 (Sealed Order).

and a fact issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018) (cleaned up).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (cleaned up).

The burden then shifts to the nonmovant to show that a genuine fact dispute exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The nonmovant may not rely on its pleadings; it must point to "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48.  "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003).  A "scintilla of evidence" will likewise not meet the nonmovant's burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  The Court will not assume "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Id*.  The Court has "no duty to search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).  The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *Reeves v. Sanderson Plumbing Prods.,*

*Inc.*, 530 U.S. 133, 150 (2000), and must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 180 (5th Cir. 2009).

<div align="center">ARGUMENT</div>

The Government now moves for summary judgment as to the AKS, the FCA elements of falsity, materiality, knowledge, and causation, and damages premised on PCCA's violation of the FCA and AKS. The extensive record compiled above cannot be in genuine dispute as it consists largely of PCCA's own sworn testimony, internal documents, and admissions in this case. That record shows that PCCA knowingly and willfully manipulated and inflated its AWPs and marketed the resulting spreads to induce the sale of its products to customers who then submitted 129,975 false and inflated compound claims to TRICARE for reimbursement. PCCA's conduct violated the AKS, which establishes falsity and materiality under the FCA as a matter of law. The undisputed record further shows that PCCA's AWPs were fictitious numbers that bore no relationship to selling prices; its AWPs influenced TRICARE's payment of claims; PCCA knew or was placed on notice that inflating AWPs and marketing the spread was illegal, would draw scrutiny, and a "house built on sand;" and its inflated AWPs caused TRICARE to pay inflated claims for reimbursement. PCCA's conduct thus satisfies the FCA elements of falsity, materiality, knowledge, and causation as a matter of law. It also establishes the number of claims at issue and the amount of damages premised on PCCA's violations of the AKS and FCA before trebling and penalties.

## I. The False Claims Act and Anti-Kickback Statute.

The FCA prohibits false and fraudulent claims for reimbursement to the federal government. An entity violates the FCA when it:

A. knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

> B.    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]

31 U.S.C. §§ 3729(a)(1)(A)–(B). In addition, "a false or fraudulent claim violates the FCA only if the misrepresentation it contains is material." *United States ex rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*, 507 F. Supp. 3d 734, 758 (W.D. Tex. 2020) (cleaned up).

To prevail on an FCA claim, the Government must prove: (1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim). *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 467 (5th Cir. 2009). A defendant "need not be the one who actually submitted the claim forms in order to be liable[.]" *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir. 2004) (quotations omitted). Damages are not a required element. *See United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 189 (5th Cir. 2009).

"In the healthcare context, the AKS commonly serves as an FCA predicate[.]" *United States ex rel. Wheeler v. Union Treatment Ctrs., LLC*, No. CV SA-13-CA-4-XR, 2019 WL 571349, at *5 (W.D. Tex. Feb. 12, 2019). The AKS makes it illegal for an individual or entity to knowingly and willfully:

> [O]ffer[ ] or pay[ ] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase, lease, [or] order . . . any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b)(2). The AKS expressly provides that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." *Id.* § 1320a-7b(g). "Under this provision, claims submitted to federal health care programs that result from AKS violations are per se false or fraudulent within the meaning of the

FCA." *PCCA I*, 664 F. Supp. 3d at 740. "AKS violations are also 'inherently material' under the FCA 'to the government's decision to pay claims presented.'" *Id.* (quoting *United States v. Marlin Med. Sols., LLC*, 579 F. Supp. 3d 876, 890 (W.D. Tex. 2022)).

## II.    The Government Is Entitled to Summary Judgment under the AKS.

PCCA's own witnesses and documents establish that it violated the AKS by knowingly and willfully offering remuneration to its customers through inflated AWPs and large profit spreads to induce the sales of its products, which TRICARE reimbursed. PCCA's AKS violations establish falsity and materiality as a matter of law under the FCA.

### A.   PCCA Knowingly and Willfully Offered Remuneration to its Customers to Induce Them to Purchase PCCA's Products.

Courts and the HHS OIG have interpreted the term "remuneration" broadly to include "anything of value in any form whatsoever." *Marlin*, 579 F. Supp. 3d at 892 (quotations omitted); *accord* Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (July 29, 1991). PCCA's inflated AWPs and the resulting spreads constitute remuneration because PCCA's customers valued high AWPs and profited from large AWP spreads through increased reimbursements from TRICARE. *See* Statement of Undisputed Material Facts ("SOF") ¶¶ 9-10, 16-27, 36-43. As explained in the OIG Guidance, "manipulation of the AWP transfers remuneration to a seller's immediate customer from a subsequent purchaser." 68 Fed. Reg. at 23737. PCCA's manipulation of its AWPs transferred remuneration to PCCA's customers from TRICARE. *See PCCA I*, 664 F. Supp. 3d at 741 (noting that "OIG warned that AWP manipulation combined with active marketing of the spread was 'strong evidence' of an AKS violation").

To act willfully, "a person need not have actual knowledge of [the AKS] or specific intent to commit a violation of [the AKS]." 42 U.S.C. § 1320a–7b(h). "Rather, it is sufficient for the

Government to plead 'that the defendant willfully committed an act that violated the [AKS].'"
*PCCA I*, 664 F. Supp. 3d at 740-41 (quoting *United States v. St. Junius*, 739 F.3d 193, 210 (5th Cir. 2013)); *see also United States ex rel. King v. Solvay Pharms., Inc.*, 871 F.3d 318, 332 n.12 (5th Cir. 2017) (citing *St. Junius* in FCA case). "That is to say, the defendant committed the act voluntarily and intentionally, and not necessarily with the purpose to violate the AKS." *Marlin Med.*, 579 F. Supp. 3d at 885.[5]

In criminal cases, the Fifth Circuit requires the Government to prove that that the defendant acted "with the specific intent to do something the law forbids or with bad purpose either to disobey or disregard the law." *United States v. Shah*, 95 F.4th 328, 350 (5th Cir. 2024) (cleaned up). The Court, however, has rightfully refused to apply that criminal standard in the civil FCA context. *See Marlin*, 579 F. Supp. 3d at 885 n.2. *But see United States ex rel. Hart v. McKesson Corp.*, 96 F.4th 145, 157 (2d Cir. 2024) ("[T]he term 'willfully' in the AKS means what it typically means in federal criminal law."); *accord U.S. ex rel. Jamison v. McKesson Corp.*, 900 F. Supp. 2d 683, 702 (N.D. Miss. 2012).

The evidence here establishes willfulness under even the criminal standard. Testimony from PCCA's president and Rule 30(b)(6) witness, Jim Smith, establishes that PCCA willfully offered high AWPs and spreads to induce the purchase of its products:

| Q. And the company knew in March 2012 that AWPs were of value to pharmacies billing third-party payors; right? A. That's correct. | Q. The company wanted pharmacy customers to purchase its ingredients and bases? A. That's correct. |
|---|---|

[5] The Government need only show that one purpose of the remuneration was to induce sales; it need not be the only purpose. *See United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998) (proposed jury instruction that guilt under the AKS required finding that payments "were 'for no other purpose' than 'inducing the referral of Medicare patients'" was "an erroneous statement of the law and was therefore correctly denied"); *United States ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368, 374 (5th Cir. 2016) ("Relator need only show that one purpose of the remuneration was to induce such referrals.").

41

| Q.  The company increased its AWPs in March 2012 to be competitive with Freedom; right?  A.  That's correct.  Q.  The company wanted to maintain its market share; right?  A.  Yes. | Q.  The company believed increasing its AWPs was the way to do that?  A.  That is correct.  Q.  The company knew some of its customers billed TRICARE for compound prescriptions?  A.  It wasn't on our mind, but we do know that, yes. |
|---|---|

Ex. 16, Smith Dep. Vol. II at 270:16-271:10.

PCCA knew that its customers billed and were reimbursed by TRICARE for PCCA's ingredients based on its AWPs.  *See* SOF ¶¶ 16-20, 62-64, 66.  PCCA knew that its customers valued high AWPs and profited from large AWP spreads through increased reimbursements from TRICARE.  *Id.* at ¶¶ 16-27, 36-43, 62-64, 66.  PCCA knew that by increasing its AWPs, its pharmacy customers would receive increased reimbursement from TRICARE.  *Id.*  PCCA knew that offering inflated AWPs and higher profit spreads (remuneration) would drive sales by inducing customers to purchase PCCA products.  *Id.* at ¶¶ 21-27.  PCCA's senior management instructed its sales representatives to market its high AWPs and spreads to drive sales.  *Id.* at ¶¶ 36-39.  And PCCA's sales representatives marketed its high AWPs and spreads to induce sales.  *Id.* at ¶¶ 40-43.

Moreover, PCCA knew that manipulating and inflating its AWPs would trigger red flags and bring scrutiny, audits, investigations, and enforcement actions.  *Id.* at ¶¶ 21, 30-35.  PCCA thus sought to conceal its AWP spreads.  *Id.* at ¶¶ 47-50.  PCCA also knew such conduct was unlawful.  *Id.* at 15, 21, 24, 30-35, 47-50.  The 2003 HHS-OIG Guidance put PCCA on notice that its actions were illegal, and that the Government considered AWP manipulation material to its payment decisions and strong evidence of an AKS violation.  As the OIG made clear "[t]he conjunction of manipulation of the AWP to induce customers to purchase a product with active marketing of the spread is *strong evidence of the unlawful intent* necessary to trigger the anti-kickback statute."  68 Fed. Reg. at 23737 (emphasis added).  PCCA's senior management was

aware that another pharmaceutical wholesaler was accused of Medicaid fraud for inflating its AWPs. SOF ¶ 34.

### B. Payment for PCCA's Products May Be Made under a Federal Health Care Program.

The AKS applies when kickbacks are offered, paid, or received in connection with any item "for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(B). *See Shah*, 95 F.4th at 352 (construing "payment may be made" language as "meaning only that 'an item or service . . . *could* be paid for by a federal health care program'" (emphasis in original)). The "payment may be made" language requires only a "minimal showing." *MedPricer.com, Inc. v. Becton, Dixon & Co.*, 240 F. Supp. 3d 263, 272-73 (D. Conn. 2017); *see also In re EpiPen Direct Purchaser Litig.*, No. 20-cv-0827, 2021 WL 147166, at *14 (D. Minn. Jan. 15, 2021). The Government need only show that "some patients were federally insured or that payment 'may' have been made by a federal healthcare program." *Shah*, 95 F.4th at 352. This requirement is plainly satisfied in this case because TRICARE paid hundreds of millions of dollars for compound claims containing PCCA's ingredients on behalf of TRICARE beneficiaries. SOF ¶¶ 56-66.

### C. PCCA's AKS Violations Establish Falsity and Materiality as a Matter of Law under the FCA.

In 2010, Congress amended the AKS to provide that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g). A sponsor of the amendment explained that it was meant to "strengthen[] whistleblower actions based on medical care kickbacks," and overrule *United States ex rel. Thomas v. Bailey*, No. 4:06-cv-465, 2008 WL 4853630 (E.D. Ark. Nov. 6, 2008). 155 Cong. Rec. S10,853 (daily ed. Oct. 28, 2009) (Sen. Kaufman). In that case, the court concluded that a hospital's reimbursement claims for surgeries were not false, even though a device

manufacturer had violated the AKS by paying a surgeon to use its products in surgeries, because the hospital had not itself violated the AKS or been aware of the violation.  *Id*.  The sponsor explained that the amendment would make clear that such claims are indeed false or fraudulent— i.e., "all claims resulting from illegal kickbacks are 'false or fraudulent,' even when the claims are not submitted directly by the wrongdoers themselves."  *Id*.

Section 1320a-7b(g) was therefore intended to clarify that claims that include items or services tainted by kickbacks are false or fraudulent claims for purposes of the FCA.  There is nothing in the text or context of § 1320a-7b(g) to suggest that Congress intended the "resulting from" language to require proof that the kickback actually altered medical decisionmaking or that the items or services would not have been purchased or provided "but for" the kickback.[6]  Such requirements would be inconsistent with Congress' objective to "strengthen" whistleblower actions and to make it *easier* to prove falsity under the FCA based on AKS violations.

---

[6] Courts have interpreted the "resulting from" language differently.  The Third Circuit rejected a but-for standard, concluding that a plaintiff need only demonstrate that a defendant "sought reimbursement for medical care that was provided in violation of the Anti-Kickback Statute." *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 98 (3d Cir. 2018).  The Eighth and Sixth Circuits, however, interpreted the language to require but-for causation—i.e., a claim is false under § 1320a-7b(g) only if the claimed items would not have been provided but for a kickback.  *See United States ex rel. Cairns v. D.S. Medical LLC*, 42 F.4th 828, 836 (8th Cir. 2022); *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1052-55 (6th Cir. 2023).  The Fifth Circuit has not specifically addressed the issue, and the First Circuit is currently considering the issue. *See United States v. Teva Pharms. USA, Inc.*, 682 F. Supp. 3d 142, 148 (D. Mass. 2023), appeal pending, No. 23-1958 (1st Cir.); *United States v. Regeneron Pharms., Inc.*, No. CV 20-11217-FDS, 2023 WL 7016900, at *12 (D. Mass. Oct. 25, 2023), appeal pending, No. 23-2086 (1st Cir.).  This Court has previously interpreted § 1320a-7b(g) and held that "if claims are submitted in violation of the AKS, they are considered false claims under the FCA as a matter of law." *Wheeler*, 2019 WL 571349, at *5 & n.5.  And in the present case, the Court noted the issue was not properly before the Court but added that it was "neither bound nor persuaded by the Eighth Circuit's reasoning [in *Cairns*], which has been rejected by numerous courts." *PCCA I*, 664 F. Supp. 3d at 741 n.4.  The Court has correctly interpreted § 1320a-7b(g).  Nevertheless, as explained below, PCCA's conduct in this case satisfies both standards.

The AKS prohibits kickbacks or "remuneration" meant "to induce" the recipient "to purchase, lease, order . . . or recommend purchasing. . . any . . . item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2). The AKS does not require that a kickback be successful—i.e., that it actually caused the recipient to take the actions that the payor sought "to induce"—for the kickback to be illegal. *See United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 665 (S.D. Tex. 2013) ("The AKS's plain language . . . makes it unlawful for a defendant to pay a kickback with the intent to induce a referral, whether or not a particular referral results."), *aff'd sub nom. United States ex rel. Parikh v. Brown*, 587 F. App'x 123 (5th Cir. 2014). Congress chose to forbid kickbacks themselves, recognizing that financial conflicts are inherently corrupting and are punishable regardless of whether they can be shown to have produced a concrete change in medical decisionmaking.

Thus, under the plain language of the AKS, if a kickback or remuneration is offered or paid to induce the purchase of particular items, and that result comes to pass—i.e., those items are purchased or provided, a claim seeking reimbursement for those items is "a claim that includes items or services resulting from" the kickback and is false within the meaning of § 1320a-7b(g). Several courts have adopted this interpretation.[7]  The AKS does not require an additional showing that the items would not have been purchased but for the kickback.

Here, the undisputed evidence establishes that PCCA offered remuneration to its customers in the form of inflated AWPs and egregious spreads to induce its customers to purchase its

---

[7] *See Kuzma v. Northern Ariz. Healthcare Corp.*, 607 F. Supp. 3d 942, 956–57 (D. Ariz. 2022); *United States ex rel. Kester v. Novartis Pharm. Corp.*, 41 F. Supp. 3d 323, 332–35 (S.D.N.Y. 2014); *United States ex rel. Fitzer v. Allergan, Inc.*, No. 1:17-cv-00668, 2022 WL 3599139, at *9 (D. Md. Aug. 23, 2022); *United States v. Medtronic, Inc.*, No. 17-cv-2060, 2021 WL 4168140, at *23–24 (D. Kan. Sept. 14, 2021); *United States v. Teva Pharm. USA, Inc.*, No. 13-cv-3702, 2019 WL 1245656, at *24, *27 (S.D.N.Y. Feb. 27, 2019).

products. SOF ¶¶ 16-27, 36-43. Because of its inflated AWPs and egregious spreads, PCCA's customers purchased its products, and in fact PCCA's sales of the 13 relevant products in this case soared between 2012 and 2015. *Id.* at ¶¶ 54-55. The record further shows that PCCA's pharmacy customers sought and obtained reimbursement for those products in 129,975 claims to TRICARE. *Id.* at ¶¶ 56-59. Because those claims contained PCCA products tainted by its fraudulent AWP pricing and marketing scheme, they are false within the meaning of § 1320a-7b(g). *See Wheeler*, 2019 WL 571349, at *6 ("[T]he Government has provided undisputed evidence that Vidor and Family Pharmacies submitted 11,907 claims based on referrals . . . and that these claims were false as a matter of law because they arose from and were tainted by [] kickbacks [] paid . . . for the referrals.").

Nevertheless, even if a but-for standard applied, the evidence satisfies it. TRICARE would not have paid for PCCA's products at its inflated AWPs had PCCA not offered the kickbacks here—the inflated AWPs and large spreads. Moreover, PCCA has repeatedly claimed that its customers would not have purchased its ingredients if PCCA had not offered inflated AWPs and large spreads. *See* SOF ¶¶ 16-20, 21-23, 36-39. Indeed, PCCA has repeatedly claimed that it had to inflate its AWPs to "meet competition" or it would have lost or gone out of business. *See* ECF No. 113 at 30. But as this Court recognized, ECF No. 129 at 8:8–9 (June 20, 2023 Hr'g Tr.), paying kickbacks to "meet competition" is not a valid defense under the FCA. Regardless, PCCA admitted that its inflated AWPs increased sales to record levels. *See* SOF ¶¶ 54-55. All this underscores the direct causal link between PCCA's sales and its kickbacks, without which even PCCA believed its customers would neither have purchased those products nor submitted claims containing those products to TRICARE at inflated amounts.

AKS violations are inherently material to the government's decision to pay claims presented. *See PCCA I*, 664 F. Supp. 3d at 740; *accord Wheeler*, 2019 WL 571349, at *7 (failure to disclose AKS violation was "material omission" as a matter of law). A violation of a federal criminal law designed to prevent fraud in federally funded health care programs is indisputably material to the government's payment decisions. *See United States ex rel. Capshaw v. White*, No. 3:12-CV-4457-N, 2018 WL 6068806, at *4 (N.D. Tex. Nov. 20, 2018); *United States v. Berkeley Heartlab, Inc.*, No. 9:14-cv-230-RMG, 2017 WL 6015574, at *2 (D.S.C. Dec. 4, 2017). Violations of the AKS are material because Congress has decreed that they are material. *See Guilfoile v. Shields*, 913 F.3d 178, 190–91 (1st Cir. 2019). The claims at issue here resulted from violations of the AKS and are false and material under the FCA as a matter of law. *See* 42 U.S.C. § 1320a-7b(g); *PCCA I*, 664 F. Supp. 3d at 740. The government does not rely exclusively on PCCA's violations of the AKS to prove FCA falsity and materiality. As explained below the indisputable facts separately establish FCA falsity, materiality, knowledge and causation.

## III.    The Government Is Entitled to Summary Judgment under the FCA.

There is no genuine dispute of material fact that PCCA violated the FCA because: (1) it made false statements or engaged in a fraudulent course of conduct; (2) the statements or conduct were material; (3) PCCA acted with the requisite scienter; and (4) PCCA caused the Government to pay out money.

### A. PCCA Made False Statements and Engaged in a Fraudulent Course of Conduct.

PCCA is liable for violating the FCA under two separate but related theories. First, PCCA reported false and fraudulent AWPs that were material to TRICARE's payment for compound claims. *See* 31 U.S.C. § 3729(a)(1)(B). Second, PCCA engaged in a fraudulent course of conduct

that caused TRICARE to pay inflated amounts for compound claims with PCCA's ingredients. *See* 31 U.S.C. § 3729(a)(1)(A).

### i. PCCA Made Fraudulent Statements Material to False Claims— § 3729(a)(1)(B).

The FCA imposes liability on any person who knowingly makes "a false record or statement material to a false or fraudulent claim[.]" 31 U.S.C. § 3729(a)(1)(B). The false statement need not be made to the Government, so long as the defendant knew it would be material to a payment by the Government. *See Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 671–72 (2008).[8]

### 1. PCCA's AWPs Bore No Rational Relationship to Actual Prices.

This Court has held that "the FCA does not require proof of objective falsity." *PCCA I*, 664 F.Supp.3d at 742-43; *see also* ECF No. 224 at 6. It has further held that "[w]hen AWPs are fictitious numbers bearing no rational relationship to any actual price, they are false or fraudulent." *PCCA I*, 664 F. Supp. 3d at 742-43; *see also* ECF No. 224 at 7 ("[T]he falsity question asks whether PCCA's AWPs bore any rational relationship to actual selling prices or were instead fictitious numbers used as instruments of its fraudulent scheme."); *In re Pharm. Indus. AWP Litig.*, 582 F.3d 156, 170–71 nn.9–10 (1st Cir. 2009); *In re Pharm. Indus. AWP Litig.*, 478 F. Supp. 2d 164, 173-74 (D. Mass. 2007)*; Massachusetts v. Mylan Labs.*, 608 F. Supp. 2d 127, 145 (D. Mass. 2008); *In re Lupron Mktg. & Sales Pracs. Litig.*, 295 F. Supp. 2d 148, 168 n.19 (D. Mass. 2003); *United*

---

[8] Although *Allison Engine* discussed whether the statement was made "to get" the Government to pay a claim, Congress amended the FCA in response, and the relevant question is now whether the statement was material. *United States ex rel. Int'l Brotherhood of Electrical Workers Local Union No. 98 v. Farfield Co.*, 5 F.4th 315, 324 (3d Cir. 2021). And as this Court has already held, "[b]ecause the materiality inquiry only applies to claims that have already been submitted, no further showing of 'causation' is required." ECF No. 219 at 10 n.4 (citing *Grubbs*, 565 F.3d at 193).

*States ex rel. Rahimi v. Zydus Pharm., Inc.*, No. 15-cv-6536, 2017 WL 1503986, at *11 (D.N.J. Apr. 26, 2017); *In re Miss. Medicaid Pharm. AWP Litig.*, 190 So. 3d 829, 838–39 (Miss. 2015); *People ex rel. Spitzer v. Pharmacia Corp.*, 895 N.Y.S.2d 682, 695 (N.Y. Sup. Ct. 2010).

PCCA's AWPs were false as a matter of law because they were fictitious numbers bearing no rational relationship to any actual selling price. *See PCCA I*, 664 F.Supp.3d at 742-43. In March 2012, PCCA raised its AWPs to maintain or increase its sales and in response to its competitor's decision to inflate AWPs. SOF at ¶¶ 21-25. As this Court itself noted when denying PCCA's *Daubert* motion, "PCCA's own expert, Dr. Carr, acknowledges that PCCA increased its AWPs in March 2012 *not as a reflection of changes to PCCA's selling prices* but to compete based on those AWPs and make its products more attractive to customers, in order to maintain or increase PCCA's sales volumes." ECF No. 224 at 7 (emphasis in original). And after its initial AWP increases, PCCA continued to increase its already inflated AWPs by an additional 3% to 5% annually. *See* SOF ¶¶ 26-27. By 2015, PCCA's AWPs were higher than its main competitors, Freedom and Medisca, for several of the relevant products. *See id*. ¶ 27. And PCCA sometimes increased its AWPs on certain products at the request of its customers. *See id*. ¶ 19.

On average, PCCA's AWPs were marked up from 1,146% to 43,143% over their respective selling prices during the relevant period. *See id*. ¶ 26. A reasonable markup of pharmacy reimbursements over pharmacy acquisition costs ranges from 43% to 167%, far lower than the markups reflected in PCCA's reported AWPs. *Id*. ¶ 28. PCCA neither offered an expert opinion nor otherwise attempted to demonstrate that its AWPs on the 13 relevant products bore a rational relationship to its selling prices or reflected a reasonable markup over its selling prices. *Id*. at ¶ 29. The reason is simple. It cannot.

PCCA reported these false AWPs to create a spread for its customers and with the knowledge that TRICARE would use them to determine reimbursements. *Id*. at ¶¶ 16-18, 20. PCCA itself did not believe its AWPs were proper because it actively sought to conceal its AWP spreads, knew that "ridiculous" AWP inflation would bring audits and investigations, and recognized that it was setting AWPs well above what they "should be." *Id*. at ¶¶ 19, 30-35, 47-50. In addition, by reporting falsely inflated AWPs, PCCA caused its customers to submit false statements to TRICARE since all of the 129,975 claims at issue in this case were submitted using PCCA's false and inflated AWPs and were reimbursed on AWP or AWP less a discount. *Id*. at ¶ 58.

## 2. PCCA's AWPs Are Actionable Misrepresentations.

PCCA's AWPs also constitute actionable misrepresentations under the FCA because they omit important qualifying information. The FCA's reference to "false" and "fraudulent" claims incorporates the common law meaning of those terms. *Escobar*, 579 U.S. at 187. In *Escobar*, the Court held that falsity includes not only "express" or "affirmative" falsehoods, but also misrepresentations resulting from misleading "half-truths," i.e., "representations that state the truth only so far as it goes, while omitting critical qualifying information." *Id*. at 187-88. "A statement that misleadingly omits critical facts is a misrepresentation irrespective of whether the other party has expressly signaled the importance of the qualifying information." *Id*. at 191; *see also Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024) (SEC Rule 10b-5(b) applies to "half-truths" and "requires disclosure of information necessary to ensure that statements already made are clear and complete (i.e., that the dessert was, in fact, a whole cake.)").[9]

---

[9] In *Lupron*, the court found inflated AWPs to constitute the kind of misleading half-truths later discussed in *Escobar*. 295 F.Supp.2d at 165-68. There, the defendants allegedly inflated the AWP of an injectable drug, explained how doctors could "profit from the spread," increased the drug's

Here, PCCA omitted (and affirmatively concealed) critical facts about its AWPs—that they were marked up thousands of percent over actual selling prices to increase customer's profits. *See* SOF ¶¶ 47-50. And PCCA misleadingly implied facts PCCA knew were untrue. Even if understood as a "list price," "sticker price," or "suggested retail price," an AWP of $847 per gram for resveratrol, for example, implies an actual selling price far greater than under $2. *See id.* ¶ 28. As the *Mylan* court observed, "spreads that were almost always greater than 50%, consistently greater than 100%, sometimes greater than 1000%, and occasionally greater than 10000% . . . could hardly even be called true list prices; undoubtedly a consumer would be surprised to find that most purchasers could acquire a car for one-half the sticker price, let alone for a hundredth of it." 608 F. Supp. 2d at 154. Further, PCCA sought to conceal its spreads by imploring its customers not to give their acquisition costs to third-party payers, fearing a "disaster waiting to happen." *See* SOF ¶¶ 47-50.

In sum, PCCA's AWPs were false, fictitious, inflated, and misleading numbers, bearing no rational relationship to actual prices. Because there is no genuine issue of material fact, the Court should hold that PCCA's AWPs were false and fraudulent as a matter of law. *See* 31 U.S.C. § 3729(a)(1)(B); *see also* ECF No. 224 at 7 n.4 (noting that "numerous PCCA witnesses have confirmed in their testimony—PCCA's AWPs were untethered to its actual selling prices").

---

AWP to counter a competitor's AWP, and counseled doctors to conceal their actual invoice costs from Medicare and other insurance carriers. *Id.* at 161. The court explained: "[w]hether one views the defendant's actions as involving the dissemination of information that was wholly false, or false because of an incomplete depiction of the truth, they are actionable[.]" *Id.* at 167; *see also Massachusetts v. Mylan Labs.*, 357 F. Supp. 2d 314, 321 (D. Mass. 2005) ("half-truths may be as actionable as whole lies").

### ii. PCCA Caused the Submission of False or Fraudulent Claims for Payment—§ 3729(a)(1)(A).

PCCA engaged in a fraudulent course of conduct that caused its customers to submit false claims to TRICARE. PCCA reported fraudulently inflated AWPs to pricing compendia knowing they would be used by TRICARE, marketed the resulting large spreads, promoted high-AWP formulas, held seminars where it taught customers how to "work the spread," offered software to manipulate the U&C price to get reimbursed based on fraudulent AWPs, and concealed its selling prices to hide the magnitude of its AWP inflation. *See* SOF ¶¶ 3-4, 16-18, 20, 36-53; *see Mylan*, 608 F. Supp. 2d at 145 (where company reports false prices "via the publishing compendium knowing that pharmacies would present claims to [the government] which will be reimbursed based on a formula that utilizes the inflated price to determine the appropriate reimbursement amount[,]" company is "chargeable with causing false claims to be presented" because "the claims" were "predicated on an underlying fraudulent scheme." (cleaned up)); *In re Pharm. Indus. Litig.*, 582 F.3d at 199 (company "unfairly and deceptively published an artificial average wholesale price" where there was a "scheme to maximize the divergence of the AWP from actual acquisition cost"). PCCA's fraudulent conduct caused its customers to submit 129,975 false and inflated claims ranging in amounts from $2,000 to $80,000 per claim for TRICARE reimbursement of PCCA products based on PCCA's inflated AWPs. *See* SOF ¶ 58.

Furthermore, PCCA caused the submission of these claims that impliedly and falsely certified compliance with the AKS, TRICARE's regulations, and Express Scripts' provider agreements. "'False or fraudulent claims' are not limited to claims containing express falsehoods. Claims may also be false where they implicitly certify that they comply with a material statutory, regulatory, or contractual requirement." *PCCA I*, 664 F. Supp. 3d at 740. Liability under an "implied false certification theory" attaches "at least" where a claim "makes specific

representations about the goods or services provided," and "failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Escobar*, 579 U.S. at 190. "Even where there is no expressly certified compliance, an implied certification of compliance through the mere submission of a claim for payment can be sufficient for FCA liability, at least where falsity is premised on an AKS violation." *PCCA I*, 664 F. Supp. 3d at 740; *see also United States ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 372 n.2 (5th Cir. 2017) (absence of certification of AKS compliance did not preclude liability).

Because of PCCA's inflated AWPs, its customers' claims violated material statutory, regulatory, and contractual requirements. The claims violated TRICARE's fraud and abuse regulations, which explicitly prohibit arrangements between a supplier (like PCCA) and providers (like PCCA's customers) that result in unnecessary costs or charges to TRICARE or that include kickback arrangements designed to overcharge TRICARE. *See* SOF ¶ 13. Those regulations also prohibit billing at rates substantially more than customary or reasonable charges. *See id.* Further, TRICARE requires providers to furnish items and services economically. *See id.* ¶ 5. PCCA caused grossly excessive charges due to its fraudulently inflated AWPs and kickbacks. *See id.* ¶¶ 59-60. PCCA's fraudulent AWP scheme also caused its customers to violate explicit contractual requirements that compound claims not be submitted to Express Scripts with inflated AWPs or for amounts more than the pharmacy's acquisition costs, taking into account a reasonable markup. *See id.* ¶¶ 6, 14. Through its fraudulent AWPs and kickback scheme, PCCA caused the claims at issue here to be false. *See Mylan*, 608 F. Supp. 2d at 145.

### B. PCCA's False Statements and Fraudulent Conduct Are Material.

As discussed, AKS violations are inherently material under the FCA. In addition, the government is entitled to summary judgment on materiality because PCCA's fraudulent AWPs are material under both the FCA's statutory definition and *Escobar*. To violate the FCA, the falsity

must be material.  *Escobar*, 579 U.S. at 191.  The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).  The FCA requires "proof only that the defendant's false statements *could have* influenced the government's pay decision or had the potential to influence the government's decision[.]"  *United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 661 (5th Cir. 2017) (emphasis added).

### i. PCCA's False Statements of its AWPs Are Material under the FCA's Definition.

The Court has already held that "AWP is inherently material under the language of the statute because, as part of the pricing calculation, it has 'a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'"  *PCCA I*, 664 F. Supp. 3d at 748 (quoting 31 U.S.C. § 3729(b)(4)); *see also United States ex rel. Ven-A-Care v. Actavis Mid Atl. LLC*, 659 F. Supp. 2d 262, 271 (D. Mass. 2009) ("Reporting false AWPs had a natural tendency to influence the Government's actions, by inflating the amount of the Government's payment." (quotations and alteration marks omitted)); *Mylan*, 608 F.Supp.2d at 153 ("Reporting false [wholesale acquisition costs] had a natural tendency to influence the [state's] actions, by inflating the amounts used to compute [estimated acquisition cost], and thus potentially the amount of the [state's] payment.").  Moreover, PCCA's own experts have acknowledged that PCCA's AWPs impacted TRICARE's payment for compound claims containing those ingredients.  *See* SOF ¶ 9.  Therefore, PCCA's false statements of its AWPs are inherently material under the FCA's statutory definition of materiality as a matter of law.

### ii. Materiality Under *Escobar*.

Under *Escobar*, "a matter is material" if: (1) a reasonable person would attach importance to it in determining a "choice of action," or (2) "the defendant knew or had reason to know that

the recipient of the representation attaches importance to the specific matter in determining his choice of action," whether or not a reasonable person would do so. *Id.* at 193 (cleaned up). *Escobar* identified several factors that are relevant to, but not dispositive of, the materiality inquiry: whether the government has designated "compliance with a particular . . . requirement as a condition of payment," *id.* at 194; whether the violation of that requirement goes to the "essence of the bargain," *id.* at 193 n.5 (internal quotation marks omitted); whether the violation is "minor or insubstantial," *id.* at 194; and whether the government has taken action when it had actual knowledge of similar violations, *id.* at 195. "[P]roof of materiality can include . . . evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the . . . requirement[.]" *Id.* at 194-95.

## 1. PCCA's Fraudulent Conduct Is Material under *Escobar*.

Indisputable evidence establishes "that the inflated AWPs were material under both methods of proof set forth in *Escobar*—establishing that a 'reasonable person' would attach importance to AWP inflation and that PCCA knew or had reason to know that the Government actually attached importance to it in making payment decisions." *PCCA I*, 664 F. Supp. 3d at 748-749. First, this Court recognized that "as a matter of common sense . . . a reasonable person would attach importance to the price paid in a transaction, particularly where, as here, the price is inflated." *Id.* at 749; *see also United States ex rel. Campbell v. KIC Dev., LLC*, No. EP-18-CV-193-KC, 2019 WL 6884485, at *12 (W.D. Tex. Dec. 10, 2019) ("Because 'a reasonable person would attach importance to' the price of a contract that he or she enters, the Government has adequately alleged materiality").

Second, PCCA's own actions reflect this common-sense understanding and establish that PCCA knew or should have known that third-party payers attached importance to AWP inflation and manipulation. Specifically, PCCA went to great lengths to prevent insurance companies from

comparing its selling prices to its AWPs for fear that they would stop paying for compound claims. *See* SOF ¶¶ 30, 47-50. PCCA's CEO testified that PCCA did not want to reveal its selling prices to insurance auditors because if they knew the "true cost," they "would perhaps lower their reimbursement for that ingredient." Ex. 58, Sparks CID Dep. Vol II at 40:6-23. In response to a customer request to include the selling price on its invoices, PCCA's COO explained that it "would not be a very good idea" because it would allow insurance companies "to see both the AWP and the cost in one location." SOF ¶ 50. Thus, PCCA implored its members to never divulge its actual prices to auditors fearing a "disaster waiting to happen." *See id*. ¶ 49. Instead, PCCA urged customers to report auditor requests for invoices to PCCA, which would then generate a report for the auditor excluding the actual selling price of PCCA's ingredients. *See id*. ¶¶ 49-50. PCCA knew (or should have known) that the Government attached importance to AWP manipulation in its payment decisions.

### 2. *Escobar* Factors.

Moreover, each *Escobar* factor—conditions of payment, essence of the bargain, significance, and government action—indisputably weighs in favor of materiality. "[I]f a requirement is labelled a condition of payment and it is violated, that alone does not conclusively establish materiality. But it is certainly probative[.]" *United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 161 (5th Cir. 2019) (quotations omitted); *see also United States ex rel. Bibby v. Mortgage Inv'rs Corp.*, 987 F.3d 1340, 1347 (11th Cir. 2021). PCCA caused its customers to violate the following conditions of payment: (1) the AKS; (2) fraud and abuse regulations prohibiting kickbacks and excessive and unreasonable charges to TRICARE; and (3) requirements that compound claims not be submitted with inflated AWPs or acquisition costs plus a reasonable markup. *See* SOF ¶¶ 13-15.

PCCA's fraudulent conduct went to the essence of the bargain and was significant. PCCA's scheme was neither an innocent mistake nor unwitting non-compliance with minor or insubstantial requirements. Rather, PCCA's actions caused repeated violations of fraud and abuse regulations and other requirements central to TRICARE. *See id*. Because of PCCA's actions, TRICARE paid hundreds of millions of dollars in excess reimbursements, while PCCA directly profited from its scheme. *See id*. ¶¶ 56-60.

The government action factor also favors materiality. Where "the government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Escobar*, 579 U.S. at 195. The Fifth Circuit has reasoned that "continued payment by the federal government after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality." *Trinity*, 872 F.3d at 663. "The government-action factor turns on whether the government paid a specific claim notwithstanding its *contemporaneous and actual* knowledge that the claim was false." *PCCA I*, 664 F. Supp. 3d at 749-50 (emphasis in original). "Actual knowledge of violations is not the same as awareness of allegations of violations." *Id*. at 750. "[E]ven the Government's continued payments in light of its *actual* awareness of misconduct is not proof per se that the misconduct is immaterial under the FCA. Courts have long held that an FCA defendant is not automatically exonerated by any overlapping knowledge by government officials." *Id*. at 751 (cleaned up). "There are many good reasons, including important public health and safety considerations, why the Government might continue to pay claims in such circumstances." *Id*. "The Government must ensure the delivery of health care to many millions of Americans enrolled in its health insurance programs; it does not enjoy the luxury of refusing to reimburse health care claims the moment it suspects there may be

wrongdoing." *Id.* Of course, "[t]here are circumstances in which the Government may properly stop payments, but such decisions are necessarily tempered by the need to ensure adequate access to health care." *United States ex rel. Montcrieff v. Peripheral Vascular Associates, P.A.,* 649 F.Supp.3d 404, 416 (W.D. Tex. 2023).

TRICARE considered rapidly growing costs to be a significant problem and took active measures to address the issue as early as April 2013. *See* SOF ¶ 61. After announcing those measures, TRICARE received significant pushback from compounding pharmacies, beneficiaries, and other industry participants like PCCA. *See id.* ¶¶ 62-64. Therefore, TRICARE *temporarily* delayed the implementation of controls while it considered those concerns and policy options to address what it viewed to be a significant and growing problem. *See id.* Those temporary delays did not mean that TRICARE considered rising costs to be "minor or insubstantial." In fact, the Assistant Secretary of Defense for Health Affairs, Dr. Woodson, rejected the suggestion that rising costs were "not important," stating, "Sir, it was certainly important in the sense that it was a number of issues that we wanted to deal with, but also important was making sure that we got the new policies for oversight correct and responded to the concerns of Congress that were emerging." Ex. 3, Woodson Dep. at 115:7-12. Nor did TRICARE's continued payment for compound prescription claims, while it grappled with a significant policy issue, mean that PCCA's fraudulent conduct was immaterial. *See id.* at 113:20-116:3 (disagreeing with the suggestion that monthly compound payments or escalating compound costs were "not material"). Rather, the undisputed record shows that TRICARE's concerns about possible fraud were in fact "tempered" by the need to ensure adequate access to an important health benefit for its beneficiaries. *See PCCA I,* 664 F. Supp. 3d at 751 ("declin[ing] to endorse a theory of materiality that would, at a minimum, force the Government to deny care to people who have made sacrifices for their country, and, at worst,

58

create a national security risk"); ECF No. 219 at 14 ("[T]he Court has already rejected PCCA's suggestion that the Government's claims fail because it should have denied claims for pain, scar, and *wound* creams on behalf of TRICARE beneficiaries—active and retired military personnel and their dependents."); *United States ex rel. Aldridge v. Corp. Mgmt., Inc.*, 78 F.4th 727, 737-38 (5th Cir. 2023) (agreeing with the Government that Medicare's "pay and chase" policy does not neutralize a finding of materiality); *United States v. Howard*, 28 F.4th 180, 209 (11th Cir. 2022) ("As one Navy Captain from the Defense Health Agency testified in this case, because Tricare doesn't want to put red tape in the way of veterans getting the care that they need, 'the system is based on trust.'").

The record further establishes that TRICARE "signaled a change in position" in 2014 and 2015, "which weighs in favor of materiality." *PCCA I*, 664 F. Supp. 3d at 751 (cleaned up); *see also United States v. Luce*, 873 F.3d 999, 1009 (7th Cir. 2017) (materiality as a matter of law where government debarred defendant for noncompliance). In November 2014, the DOD P&T Committee unanimously recommended a prior authorization process for compound prescription claims. *See* SOF ¶ 65. Following input from the Beneficiary Advisory Panel, in March 2015, the Director of TRICARE approved enhanced electronic screening and prior authorization, effective on May 1, 2015. *See id.* Because of TRICARE's action, the number of compound claims to TRICARE declined sharply, and PCCA's sales plummeted. *See id.* ¶ 66. In short, the undisputed evidence establishes that PCCA's inflated AWPs were material to TRICARE's reimbursement of PCCA's customers' claims under all of the *Escobar* factors.

### C. PCCA Acted with Actual Knowledge, Deliberate Ignorance, or Reckless Disregard.

"The FCA applies to anyone who knowingly assists in causing the Government to pay claims grounded in fraud, without regard to whether that person had direct contractual relations

with the Government." *Aldridge*, 78 F.4th at 741.  A person acts "knowingly" with respect to information if the person "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b); *see also United States ex rel. Schutte v. SuperValu, Inc.*, 598 U.S. 739, 750 (2023).  It "require[s] no proof of specific intent to defraud[.]"  31 U.S.C. § 3729(b)(1)(B).  "In short, either actual knowledge, deliberate ignorance, or recklessness will suffice."  *SuperValu*, 598 U.S. at 750.

When "state of mind is an essential element," "it is less fashionable to grant summary judgment."  *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1265 (5th Cir. 1991).  But the "presence of an intent issue does not automatically preclude summary judgment; the case must be evaluated like any other to determine whether a genuine issue of material fact exists."  *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1326 (5th Cir. 1996).  Summary judgment is proper under the FCA where the defendants "either purposefully, or with reckless disregard to the truth or falsity of their statements, misled" the Government.  *Longhi*, 575 F.3d at 472.

Here, the undisputed record establishes that PCCA acted "knowingly" under the FCA. PCCA knew that: (1) its AWPs were highly inflated, set at "ridiculous" levels, and bore no rational relationship to its selling prices; (2) its inflated AWPs and large spreads induced customers to purchase PCCA ingredients because of their reimbursement potential; (3) its customers submitted compound claims to TRICARE seeking reimbursement based on PCCA's inflated AWPs; (4) TRICARE reimbursed PCCA's customers based on those AWPs; (5) its AWPs were material to payment because PCCA actively sought to conceal its AWP spreads; (6) manipulating and inflating AWPs would trigger red flags and bring scrutiny, audits, investigations, and enforcement

actions; and (7) manipulating and inflating AWPs was an "unsustainable" "bubble" that would burst, and a "house built on sand." *See* SOF ¶¶ 17-24; 30-35; 47-50.

This undisputed evidence establishes that PCCA acted with "actual knowledge" as to the falsity of its AWPs. *See also United States v. Bollinger Shipyards, Inc.*, 775 F.3d 255, 261 (5th Cir. 2014) ("The FCA does not require the United States to show that [defendant] knew the *correct* figure. The FCA is satisfied if the plaintiff alleges the defendant either knew that the [reported] figure was false or acted with reckless disregard of its truth or falsity."); ECF No. 224 at 6-7. But as this Court has previously explained, in *SuperValu,* the Supreme Court "clarified that FCA liability is not cabined to those with 'actual knowledge' that their claims are false." *United States ex rel. Montcrieff v. Peripheral Vascular Assocs.*, SA-17-CV-00317-XR, 2024 WL 390091, at * 4 (W.D. Tex. Jan. 30, 2024). "It also covers those who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity as well as those who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyways." *Id.* And as further noted by the Court, *SuperValu* "did not foreclose the application of an objective form of recklessness in FCA cases. . . . That is, in some civil contexts, a defendant may be called 'reckless' for acting in the face of an unjustifiably high risk of illegality that was so obvious that it should have been known, even if the defendant was not actually conscious of that risk." *Id.*

Here, PCCA acted with "reckless disregard" or deliberate ignorance as to the truth or falsity of its inflated AWPs and kickback scheme. Specifically, the record establishes that PCCA's senior management was "conscious of a substantial and unjustifiable risk" that its AWPs would be highly inflated—approaching the levels of a competitor it viewed as a "bad actor"—yet increased them anyways and continued to do so annually thereafter. The record further establishes that PCCA

was "objectively reckless" because it inflated its AWPs and marketed the spread in the face of an "unjustifiably high risk of illegality that was so obvious that it should have been known" even if PCCA "was not actually conscious of that risk." *See* SOF ¶¶ 21-25; 30-35. As this Court observed, "the 2003 OIG Guidance put PCCA on notice that its actions were illegal," *PCCA I*, 664 F. Supp. 3d at 749 (cleaned up), and that the Government considered AWP manipulation material to its payment decisions and strong evidence of an AKS violation. Yet the record establishes that PCCA manipulated its AWPs and marketed the resulting large spreads to induce sales of its products.

Thus, as a matter of law, PCCA acted with actual knowledge, deliberate ignorance, or reckless disregard. *See United States ex rel. Drummond v. BestCare Lab. Servs., L.L.C.*, 950 F.3d 277, 281 (5th Cir. 2020) (affirming summary judgment on scienter where defendants were clearly billing for services not rendered, and no reasonable interpretation of regulatory guidance could support the defendants' position); *Longhi*, 575 F.3d at 471 (defendants "either purposefully, or with reckless disregard to the truth or the falsity of their statements, misled" the Government "into believing" certain statements in defendants' grant proposals); *Montcrieff*, 507 F. Supp. 3d at 771 (granting summary judgment on scienter because "Relators have proffered evidence demonstrating that PVA knew"—or at least acted with deliberate ignorance or reckless disregard—"that it was submitting claims for reimbursement to Medicare when it had not fully furnished the services it certified it had completed.").

### D. PCCA Proximately Caused the Government to Pay Out Money.

The FCA "causation standard employs traditional notions of proximate causation to determine whether there is a sufficient nexus between the conduct of the party and the ultimate presentation of the false claim." *Aldridge*, 78 F.4th at 741 (cleaned up). Proximate cause is a "flexible concept[]" that is "often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct[.]" *United States v. Hodge*, 933 F.3d 468, 475 (5th Cir. 2019)

(quoting *Paroline v. United States*, 572 U.S. 434, 444-45 (2014)).  "Such nexus merely demands more than mere passive acquiescence in the presentation of the claim and some sort of affirmative act that causes or assists the presentation of a false claim." *Aldridge*, 78 F.4th at 741 (cleaned up); *see also Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1107 (11th Cir. 2020) ("[D]efendant's conduct may be found to have caused the submission of a claim . . . if the conduct was (1) a substantial factor in inducing providers to submit claims for reimbursement, and (2) if the submission of claims for reimbursement was reasonably foreseeable or anticipated as a natural consequence of defendants' conduct." (cleaned up)). [10]

The Statement of Undisputed Material Facts above as well as the Government's Opposition to PCCA's Motion for Summary Judgment on Lack of Proof of Causation and Damages (ECF No. 160) provide "ample evidence of proximate cause."  ECF No. 219 at 17.  That evidence shows that PCCA's actions were (1) a substantial factor in causing its customers to submit inflated claims to TRICARE; and (2) the submission of claims to TRICARE was reasonably foreseeable or anticipated as the natural consequence of PCCA's actions.  The undisputed evidence in the record provides extensive detail of PCCA's fraudulent AWP pricing and marketing scheme; its efforts to assist its customers to submit compound claims based on its AWPs; and its educational seminars teaching customers how to "work the spread" to get the "widest spread possible."  SOF ¶¶ 16-27, 36-53.  These "affirmative act[s]" by PCCA caused its pharmacy customers to submit fraudulently inflated claims for reimbursement to TRICARE.  *See Aldridge*, 78 F.4th at 741.  PCCA's efforts fueled a rapid increase in the submission of compound prescription claims to TRICARE containing

---

[10]  Further, parties to a kickback arrangement are liable for causing the submission of claims that were a foreseeable consequence of the arrangement.  *E.g.*, *United States ex rel. Freedman v. Suarez-Hoyos*, No. 8:04-cv-933-T-24 EAJ, 2012 WL 4344199, at *8 (M.D. Fla. Sept. 21, 2012); *see also Greenfield*, 880 F.3d at 97 (neither the AKS nor the FCA requires showing "that a kickback directly influenced a . . . decision to use a particular" provider).

PCCA ingredients with inflated AWPs. *See id.* ¶¶ 56-58. The record establishes that pharmacies submitted and obtained TRICARE payment for more than 940,000 compound claims containing one or more PCCA products. The Government is seeking damages for 129,975 claims submitted by pharmacies using the code for and amounts reflecting PCCA's AWPs. This is more than sufficient to satisfy the FCA's causation standard as a matter of law. *See Mylan*, 608 F. Supp. 2d at 145; *see also In re Pharm. Indus. AWP Litig.*, 478 F. Supp. 2d at 175 ("reasonable and foreseeable" that overpayments would result from false AWP reporting). Significantly, the Court has already denied PCCA's motion for summary judgment on causation and damages. In so doing, the Court carefully considered the evidence cited by PCCA and concluded that "PCCA has failed to shift its burden to the Government to identify a fact issue as to causation." ECF No. 219 at 16. "As the Court has explained, the evidence cited in PCCA's motion does not 'negate' the existence of the causation element." *Id.* at 17. The Court should grant summary judgment to the Government on causation.

## IV.    The Government Suffered Damages.

Under the FCA, the Government is entitled to recover the full value of paid claims tainted by kickbacks. *See* ECF No. 219 at 19 ("This Court has held that where claims to federal health care programs are tainted by underlying AKS violations, the measure of damages is the full amount paid on the ineligible claims." (cleaned up)); *see also United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) ("The government offers a subsidy (from the patients' perspective, a form of insurance), with conditions. When the conditions are not satisfied, nothing is due."). Accordingly, the Government is entitled to the full value of the amounts TRICARE paid for the 129,975 claims tainted by PCCA's kickbacks under the "Tainted Claim" theory—$768,950,067. *See* SOF ¶ 60. Nevertheless, for purposes of summary judgment only, the government seeks only the full amount TRICARE paid for the relevant PCCA products under the "Tainted Product" theory. *See U.S. ex*

*rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 406 (4th Cir. 2013) (plaintiff has discretion to take voluntary remittitur). For the 129,975 claims at issue, TRICARE paid $385,002,776 for the 13 PCCA products. *See* SOF ¶ 60. PCCA's experts have not disputed the number of claims and the figures associated with those claims. *See* ECF No. 224 at 9-10.

Alternatively, the Government is entitled to damages under its "Excess Reimbursement" theory reflecting the difference between what TRICARE paid based on PCCA's inflated AWPs and what TRICARE would have paid if PCCA's AWPs had not been inflated. Hines used the "maximum" value of "Reasonable AWPs" as defined in Dr. Saha's report as the basis for what TRICARE would have paid if PCCA's AWPs had not been inflated. Ex. 7, Hines Rep. at 32. The use of this measure of "reasonable AWPs" is just one of a series of "conservative" assumptions Hines applied that tended to lower his calculation of damages in this case. For the 129,975 claims at issue, Hines calculated damages under the "Excess Reimbursement" theory ranging from $333,583,192 to $357,478,849 for the 13 relevant products. *See* SOF ¶ 60. None of PCCA's experts have challenged Hines' calculations or identified any flaws in Hines' methodology. These damages are subject to mandatory trebling under the FCA, plus statutory penalties.[11]

## CONCLUSION

For the foregoing reasons, the Court should grant the Government's Motion for Partial Summary Judgment on the FCA elements of falsity, materiality, knowledge, and causation. The Court should also grant judgment for the Government on damages under the AKS and FCA.

---

[11] The Government is also entitled to statutory penalties, *see United States v. Bornstein*, 423 U.S. 303, 313 (1976), but is not moving at this time for a specific number of statutory penalties. "The appropriate number of statutory penalties is a question for another day." ECF No. 219 at 16.

DATED:  May 20, 2024

Respectfully submitted,

JAIME ESPARZA
United States Attorney
Western District of Texas

MICHAEL D. GRANSTON
Deputy Assistant Attorney General
Civil Division

*/s/ Mary F. Kruger*
MARY F. KRUGER
Georgia Bar No. 6282540
Assistant United States Attorney
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216
Tel: (210) 384-7630
Fax: (210) 384-7322
mkruger@usa.doj.gov

*/s/ Sanjay Bhambhani*
JAMIE ANN YAVELBERG
NATALIE A. WAITES
SANJAY BHAMBHANI
DANIELLE L. SGRO
NATHAN GREEN
JOHN M. DECK
F. ELIAS BOUJAOUDE
Attorneys, Civil Division
Commercial Litigation Branch
Post Office Box 261
Ben Franklin Station
Washington, D.C.  20044
Tel: (202) 305-0546
sanjay.bhambhani@usdoj.gov

*Attorneys for the United States*

## CERTIFICATE OF SERVICE

I certify that, on May 20, 2024, I served the foregoing document via CM/ECF on all counsel of record registered to receive CM/ECF notifications.

*/s/ John M. Deck*
JOHN M. DECK