IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> *ex rel.* PETER HUESEMAN, ) <br> ) <br> Plaintiff, ) <br> ) SA-14-CA-212-XR <br> v. ) <br> ) <br> PROFESSIONAL COMPOUNDING ) <br> CENTERS OF AMERICA, INC., ) <br> ) <br> ) <br> Defendant. ) | |

**UNITED STATES' NOTICE OF SUPPLEMENTAL AUTHORITY**

In *United States ex rel. Montcrief v. Peripheral Vascular Associates, P.A.*, No. 24-50176, 2025 WL 939890, at *5-8, --F.4th --, (5th Cir. Mar. 28, 2025) ("*Montcrief*"), the Fifth Circuit affirmed this Court's grant of summary judgment on falsity and knowledge of falsity as to certain claims under the FCA. *Montcrief* supports the government's pending motion for partial summary judgment on those same elements. *See* ECF No. 230 at 47-53, 59-62; ECF No. 244 at 2-15.

**I.   The Fifth Circuit Affirmed this Court in Relevant Part.**

In *Montcrief*, the relators alleged that a vascular surgery practice—Peripheral Vascular Associates, P.A. ("PVA")—"billed Medicare for vascular ultrasound services that PVA had not yet completed." 2025 WL 939890, at *1.[1] The relators alleged two categories of false claims: the "Testing Only" claims and the "Double Billing" claims. *Id.* The Testing Only claims "were for vascular ultrasounds performed [by PVA] on patients who did not see a [PVA] doctor, i.e., they

---

[1] Vascular ultrasounds have two components: a technical component (i.e., a technician performing the ultrasound) and a professional component (i.e., a physician reading and interpreting the results of the ultrasound). *Montcrief*, 2025 WL 939890 at *1.

1

did not receive an E/M visit, and no data was entered into" the electronic medical record system (called Allscripts) "for these patients." *Id*. at *2. "[A]t least some of these claims were submitted to Medicare before a doctor wrote and signed" a standalone written report interpreting the ultrasound in a program called MedStreaming—"the only interpretive report . . . created for patients whose claims fell into this category." *Id.* The Double Billing claims "were for services provided to patients who received E/M visits and underwent vascular ultrasounds and for whom standalone MedStreaming reports were at least sometimes not written and finalized until after PVA billed Medicare." *Id*. But "[i]t appears undisputed that Allscripts reports were created and signed before submitting these claims to Medicare[.]" *Id.* at *7.

The Fifth Circuit affirmed this Court's grant of summary judgment regarding the Testing Only claims on the elements of falsity and knowledge of falsity. *Id.* at *6-8; *see id*. at *5 (noting that falsity and knowledge of falsity are two essential FCA elements). As to falsity, the Fifth Circuit emphasized that "[t]he only interpretive reports created for these patients were the MedStreaming reports, which—at least as relevant here—were not finalized until *after* PVA billed Medicare." *Id*. at *6 (emphasis in original). From this fact, "the only reasonable inference is that PVA physicians failed to complete the professional components of the corresponding vascular ultrasounds before billing Medicare using 'global' CPT–4 codes, which covered both the technical and professional components." *Id*.

According to the Fifth Circuit, these circumstances presented a "'paradigmatic case' involving 'a request for reimbursement for goods or services' that had not yet been furnished." *Id.* (quoting *United States v. Sci. Apps. Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010)). "In other words," the Testing Only claims "were factually false." *Montcrief*, 2025 WL 939890 at *6 (internal quotation marks omitted); *see also id.* at *5 (noting that claims can be factually or legally

2

false). Accordingly, "it was appropriate for the district court to grant summary judgment to Relators on the falsity element with respect to the Testing Only claims." *Id.* at *6.

Next, the Fifth Circuit found no error with this Court's grant of summary judgment on the "knowledge" of falsity element with respect to the Testing Only claims. *Id.* at *8. The Fifth Circuit highlighted an email showing PVA's awareness that the studies could not be billed until interpreted. *Id*. The court also identified meeting notes indicating that PVA shifted "to billing after completion of MedStreaming reports" so as to "'[e]nsure no audit requests for incomplete medical records.'" *Id.* (alteration in original). The Fifth Circuit found this evidence to be sufficient to "show that PVA either 'intentionally avoid[ed] taking steps' to learn whether the Testing Only claims were false or took 'a substantial and unjustifiable risk' that they may have been false." *Id.* at *8 (quoting *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 751 (2023)) (alteration in original). Citing *Schutte*, the Fifth Circuit further noted that ambiguity did not preclude the defendant from learning the correct meaning of somewhat ambiguous terms or at least becoming aware of a substantial likelihood of the terms' correct meaning. *See Montcrief*, 2025 WL 939890 at *8.

In contrast, the Fifth Circuit reversed this Court's grant of summary judgment regarding the Double Billing claims on the elements of falsity and knowledge of falsity. *Id.* at *7-8. As to falsity, the Fifth Circuit framed the question as whether "the CPT–4 Manual . . . required PVA to generate a separate MedStreaming report before billing[]" in addition to the Allscripts report in the patient's medical record. *Id*. at *7. There was a fact issue, according to the Fifth Circuit, because the CPT–4 Manual was "ambiguous with respect to whether the section of an Allscripts report dedicated to interpreting a patient's ultrasound can serve as a 'separate distinctly identifiable

3

signed written report,' even if it is attached to the rest of the relevant patient's medical record." *Id*.; *see also id*. (language was not clear "beyond peradventure").

As to knowledge of falsity, the Fifth Circuit noted that the relators' evidence was "not as strong . . . with respect to the Double Billing claims." *Id*. at *8. The evidence did not establish that PVA was "aware that ultrasound interpretations reported in Allscripts (as opposed to MedStreaming) might not be sufficiently 'separate[ly] [and] distinctly identifiable' such that they may not serve as predicates for global ultrasound bills." *Id*. (alteration in original). And "the record here does not even make clear that" the CPT–4 Manual language "means what Relators say it means." *Id*. Accordingly, the Fifth Circuit held that a jury should decide the issues of falsity and knowledge of falsity with respect to the Double Billing claims. *Id.* at *8, nn. 5 & 6.[2]

## II.   *Montcrief* Supports Summary Judgment Here on Falsity and Knowledge of Falsity.

Just like the Testing Only claims in *Montcrief*, summary judgment is proper here because the government has established beyond peradventure the elements of falsity and knowledge of falsity. *See* ECF No. 230 at 47-53, 59-62; ECF No. ECF No. 244 at 2-15.[3]

The Fifth Circuit found the Testing Only claims to be factually false because the defendant submitted these claims to Medicare for services that had not yet been furnished. *See Montcrief*, 2025 WL 939890 at *6. Similarly, here, PCCA's AWPs were factually false because they were fictitious numbers that bore no rational relationship to any actual selling prices. *See United States ex rel. Hueseman v. Pro. Compounding Ctrs. of Am., Inc.*, 664 F. Supp. 3d 722, 742-43 ("[w]hen

---

[2] The Fifth Circuit made several other holdings including that: (1) there was sufficient evidence to support the jury's finding of materiality; (2) the scienter requirement did not extend to the materiality element in this case; and (3) a new trial on damages was necessary. *See Montcrief*, 2025 WL 939890 at *8-10.

[3] As the government has previously explained, summary judgment is also proper on FCA materiality and causation, the elements of the Anti-Kickback Statute, the number of claims, and damages. *See* ECF No. 230 at 1-4; ECF No. 244 at 1-2.

AWPs are fictious numbers bearing no rational relationship to any actual price, they are false or fraudulent"); *see also* ECF No. 224 at 7; ECF No. 230 at 48-50. For the 13 products at issue, PCCA's AWPs were marked up from about 1,100% to 43,000% over their respective selling prices. *See id*. PCCA's AWPs were made up numbers that were vastly higher than the markups typically associated with pharmacy reimbursements over pharmacy acquisition costs, which ranged from 43% to 167%. *See id*. PCCA has offered no contrary evidence to dispute the government's evidence or figures on this point. *See id.* at 49; ECF No. 244 at 3-8.

In addition, the government established beyond peradventure that PCCA engaged in a fraudulent course of conduct that caused TRICARE to pay inflated amounts for compound claims with PCCA's products by, among other things, reporting its false AWPs. *See* ECF No. 230 at 52-53. And PCCA's AWPs were actionable misrepresentations under *Universal Health Services, Inc., v. United States ex rel. Escobar*, 579 U.S. 176, 187-88 (2016), because they omitted critical qualifying information like the fact that they were marked up thousands of percent over actual selling prices to increase customer's profits. *See* ECF No. 230 at 50-51.

Furthermore, the government established beyond peradventure legal falsity because PCCA caused the submission of claims to TRICARE that impliedly and falsely certified compliance with material statutory, regulatory, and contractual requirements: namely, fraud and abuse regulations prohibiting excessive and unreasonable charges to TRICARE; and requirements that compound claims not be submitted for amounts in excess of acquisition costs plus a reasonable markup. *See id*. at 9-10, 52-53.

As to knowledge of falsity, the defendant in *Montcrief* was at least conscious of a substantial and unjustifiable risk that its claims were false, where the evidence showed awareness that the studies could not be billed until interpreted and a shift in policy away from billing early to

avoid audit requests. 2025 WL 939890 at *8. In this case, the evidence is even stronger. The government compiled an extensive record consisting of sworn testimony from PCCA's own senior executives and officials, its own documents, and its own admissions. *See* ECF No. 230 at 59-62. That evidence showed, among other things:

- PCCA's senior management discussed the risks of inflating its AWPs at a meeting in March 2012, and most were opposed due in part to concerns over greater third-party payor scrutiny and reimbursement cutoff. *Id*. at 13.

- PCCA's President overruled internal opposition and approved AWP increases to compete with a competitor's high AWPs despite "red flags" identified by other members of senior management. *See id*. at 13-14.

- PCCA abandoned its historical formula of 3.5 times selling prices in March 2012 and deliberately and consciously inflated its AWPs to between 12 and 430 times the actual selling price of its ingredients. *See id*. at 14-17; ECF No. 242 at 15, 17, 28, 57; ECF No. 244 at 10.

- PCCA knew its inflated AWPs were false because it knew they bore no rational relationship to its selling prices. ECF No. 230 at 60-62; ECF No. 244 at 10-13.

- PCCA knew that TRICARE reimbursed for its products based on AWPs and its customers valued high AWPs and knew that the higher the AWP it set, the greater the reimbursement to the pharmacy. ECF No. 230 at 10-13

- PCCA knew that inflating AWPs was risky, unsustainable and would raise red flags with payors, who would and did initiate audits to stop payments. *See id*. at 19-21.

- PCCA knew that if auditors could compare PCCA's AWPs with actual selling prices, auditors might discontinue coverage or lower reimbursement payments. *See id*. at 27-28. Accordingly, when its customers faced audits, PCCA advised its customers to conceal its selling prices because "[t]hat is a disaster waiting to happen[]" and "may create major issues for the Pharmacy." *See id*. at 27-29.

- PCCA knew its high AWPs could subject it to government enforcement action. *See id*. at 21.

- PCCA was on notice that HHS-OIG viewed a company's manipulation and inflation of AWPs to induce the purchase of its products to be illegal under the Anti-Kickback Statute. *See id*. at 10.

- And PCCA knew that its record sales and profits (at least in part) were attributable to its customers submitting compound prescription claims to TRICARE. *See id*. at 30-31, 36.

6

This evidence establishes beyond peradventure that PCCA had actual knowledge that its AWPs were false, inflated by thousands of percent, and bore no rational relationship to actual selling price. *See* ECF No. 230 at 59-62. At the very least, it establishes that PCCA was conscious of a substantial and unjustifiable risk that its AWPs were false. *See Montcrief*, 2025 WL 939890 at *8. *Montcrief* also reaffirms that establishing scienter under the FCA requires knowledge of falsity—not knowledge of illegality. *See id*. at *5. Any argument by PCCA that it believed its conduct was not unlawful or illegal is immaterial where, as here, the unrebutted evidence shows actual knowledge, deliberate ignorance, or reckless disregard as to the truth or falsity of its AWPs. Accordingly, *Montcrief* supports summary judgment on the knowledge of falsity element as well.[4]

## CONCLUSION

For all of these reasons and those stated in prior briefing and argument, the Court should grant the government's motion for partial summary judgment.

---

[4] The present case is unlike the Double Billing claims in *Montcrief*. The falsity question for the Double Billing claims turned on the meaning of the CPT–4 Manual, which was ambiguous. The falsity question here turns on whether the AWPs bore a rational relationship to selling prices, which they indisputably did not. And the evidence did not establish beyond peradventure that PVA knew the Double Billing claims were false. Here, the evidence establishes PCCA's scienter.

Dated: April 4, 2025

Respectfully submitted,

| | |
|---|---|
| MARGARET F. LEACHMAN<br>Acting United States Attorney<br>Western District of Texas | YAAKOV M. ROTH<br>Acting Assistant Attorney General<br>Civil Division |
| */s/ Mary F. Kruger*<br>MARY F. KRUGER<br>Assistant United States Attorney<br>Georgia Bar No. 6282540<br>601 N.W. Loop 410, Suite 600<br>San Antonio, Texas 78216<br>Tel: (210) 384-7360<br>Fax: (210) 384-7322 | */s/ Sanjay M. Bhambhani*<br>JAMIE A. YAVELBERG<br>NATALIE A. WAITES<br>SANJAY M. BHAMBHANI<br>NATHAN P. GREEN<br>JOHN M. DECK<br>F. ELIAS BOUJAOUDE<br>Attorneys, Civil Division<br>Commercial Litigation Branch<br>U.S. Department of Justice<br>Post Office Box 261<br>Ben Franklin Station<br>Washington, D.C. 20044<br>Tel: (202) 305-0546<br>sanjay.bhambhani@usdoj.gov |

*Attorneys for the United States of America*

### CERTIFICATE OF SERVICE

I certify that, on April 4, 2025, I served the foregoing document via CM/ECF on all counsel of record registered to receive CM/ECF notifications.

*/s/ John M. Deck*
JOHN M. DECK